1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

---

UNITED STATES OF AMERICA,          Case No. 2:20-CR-52-DCN

       Plaintiff,

   vs.                             Coeur d'Alene, Idaho
                                  August 3, 2022
 TRINA MARIE WELCH,                  9:23 a.m.

       Defendant.

---

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

BEFORE THE HONORABLE DAVID C. NYE
CHIEF UNITED STATES DISTRICT COURT JUDGE

---

APPEARANCES:

For the Plaintiff:      MR. KEVIN T. MALONEY
                        United States Attorney's Office
                        1290 West Myrtle Street, Suite 500
                        Boise, Idaho  83702

For the Defendant:      MR. JOHN STEPHEN ROBERTS, JR.
                        MS. AMY RUBIN
                        Federal Defenders of Eastern
                            Washington and Idaho
                        10 North Post Street
                        Spokane, Washington  99201


Court Reporter:         MS. ANNE BOWLINE, RMR, CRR
                        Anne_Bowline@id.uscourts.gov


*Proceedings recorded by stenography.  Transcript produced by computer-aided transcription.*

2

<u>I N D E X</u>

OPENING STATEMENTS                                          PAGE

    Mr. Maloney                                             9


GOVERNMENT'S WITNESS                                        PAGE

BRYANT GUNNERSON
    Direct Examination by Mr. Maloney                      10
    Cross-Examination by Ms. Rubin                         56
    Redirect Examination by Mr. Maloney                    65


    GOVERNMENT'S
      EXHIBITS                        IDENTIFIED   RECEIVED

| GOVERNMENT'S EXHIBITS | IDENTIFIED | RECEIVED |
|---|---|---|
| 1 | 13 | 56 |
| 2 | 16 | 16 |
| 3 | 19 | 56 |
| 4 | 55 | 55 |
| 5 | 22 | 23 |
| 6 | 25 | 25 |
| 7 | 28 | 29 |
| 8 | 31 | 32 |
| 9 | 33 | 36 |
| 10 | 38 | 56 |
| 11 | 40 | 40 |
| 12 | 43 | 45 |
| 13 | 48 | 48 |
| 14 | 51 | 51 |
| 15 | 52 | 54 |

1        (Proceedings commenced at 9:23 a.m., August 3, 2022.)

2            THE COURTROOM DEPUTY:  The Court will now hear the

3    evidentiary hearing in United States of America versus Trina

4    Marie Welch, Case Number 2:20-CR-52-DCN.

5            Counsel, beginning with the Government, please state

6    your appearance.

7            MR. MALONEY:  Good morning, Your Honor.  Kevin

8    Maloney for the United States.  With me at counsel table I

9    have Special Agent Bryant Gunnerson of the FBI.

10           THE COURT:  Thank you.

11           MS. RUBIN:  Good morning, Your Honor.  Amy Rubin and

12   Steve Roberts with the Federal Defenders on behalf of

13   Ms. Welch, who is seated beside me at counsel table.

14           THE COURT:  Thank you.  All right.  We are here

15   today -- this hearing is to determine -- just a minute.  This

16   microphone's not where I like it.  All right.  This hearing's

17   to determine the basic guideline level -- well, the guideline

18   loss in order to determine the guideline level.  It's not to

19   determine restitution or forfeiture.  That'll be determined

20   later.

21           As I understand it, we're dealing with a dispute over

22   two offense levels.  It goes up by 18 points if there's

23   $3.5 million or more involved; it goes up by 16 points if it's

24   between 1.5 and 3.5.  The burden's on the Government to

25   determine the loss level, so I will let them go first.

1          Before they testify, I need to put on the record that

2    I did have an ex parte communication this morning with defense

3    counsel.  There are some unforeseen circumstances that have

4    arisen.  Defendant cannot decide whether she wants to testify

5    or what she will testify to until there's been communication

6    between defense counsel and the lead criminal U.S. Attorney on

7    this matter, who I understand is not available this week.

8          So in the interests of justice, I'm going to let the

9    Government put on all of their evidence, and I'm going to

10   postpone the case in chief for the -- of the defendant, but I

11   am not going to postpone sentencing.  So we're going to have

12   this done before sentencing.

13         With that, you may proceed.  And I don't know if you

14   want to make an opening statement or go straight to witnesses.

15   That's up to you.

16         MR. MALONEY:  Thank you, Your Honor.  I'll make a

17   brief opening statement if the Court will allow.  I'm going to

18   try to stretch my equipment to the podium.  I think it's going

19   to make it.

20          Your Honor, as a preliminary matter, on the notion

21   of splitting the hearing between the Government's presentation

22   and the defense presentation, I think it's important to note

23   that the victim is present in the courtroom.  Mr. Keith Sims

24   is back here in the audience.  I've informed him of his

25   victim's rights, his right to be consulted and to make a

1     statement.  He probably will want to make a statement to the

2     Court at the end of this hearing.  He's prepared something in

3     writing.  I've told him that it is his option whether he wants

4     to submit that in writing or actually stand up and read it to

5     the Court.  He did initially a fairly long statement, and we

6     asked him to cut that back if he was going to read it to the

7     Court.  So if he does read it to the Court, it will be fairly

8     brief.

9               It will not be in the nature of testimony.  I will

10    not be asking him questions.  I do not intend to call him as a

11    witness.  It's just a submission under the Victims' Rights Act

12    for the Court's consideration in determining the loss amount.

13              MR. ROBERTS:  Your Honor, may I clarify for one

14    second?

15              THE COURT:  Yes.

16              MR. ROBERTS:  If Mr. Sims is going to read a

17    statement -- and as Mr. Maloney represents, that's his right

18    under the Crime Victims' Rights Act -- is Mr. Malone then

19    suggesting that statement can be used by the Court to

20    determine the loss amount?  That's what I'm hearing.  And if

21    so, I think the defense standpoint needs to be Mr. Sims needs

22    to testify under oath.

23              And I would remind this Court that not only does the

24    Government have the burden to prove the loss in this case, but

25    it's by clear and convincing evidence because of the amount of

6

1    the guideline swing.

2              THE COURT:  Counsel.

3              MR. MALONEY:  Your Honor, the Government disagrees.

4    The victim under the Victims' Rights Act has a right to be

5    heard at every public hearing and to comment on every aspect

6    of sentencing.  Part of sentencing is loss.  He's not going to

7    do an accounting per se.  He's not going to go through the 341

8    checks like the Government is.  He's going to describe to the

9    Court the impact on him and his business and his interactions

10   with Ms. Welch during the time that she was stealing all this

11   money from him.

12             I suppose the Court can take the statement and, since

13   this hearing apparently is going to be split, decide what it

14   wants to do with it and inform us.  If the Court decides that

15   the statement is overly testimonial, it can inform the

16   parties.  But I think the Court will find that the statement

17   fits squarely within the Victims' Rights Act.

18             THE COURT:  The only question I have is -- he

19   certainly has the right to do that.  The only question I have

20   is, why do it today instead of at sentencing?

21             MR. MALONEY:  Well, Your Honor, this of course was

22   supposed to be a full submission of the loss amount, and it's

23   the Government's position that it's important that the Court

24   understand the impact of that loss on the victim and the

25   victim company in considering the loss amount.

1          And frankly, Your Honor, the Victims' Rights Act

2    gives him that right, period.  It gives him the right to speak

3    at every public hearing.  He's waited here for this case to

4    come before the Court.  He's waited years for this loss amount

5    to be addressed.  Apparently he's going to have to wait a

6    little longer, which is news to him today.  And that's

7    unfortunate, but it doesn't change the fact that under the

8    Victims' Rights Act --

9          THE COURT:  Are you telling me that you didn't know

10   this was going to be split?

11         MR. MALONEY:  We spoke with the defense yesterday,

12   and as far as I knew, Ms. Welch was going to take the stand

13   today, or at least that was the plan.  I mean, I certainly

14   understood that she had the right to change her mind and not

15   take the stand.  But it was not my understanding that the

16   hearing would be split to a different day.

17         THE COURT:  Well, you understand there are Rules of

18   Professional Conduct that come into play at some of these

19   hearings sometimes too that change things.

20         MR. MALONEY:  Sure.  I understand that the Court had

21   an ex parte communication, and I wasn't privy to that.  I

22   don't know what the reasoning is necessarily for the split.  I

23   mean, I can sort of infer it.  You know, and Ms. Whelan --

24         THE COURT:  It was represented to me that you had

25   been contacted about the problem.

1     MR. MALONEY:  I had been contacted that there were

2  concerns on the defense side about how the Government would

3  react to the defendant's testimony, and I think those are

4  legitimate concerns.  I think the defendant takes substantial

5  risk --

6     THE COURT:  And you knew Ms. Whelan's not available

7  to talk to about it; right?

8     MR. MALONEY:  I mean, I emailed with her yesterday on

9  other topics, so I -- whether -- she's not working, Your

10 Honor.  That's true.  She is not in the office.  She's not in

11 town.  I have her cell phone number, but I didn't try to reach

12 out to her on this specific issue.  I did send her an email

13 and told her that we had communications and there were issues,

14 but, yeah, it's --

15    THE COURT:  Well, we're wasting our time here.

16    MR. MALONEY:  I don't mean to belittle the Court's

17 decision or argue against it.

18    THE COURT:  It sure sounds like you are.

19    MR. MALONEY:  I'm sorry, Your Honor.  I don't mean

20 that at all.

21    THE COURT:  I have no problem with you putting on

22 your witnesses.  I have no problem with the victim giving a

23 statement today.  I'm not sure the purpose of doing it today

24 as opposed to at sentencing, but I understand he has that

25 right, and I'm going to let him do it.  Depending on what is

1  said, there may have to be some follow-up if we have a later

2  hearing where he can be cross-examined.  But that's going

3  to -- I can't make that call now because I have no idea what

4  he's going to say.

5             MR. MALONEY:  I understand that, Your Honor.

6             THE COURT:  So we'll proceed to that point.

7             MR. MALONEY:  Okay.  I appreciate that.

8             THE COURT:  And I know I interrupted your opening

9  statement.  Go ahead and make that if you want to.

10            MR. MALONEY:  Thank you, Your Honor.  I just want to

11  outline for the Court the plan from the Government today.

12  We're going to do -- well, as the Court knows, we entered 343

13  checks into evidence under seal.  We appreciate the Court

14  entering an order to seal those checks.  Those are the basis

15  of the loss amount that the Government will determine at this

16  hearing.

17            In order to determine that loss amount, we're going

18  to walk through the scheme, the nature of the scheme, the

19  nature of the admissions made.  We're going to examine a

20  couple of the checks but certainly not all of them, Your

21  Honor, and then we'll work from those examples to the full

22  list that adds up to the loss amount.  So Special Agent

23  Gunnerson is going to testify his way through those exhibits,

24  and our intent is to give the Court a picture of how we

25  calculated the loss amount without having to go into the

1    nitty-gritty detail of each check.

2            So with that, Your Honor, I suppose the Court maybe

3    wants to give the defense an opportunity for an opening

4    statement but --

5            THE COURT:  They can do it now or postpone it or not

6    give one.

7            MS. RUBIN:  We'll reserve, Your Honor.  Thank you.

8            THE COURT:  Then you may call your witness.

9            MR. MALONEY:  Thank you, Your Honor.  The Government

10   calls Special Agent Bryant Gunnerson.

11       (The witness was sworn.)

12           THE COURT:  You know I probably should have said this

13   when I first walked in, but there is no mask mandate in this

14   courthouse.  If anybody wants to wear a mask of their own free

15   choice, they're welcome to do so, but I'm not requiring it.

16           Go ahead.

17           MR. MALONEY:  Thank you, Your Honor.

18                   BRYANT GUNNERSON, GOVERNMENT'S WITNESS

19                        DIRECT EXAMINATION

20   BY MR. MALONEY:

21   Q.  Good morning, sir.  Please tell us your name and spell

22   your last name for the record.

23   A.  Bryant Gunnerson, G-U-N-N-E-R-S-O-N.

24   Q.  Where do you work, and what is your role there?

25   A.  I am a special agent with the FBI and basically

1    investigate white collar crimes, from frauds, embezzlements,

2    public corruption, civil rights.

3    Q.  Could you describe, please, a little bit about your

4    background as it's relevant to this investigation.

5    A.  Yes.  I graduated from college with a master's in

6    accounting.  Shortly after graduation I sat and passed the CPA

7    exam.  I currently am not a licensed CPA, but I believe it was

8    in 2019 I sat and passed my Certified Fraud Examiner exam and

9    have maintained that over the last few years.  And part of the

10   maintenance of that requires a minimum of 20 hours of

11   continuing professional education each year.

12   Q.  How long have you been investigating this case of Trina

13   Welch's embezzlement from Keith Sims and Kasco of Idaho?

14   A.  I began in July of 2019.

15   Q.  I'd like to have you introduce the characters in this

16   case.  Please tell us a little bit about Keith Sims and Kasco

17   of Idaho in this case.

18   A.  Keith Sims is the owner of Kasco of Idaho.  He began his

19   business a number of years ago as an excavator.  His business

20   eventually grew, and he was -- his employees grew.  Ultimately

21   he ended up with a partner and created a second company called

22   Kasco Communications, which basically extended their work into

23   the state of Washington.  A number of years ago that

24   partnership eroded, and he now currently works in the state of

25   Idaho under Kasco of Idaho.  His main business right now is

Gunnerson - Direct by Mr. Maloney                    12

1   basically putting up cell towers throughout the area.

2   Q.   Thank you.  And you mentioned Kasco of Idaho and Kasco

3   Communications.  The Court might notice that some of the

4   checks submitted were from Kasco of Idaho's account versus

5   others from Kasco Communications' account.  What's the

6   difference between those two?

7   A.   The two basically -- Kasco of Idaho was Keith's company,

8   and when he partnered with his partner to create Kasco

9   Communications, it was basically another entity that was being

10  operated, and they had separate bank accounts.

11  Q.   Describe Trina Welch's role at Kasco of Idaho.

12  A.   Trina came to work for Kasco of Idaho as a bookkeeper, I

13  believe it was in the 2012 time frame, and basically helped

14  Keith to manage the -- and run the business side of the

15  company.

16  Q.   To your knowledge, is she an accountant or otherwise have

17  a college-level business degree?

18  A.   No, she does not.

19  Q.   Does she have a prior conviction for fraud?

20  A.   Yes, she does.

21  Q.   Where did that conviction arise?

22  A.   It was a bank fraud out of the state of Montana.

23  Q.   Are you familiar with the fraud scheme to which Trina

24  Welch pled guilty?

25  A.   Yes, I am.

1  Q.  Have you reviewed the plea agreement and the factual

2  basis?

3  A.  Yes, I have.

4  Q.  I just want to walk through a couple elements of the plea

5  agreement to support your calculations of the loss amount.  Do

6  you recognize what's been put before you as Government's

7  Exhibit Number 1?

8  A.  Yes, I do.

9  Q.  Is that the plea agreement that was filed in this case?

10 A.  Yes, it is.

11 Q.  Based upon the admissions in the plea agreement, how long

12 does it say that Trina Welch worked for Kasco of Idaho?

13 A.  From 2012 to July of 2019.

14 Q.  And what was the length of the scheme that Trina Welch

15 admitted in her plea agreement?  What were those years?

16 A.  It began at least in 2013 and was terminated in 2019, in

17 July.

18 Q.  So did you use those dates in computing the loss amount in

19 this case?

20 A.  Yes, I did.

21 Q.  What was the primary method she used to embezzle from

22 Kasco of Idaho?

23 A.  She drafted checks on the bank accounts and would use

24 those checks to pay off her credit cards and/or personal loans

25 and mortgages.

Gunnerson - Direct by Mr. Maloney                    14

1    Q.  When you say her credit card, are you talking about her

2    corporate credit cards or personal credit cards?

3    A.  Personal credit cards.

4    Q.  Did she manage to conceal that in the Kasco accounting

5    system?

6    A.  Yes, she did.

7    Q.  Generally how would she do that?

8    A.  When she entered the check, she would change the name of

9    the payee of the check to a vendor of Kasco or she would leave

10   the payee blank.  She would then over time change the bucket

11   of funds that it was hitting from from an overhead charge to

12   tax charge to personal prop- -- or business property that was

13   purchased.

14   Q.  And how many fraudulent checks did she admit to in the

15   plea agreement?

16   A.  At least 341.

17   Q.  Did you use those fraudulent checks to compute the loss

18   amount?

19   A.  Yes, I did.

20   Q.  And was that loss amount $3,674,338?

21   A.  Yes, it was.

22   Q.  Were you able to track some of that money that Trina Welch

23   stole into various expenditures?

24   A.  Yes, I was.

25   Q.  What was the nature of some of those expenditures, please?

1   A.   They were materials to build homes for her and her

2   children, cars, vacations, gambling.

3   Q.   And there above the table in the plea agreement, did

4   Ms. Welch make an admission of the amount of money she spent

5   in excess of her gross earnings in just 2017 and with only her

6   Bank of America credit card?

7   A.   Yes, she did.

8   Q.   How much in excess of her gross earnings did she run

9   through her Bank of America credit card?

10  A.   Over $930,000.

11  Q.   And based upon your review of her financial information,

12  do you know approximately how much she was making on a yearly

13  basis?

14  A.   Yeah.  She was -- it ranged -- 2019 was around 20,000, and

15  it was up to, I think, 45,000.  So between 20,000 and $45,000

16  a year.

17  Q.   And if that was her salary, what were she and her husband

18  bringing in, approximately, on a yearly basis?

19  A.   It was just over 100,000, about 75,000 to 100,000.

20  Q.   And this idea that she spent over $930,000 above her gross

21  earnings with just her Bank of America credit card, were you

22  able to document that?

23  A.   Yes.

24  Q.   In investigating this case, generally speaking, what steps

25  did you and others engage in to collect financial information?

1    Or maybe I should just ask, what did you collect and review?

2    A.  I collected bank information for Kasco of Idaho to be able

3    to identify checks.  I obtained the QuickBooks file, which is

4    the accounting system, and worked to identify where those

5    checks were in the accounting system.  I also obtained a

6    number of Trina Welch's personal credit card statements,

7    mortgage statements, and other financial documents that she

8    had.

9    Q.  Did you go through her expenditures on real estate?

10   A.  Yes, I did.

11   Q.  I want to show you what's been marked as Government's

12   Exhibit Number 2.  Do you recognize that?

13   A.  Yes, I do.

14   Q.  Generally speaking, what is it?

15   A.  It's basically kind of just a layout of the scheme that

16   Trina Welch participated in to take the money out of Kasco.

17   Q.  Would it help you to explain how this fraud scheme worked

18   to use this flowchart?

19   A.  Yes.

20        MR. MALONEY:  Your Honor, I move for the admission of

21   Government's Exhibit Number 2 for purposes of this hearing.

22        THE COURT:  Counsel?

23        MS. RUBIN:  No objection.

24        THE COURT:  Exhibit 2 is admitted.

25    (Government's Exhibit 2 received.)

1           THE COURT:  I'm assuming you're not moving for

2     Exhibit 1 because it's already in the record.

3           MR. MALONEY:  Yes, Your Honor.  Thank you.

4           THE COURT:  Okay.

5     Q.  (BY MR. MALONEY)  All right.  So let's just highlight a

6     little bit of this.  Give the Court an explanation, if you

7     would, please, of how this scheme worked.

8     A.  As I said just a minute ago, Trina Welch, who was the

9     bookkeeper and kind of running the management side of the

10    business, she was able to access Kasco's accounting system,

11    which was QuickBooks.  In there she would either use that

12    system to create a check or she would create a check outside

13    of the system.  She would enter the check into the system if

14    it was done outside the system, and then she would use those

15    fraudulent checks to pay a number of different personal

16    accounts associated with her.

17    Q.  And when you say a number of different personal accounts

18    associated with her, are those the accounts shown on the line

19    that has "Capital One" on one end and "other" on the other

20    end?

21    A.  Yes.

22    Q.  In the middle of that is the Bank of America credit card.

23    What's significant about the fact that she used a Bank of

24    America credit card versus some other bank's credit card?

25    A.  Kasco also used a Bank of America credit card, and that's

1    where their corporate credit cards were held.

2    Q.   If we talk about the majority of the money stolen in this

3    case, did the majority of it flow through that Bank of America

4    credit card?

5    A.   Yes, it did.

6    Q.   Thank you.  And as we go further down in the flowchart,

7    talk to us about where you were able to track the stolen

8    money.  Where did it end up?

9    A.   As it says here, there was gambling, and then she would

10   use her Bank of America credit card to pay other credit cards.

11   She would take cash withdrawals or she would use the credit

12   card checks to pay for purchases of property or purchases of

13   supplies to build properties.  And she also transferred some

14   money into her children's bank accounts.

15   Q.   Did you have an opportunity to review the properties

16   listed in both the indictment and the plea agreement for

17   forfeiture?

18   A.   Yes, I did.

19   Q.   And are those the real properties that you're talking

20   about in terms of the flow of stolen funds?

21   A.   Yes.

22   Q.   Give the Court just a general description, if you would,

23   of the nature of some of those properties, please.

24   A.   There's a property in Post Falls that they purchased that

25   they used as a rental.  They did a remodel on their -- on

1   Trina Welch's personal home where she resided.  She used the

2   money to help pay for the supplies that built her son's home,

3   which is just a few doors down from her current residence.

4   Q.  Was there a cabin they built in Montana?

5   A.  Yes, they did.

6   Q.  Thank you.  I'd like to turn your attention now to

7   Government's trial Exhibit Number 3.

8           MR. MALONEY:  For the record, these are the checks

9   that were submitted under seal to the Court.  Your Honor, I

10  noted in my motion to the Court that we intended to show some

11  of the checks publicly in court because showing them on the

12  screen is much less egregious than having them available

13  publicly at the clerk's office.  So if the Court doesn't

14  object, we can leave these on the screen; but if the Court

15  would prefer, we can turn the screen off.

16          THE COURT:  If I objected, I'd overrule myself.

17          MR. MALONEY:  Thank you, Your Honor.

18          THE COURT:  I'm okay with it.  Does the defense have

19  a problem with it?

20          MS. RUBIN:  No objection.

21          THE COURT:  All right.

22  Q.  (BY MR. MALONEY)  So what are we looking at here, Special

23  Agent Gunnerson?

24  A.  This is a compilation of the checks that we identified as

25  fraudulent and the -- basically we have them numbered and

1    identified where they could be found in information that we

2    provided to the defense.

3    Q.  So for each of these checks, as we scroll through them,

4    there's a little red number in the upper right-hand corner,

5    such as 114, 115, 116 sequentially.  What are those numbers?

6    A.  Those are just numbers that we assigned to each check to

7    be able to identify how many checks that there were.

8    Q.  So those are essentially numbers we used to keep track of

9    her checks?

10   A.  Yes.

11   Q.  And then below each check there's a Welch 00-something

12   number.  What do those represent?

13   A.  That's the bank's number that is on the document as to

14   where we were able to identify where the check was located.

15   Q.  Thank you.  And if you add up all these checks, would you

16   get to the loss amount that the Government alleges and that

17   was reflected in the plea agreement?

18   A.  Yes.

19   Q.  Thank you.  It may come up that in the plea agreement, it

20   says 341 checks whereas this exhibit has 343 checks.  Why is

21   that?

22   A.  There were two checks at the end that were drafted and on

23   the way out of the bank account that happened around the same

24   time that Keith Sims identified the fraud, and he was able to

25   put a stop payment on those checks.

1    Q.   Thank you.  All right.  So let's get specific with one of

2    the checks and have you explain to the Court how you traced

3    through these.  I'm going to start with check number 190 here.

4    What can you tell us about that check?

5    A.   This is a check that is associated with the account that

6    Trina Welch pled guilty to.  If you look at the check, you can

7    identify that it is coming out of the Kasco of Idaho bank

8    account up in the upper left corner.  The check is for just

9    short of $49,000.  It was drafted in October of 2017, and it

10   was made out to BOA, which during the investigation we were

11   able to identify stood for Bank of America.  And in the bottom

12   left corner is a handwritten number, and that handwritten

13   number is a credit card that is associated with a personal

14   credit card of Trina Welch.

15   Q.   And just to summarize all of that, is it fair to say that

16   this is a Kasco of Idaho business check paying nearly $49,000

17   to defendant Welch's personal credit card?

18   A.   That is correct.

19   Q.   So in reviewing this check and all the other checks that

20   are like it, what steps did you take?

21   A.   We took the check.  We looked at the Kasco of Idaho bank

22   statements to confirm that the check was actually withdrawn --

23   the funds were withdrawn from the account.  I obtained the

24   credit card statements that showed where the funds were being

25   deposited to to confirm that we could see a payment being made

1   on those checks.  I also was able to obtain and review the

2   QuickBooks files and look at how the checks were identified

3   when the accounts were reconciled and the modifications to

4   those entries over time.

5   Q.  So you mentioned the word "reconcile," and before you you

6   have Government's Exhibit Number 5, which is entitled a

7   reconciliation detail.  Please explain generally what this is

8   and how this will inform your testimony.

9   A.  This is kind of the most basic of it.  When you have a

10  bank account, you get a bank statement each month, and you can

11  then compare your bank statement to the entries that you are

12  aware of that went through, which is your reconciliation to

13  basically confirm that all the transactions going through your

14  account are transactions that you have approved to go through

15  the account.  This is --

16  Q.  Hold on one second, if you would, please.  So that's page

17  1 of Exhibit Number 5.  What's page 2?

18  A.  Page 2 is basically an audit trail.  In every accounting

19  system, every time a transaction is changed or modified, the

20  accounting system will basically keep a note or keep a trail

21  of all the changes that are occurring to those transactions.

22  Q.  Will these exhibits or this exhibit of two pages help you

23  explain what happened to that nearly $49,000 check?

24  A.  Yes.

25          MR. MALONEY:  Your Honor, I'd move for the admission

1    of Exhibit 5, please.

2              THE COURT:  Counsel?

3              MS. RUBIN:  No objection.

4              THE COURT:  Exhibit 5 is admitted.

5         (Government's Exhibit 5 received.)

6    Q.  (BY MR. MALONEY)  So what does page 1 of Exhibit 5 tell us

7    about the $49,000 check -- or the nearly $49,000 check?

8    A.  It tells us that it's -- since it's on the reconciliation

9    and it was a completed reconciliation for the October 2017

10   time frame, that this check did clear Kasco's bank account.

11   The way it's entered into the records at the time that the

12   reconciliation occurred was under the number you will

13   identify -- you will see that it says EFT.  EFT stands for

14   electronic funds transfer.  But we know that actually, in

15   fact, it was a check.  So that was modified.  The name or

16   payee on the check is left blank, so it's not identified as to

17   who that check was made out to.

18   Q.  And so when you say that was modified, you mean that

19   someone went into the accounting system and input it as an EFT

20   rather than a check?

21   A.  Yes.

22   Q.  All right.  So if we turn to page 2 of this exhibit -- let

23   me try to make it a little bigger; it might be hard -- what

24   does that tell us?

25   A.  This is the audit trail.  So this shows every time that

1   somebody went in to modify this particular transaction in the

2   accounting system.

3   Q.   And when you say somebody, can you tell who?

4   A.   Yes.   The user ID that was used was Trina Welch's ID.

5   Q.   And based upon your investigation and interview with

6   people who worked at Kasco of Idaho, was she the one primarily

7   responsible for the accounting system?

8   A.   Yes.

9   Q.   All right.   What else does this tell us?

10  A.   It tells us how the entry was originally booked at the

11  bottom line.   It shows under the account that it was basically

12  entered into the system as material costs.   And then you can

13  see over time in the last two it went from material costs and

14  it was modified to show that it was a sales tax expense and a

15  payroll tax expense, and then ultimately how it shows in the

16  records now is that it was an expense associated with a

17  purchase of material, a pickup -- or a truck.

18  Q.   In your experience investigating white collar cases and

19  fraud cases, have you had the opportunity before to look at

20  QuickBooks audit trails, reconciliations, things like that?

21  A.   Yes.

22  Q.   In your experience, is it common for people who steal

23  money to go back into the system and try to hide their tracks?

24  A.   Yes, it is.

25  Q.   I'm going to show you what's been marked as Government's

1    Exhibit Number 6.  What is this, please?

2    A.  This is a copy of the Bank of America credit card

3    statement associated with Trina Welch.

4    Q.  Will this statement help you explain where that nearly

5    $49,000 went?

6    A.  Yes.

7         MR. MALONEY:  Your Honor, I'd move for the admission

8    of Exhibit 6, please.

9         MS. RUBIN:  No objection, Your Honor.

10        THE COURT:  Exhibit 6 is admitted.

11   (Government's Exhibit 6 received.)

12   Q.  (BY MR. MALONEY)  All right.  So let's talk first about

13   what time frame this represents, please.

14   A.  It's basically October into about the first week of

15   November 2017.

16   Q.  And what account is this?

17   A.  This is Trina Welch's credit card account.  And just under

18   the date is her credit card number, which is the same number

19   that was written on -- handwritten on the check that we

20   reviewed originally.

21   Q.  Is this the number that was handwritten in the lower

22   corner of the check?

23   A.  Yes.

24   Q.  Is that a consistent theme throughout this case?

25   A.  Yes, it is.

Gunnerson - Direct by Mr. Maloney                    26

1    Q.  On most of the checks that are in Government's Exhibit

2    Number 3, is there some direction, account number, or such

3    written in the lower left-hand corner of the check?

4    A.  Yes.

5    Q.  If we turn to page 2 of this exhibit, what does this

6    section called transactions tell us?

7    A.  These are all the payments that were made to this credit

8    card during this statement period.

9    Q.  And just so we're clear, you're saying payments made to a

10   credit card versus charges on a credit card; is that right?

11   A.  That is correct.

12   Q.  And do we see the nearly $49,000 check that left Kasco of

13   Idaho?

14   A.  Yes.  It is the first line in that section.

15   Q.  So what does that tell us?

16   A.  That this -- that check was used to pay the balance down

17   on this credit card.

18   Q.  And what was the total amount paid towards this credit

19   card in this one-month period?

20   A.  Over $96,000.

21   Q.  All right.  And if we page through this credit card

22   one-month statement, what else does it show us?

23   A.  Basically it shows where she was using her credit card,

24   the different locations that she was going.  It also shows

25   underneath some of those transactions the number of cash

1  advances she took from the credit card and the amount of those

2  cash advances.

3  Q.  Before you get to those, what was her credit card spending

4  for the month that we're looking at?

5  A.  Over $25,000.

6  Q.  And you mentioned just a moment ago cash advances.  How

7  did those fit into this scheme?

8  A.  It was basically a way that she could pay off her credit

9  card.  And then she would take the funds in a cash advance,

10  and a number of them she would transfer to her checking

11  account to pay off different expenses and bills.  And then if

12  you look at the top section there, she also used the checks

13  that can be associated with credit cards and would pay her

14  other credit card accounts and/or vendors that she was paying

15  to purchase supplies for the building of homes.

16  Q.  So the $25,000 and the -- $25,011.98 was cash advances,

17  and that's in addition to the $25,568 of credit card spending;

18  is that right?

19  A.  That is correct.

20  Q.  And then the $9,909, that's also in addition and is some

21  type of those little credit card checks that you get in the

22  mail with your statement sometimes?

23  A.  That is correct.

24  Q.  In this scheme of using her credit card to funnel stolen

25  funds, did she incur transaction fees and the like?

1   A.  Yes, she did.

2   Q.  What do these look like for this particular month?

3   A.  For this month she incurred fees of $1,735.

4   Q.  What about for the year?

5   A.  For the year to date so far, she was over $23,000 in fees.

6   Q.  I'd like to turn your attention to what's been marked as

7   Government's Exhibit Number 7.  Do you recognize that?

8   A.  Yes, I do.

9   Q.  What is that?

10  A.  This is a copy of her Bank of America checking and savings

11  account statement.

12  Q.  All right.  So not to be confused with her credit card

13  account.  This is her Bank of America checking account, if you

14  will?

15  A.  That is correct.

16  Q.  How many -- is this a number of charges showing all of her

17  transactions for that particular month?

18  A.  Yes, it is.

19  Q.  Will this help you explain where the money we've been

20  looking at that was stolen from Kasco went?

21  A.  Yes.

22        MR. MALONEY:  Your Honor, I'd move for the admission

23  of Government's Exhibit 7, please.

24        MS. RUBIN:  No objection.

25        THE COURT:  Exhibit 7 is admitted.

1        (Government's Exhibit 7 received.)

2    Q.   (BY MR. MALONEY)   All right.   So if we page down here a

3    little bit -- thank you, Your Honor -- and look at deposits,

4    does that provide some information about the income that

5    Mr. and Mrs. Welch were earning during this time period?

6    A.   Yes, it does.

7    Q.   What is that information?

8    A.   The first line looks like it's a direct deposit from the

9    place of employment of Mr. Welch, and just below that, the

10   second line is her payment for her work from Kasco of Idaho.

11   Q.   Based upon your review of all the financial records, does

12   it appear that those were biweekly or twice a month type

13   payments?

14   A.   Yes.

15   Q.   And do those accord with what you stated earlier, that

16   they were making together -- were grossing somewhere around

17   100,000 a year?

18   A.   Yes.

19   Q.   And if we look in here at other deposits, do you recognize

20   any of the other deposits that were reflected in this bank

21   statement?

22   A.   Yes, I do.

23   Q.   Which ones do you recognize and why?

24   A.   The one that your arrow is on, the $5,500, that is one of

25   the bank transfers or cash advances from the credit card, and

1   you can tell that from the memo field where it identifies it

2   as CRD 7726.  Those are the last four digits of the credit

3   card number.  And then the $8,500 is a similar transaction.

4   And just below that is a $9,000 transaction which is a

5   transfer from the savings, but that also ultimately was partly

6   because of transfers from the credit card which she ended up

7   moving into savings and then moved back into checking.

8   Q.  And that number, card 7726, do you recognize that?

9   A.  Yes, I do.

10  Q.  Which card is that?

11  A.  That is a personal credit card of Trina Welch.

12  Q.  The Bank of America card that we just looked at?

13  A.  Yes.

14  Q.  All right.  Thank you.  Was this type of tracing and

15  analysis that we've been doing, is this something you did for

16  all of the 343 checks that we've been talking about?

17  A.  Yes, I did.

18  Q.  All right.  So I'd like to go through just a couple more

19  checks.  So we started out with check number 190.  Have you

20  also had an opportunity to look at check number 191?

21  A.  Yes.

22  Q.  Let's just go there for a minute.  All right.  So I have

23  in front of you page 52 of Government's Exhibit 3, which has

24  the number 191 up in the right-hand corner.  And rather than a

25  check, this is a statement from Global Credit Union.  Please

1  explain why.

2  A.  At the time, those that were helping to put this

3  particular document together, they did not have a copy of the

4  check in the set of documents that they were reviewing.  Since

5  that period of time I have -- I was able to identify where

6  that check was in our database of documents.  So that's why

7  when we put this together there was just this statement,

8  because at the time we didn't have a copy of the check.

9  Q.  All right.  And so what do we know about this $18,172?

10  A.  It's basically a check that was written out of Kasco of

11  Idaho's bank account.

12  Q.  And if we page down just a little, we have a similar

13  situation with check number 192.  What do we know about that

14  check?

15  A.  Same as the other one.  It was a check that was written on

16  the Global Credit Union account of Kasco of Idaho for just

17  under $29,000.

18  Q.  And if we were to go back to Government's Exhibit Number 5

19  and talk about reconciliations, did you go through those

20  checks and do the same type of reconciliation that you did for

21  the first check we talked about?

22  A.  Yes, I did.

23  Q.  I'd like to show you what's been marked as Government's

24  Exhibit Number 8.  What is that, please?

25  A.  It is a copy of Trina Welch's 1040 federal tax return for

1    the year 2017.

2    Q.  All right.  And what does it show as the Welches' --

3          MR. MALONEY:  And just for the Court's record, this

4    is only one page.  We didn't see any need to offer the entire

5    tax return.  We've redacted the social security numbers and

6    the children's names.  With that, I'd move to admit

7    Government's Exhibit Number 8.

8          MS. RUBIN:  No objection, Your Honor.

9          THE COURT:  Counsel, I missed it.  You probably said.

10   This is a joint tax return, isn't it?

11         MR. MALONEY:  True, Your Honor.

12         THE COURT:  Okay.  It's admitted.

13     (Government's Exhibit 8 received.)

14         MR. MALONEY:  Thank you, Your Honor.

15   Q.  (BY MR. MALONEY)  What does their tax return show as their

16   adjusted gross income in 2017?

17   A.  Just over $93,000.

18   Q.  All right.  Thank you.  During the course of your

19   investigation, did you have the opportunity to interview

20   Ms. Welch, Keith Sims, and other employees of Kasco of Idaho?

21   A.  Yes, I did.

22   Q.  Did you look at their accounting records and talk to them

23   about Ms. Welch's position?

24   A.  Yes.

25   Q.  What did they tell you about how the company was doing

1  during the time of the fraud scheme?

2  A.   From a revenue perspective, they were doing very well.

3  They landed a couple of big contracts, and business was doing

4  very well.   But from a financial perspective, the business was

5  struggling, and Keith couldn't figure out why he had business

6  but he couldn't keep money in the bank.

7  Q.   Did you have an opportunity to compare Ms. Welch's income

8  against her spending through the Bank of America account over

9  the years?

10  A.   Yes.

11  Q.   Did you prepare, with the help of others, this bar chart

12  to make that comparison?

13  A.   Yes, I did.

14  Q.   Describe generally for the Court, please, what is

15  Government's Exhibit Number 9?

16  A.   It is basically looking at all the charges that occurred

17  on the credit card for each of the years identified between

18  2015 and 2019.   It then shows -- the orange bar is what the

19  adjusted gross income was on the tax returns that we had.   And

20  if we did not have a tax return, we used the tax return of

21  Norman Welch and then added to that tax return the W-2 that

22  Trina Welch would have received from Kasco.

23  Q.   So explain to the Court, if you would, please, why we had

24  some of the tax returns initially but not all of them at the

25  end.

Gunnerson - Direct by Mr. Maloney                                    34

1   A.  When we requested documents from the taxing authorities,

2   tax returns had not been filed at the time our investigation

3   had been initiated.  And so we only got those returns that had

4   been filed at the time.

5   Q.  At the time you started the investigation?

6   A.  Yes.

7   Q.  And subsequently were you able to gather additional

8   information from Kasco of Idaho and other sources to come up

9   with these numbers?

10  A.  Yes.

11  Q.  And the numbers in blue, the Bank of America credit card

12  activity, tell us again, specifically, what does that show?

13  A.  Those are the charges, cash advances, or checks that would

14  have been written on the credit card for each of the years.

15  Q.  And if you added up those from the years 2015 to 2019,

16  approximately what would they add to?

17  A.  About $3.1 million.

18  Q.  So why is that $3.1 million less than the nearly

19  $3.7 million that we are arguing should be the loss amount?

20  A.  Because this was just looking at the Bank of America

21  credit cards.  And if you remember the one chart, the

22  flowchart that we had, there were a number of other entities

23  that she was paying funds to over the years.

24  Q.  Oops, I don't want to do that.

25          And so when you say the flowchart and the other

1    entities, are you talking about that middle line on

2    Government's Exhibit Number 2?

3    A.  That is correct.

4    Q.  So just what you showed us in the former exhibit is all

5    just Bank of America credit cards; right?

6    A.  Yes.

7    Q.  Thank you.  So we've talked about 2017 and looked at

8    checks from 2017.  Just for a brief review, I want to look at

9    some earlier checks and some later checks, if you would,

10   please.  Let's go back to Exhibit Number 3.  Let's look at

11   checks number 90 -- let's look at check number 101 first and

12   also look at check number 96.  This is Government's Exhibit

13   Number 3, check number 101.  What do you know about that

14   check?

15   A.  This is a check.  Once again, if you look at the upper

16   left-hand corner, it is a check that was paid out of the Kasco

17   of Idaho business bank account in December of 2015.  The payee

18   was PTC.  Our investigation has determined that PTC is Pioneer

19   Title Company.  The amount of this check was $16,000, and the

20   handwritten memo is associated with an account that Trina had

21   at Pioneer Title Company paying off their property in Post

22   Falls.

23   Q.  Thank you.  Hold on.  I might have gone too far.

24          THE COURT:  Counsel, I may have missed it, but did

25   you admit Exhibit 9?

1          MR. MALONEY:  Your Honor, if I didn't, I apologize,

2    and I would move for the admission of Government's Exhibit

3    Number 9, which was the income versus spending.

4          THE COURT:  I didn't have it marked on --

5          MS. RUBIN:  No objection.

6          THE COURT:  Exhibit 9 is admitted.

7      (Government's Exhibit 9 received.)

8          MR. MALONEY:  Thank you, Your Honor.

9    Q.  (BY MR. MALONEY)  So let's also look at check number 96.

10   Please describe quickly, if you would, what this check does in

11   comparison to the other one.

12   A.  Once again, it's the same information out of Kasco's bank

13   account.  The handwritten memo is on the bottom left corner.

14   Payment was made in 2015, December, and it was once again also

15   made to PTC, which is Pioneer Title Company.

16   Q.  Thank you.

17         THE COURT:  And, Counsel, I apologize again.  The

18   number you're referring to on the checks is the Bates stamp

19   number, not the check number itself; is that right?

20         MR. MALONEY:  Your Honor, I'll try to be more

21   specific.

22         THE COURT:  I just want to make sure I'm looking at

23   the right numbers.

24         MR. MALONEY:  Yes.  Let me pull one up so I can be

25   demonstrative.

1          There we go.  So the checks have three numbers on

2     them.  We're calling them check one, check two, check three

3     because those are the numbers in our spreadsheet that adds up

4     to the total loss amount.

5          THE COURT:  So that's the red number at the top right

6     of each check?

7          MR. MALONEY:  Exactly, Your Honor.

8          THE COURT:  It's not on the check itself anywhere?

9          MR. MALONEY:  It is a number we have applied solely

10    for the purpose of tracking.  I shouldn't use the term check

11    number.

12         THE COURT:  That's why I got confused.

13         MR. MALONEY:  The actual check number is 10364, for

14    example, here, and the Bates number is the Welch 00 number

15    that follows.

16         THE COURT:  So neither the Bates number or the number

17    on the actual check have anything to do with the testimony so

18    far?  You're simply using the red numbers on the --

19         MR. MALONEY:  I'll refer to this as check reference

20    numbers.  Does that make sense?

21         THE COURT:  Thank you.

22         MR. MALONEY:  Appreciate you clarifying that, Your

23    Honor.

24         THE COURT:  I just got lost for a moment.

25         MR. MALONEY:  There's a lot going on here, so thank

1    you.

2    Q.  (BY MR. MALONEY)  All right.  So I was headed to Exhibit

3    Number 10, I think.  Yes.  What is Exhibit Number 10

4    generally?

5    A.  This is basically a statement received from Pioneer Title

6    associated with a loan or mortgage that Pioneer Title was

7    managing associated with Norman and Trina Welch, and this was

8    basically the payoff schedule.

9    Q.  And you mentioned before that some of the checks had on

10   them PTC.  Is that the reference to Pioneer Title Company?

11   A.  Yes, it is.

12   Q.  And if we look down through this payment history, do you

13   see payments that you recognize from reviewing the checks?

14   A.  Yes, I do.

15   Q.  Talk about those, please.

16   A.  The one -- this first check that we just recently talked

17   about is the bottom one that's highlighted in yellow, the

18   16,385.  That is the payment that was made with that check,

19   and the one just above it was the payment of the second check

20   that was just most recently referenced.

21   Q.  So the checks I was referring to by check reference number

22   101 and check reference number 96, those are reflected there

23   in that Pioneer Title payment?

24   A.  Yes.

25   Q.  And aside from these checks, were you able to trace other

1  checks into the Pioneer Title account?

2  A.  Yes, I was.

3  Q.  And to summarize, where did these -- where did these fraud

4  proceeds start and where did they end up?

5  A.  They started at the Kasco of Idaho business bank account.

6  A check was written to Pioneer Title, or PTC, and deposited to

7  the mortgage or note that Trina Welch had at that company.

8  Q.  Thank you.  All right.  So we've looked at a check from

9  2017 to begin, a check from 2015 at the early part of the

10  scheme.  Now I'd like to look at some checks from the latter

11  part of the scheme in 2019.  So we're back to Government's

12  Exhibit Number 3, and I'd like you to look at the checks that

13  have the reference numbers 228, 229, and 231.  Do you see

14  those there?

15  A.  Yes.

16  Q.  All right.  And let's just start with 228, and give us a

17  quick description of what's going on there.

18  A.  Similar to the other checks we've discussed, it's coming

19  out of the Kasco of Idaho business bank account.  It's being

20  paid to BOA, which we note to be Bank of America, and there

21  was a handwritten credit card number in the lower-left corner.

22  Q.  If we look at check 229, is it essentially the same?

23  A.  Yes, it is.

24  Q.  If we look at check 231, is it essentially the same?

25  A.  Yes, it is.

1    Q.  You're now looking at what's been marked as Government's

2    Exhibit Number 11.  What is that?

3    A.  This is the personal credit card statement for Trina Welch

4    for the time period of January 2019.

5    Q.  All right.  And is it essentially similar to the other

6    Bank of America credit card statement we looked at from Trina

7    Welch?

8    A.  Yes.

9    Q.  So those three Kasco of Idaho checks that we just looked

10   at, where did they go?

11   A.  They are in the payment section against the credit card to

12   pay down the credit card balance.

13   Q.  Similar to the Bank of America credit card statement we

14   looked at before?

15   A.  Correct.

16        MR. MALONEY:  And, Your Honor, I'd move for the

17   admission of Exhibit Number 11, please.

18        THE COURT:  Counsel?

19        MS. RUBIN:  No objection, Your Honor.

20        THE COURT:  Exhibit 11 is admitted.

21   (Government's Exhibit 11 received.)

22        MR. MALONEY:  Thank you.

23   Q.  (BY MR. MALONEY)  Similar to the last credit card

24   statement, does this show some of the transactions on which

25   Ms. Welch spent some of this money that she stole from Kasco

1   of Idaho?

2   A.  Yes, it does.

3   Q.  And just -- let's look at a couple of them.  That one for

4   Upper Keys rentals, would you describe that please.

5   A.  Yeah.  That looks like that was probably to pay for a

6   rental on a trip in the amount of just over $7,000.

7   Q.  And we haven't talked about it yet, but was there an

8   interview done with Ms. Welch where she admitted spending some

9   of this money on traveling?

10  A.  Yes.

11  Q.  And if we go down, for example, to January 21, do you see

12  some significant transactions in there?

13  A.  Yes.

14  Q.  What kind of purchases was she making?

15  A.  She made a $1,600 purchase at Nordstrom's and then just

16  other various shopping-type expenses, and there's also one at

17  the bottom associated with the Northern Quest Resort.

18  Q.  What is the Northern Quest Resort?

19  A.  It is a casino.

20  Q.  In your review of all her financial transactions, did you

21  see references to spending at casinos --

22  A.  Yes.

23  Q.  -- on a number of occasions?

24  A.  Yes.

25  Q.  Describe generally what you saw and how often you saw it.

1    A.   We saw periodically either cash advances to the credit

2    card that occurred at an ATM at the casino -- we don't end up

3    knowing what the money was used for -- or we would see large

4    cash advances at the casinos that identified that it was the

5    casino paying out the money.

6    Q.   Does this credit card account statement show the total of

7    her credit card spending for the month?

8    A.   Yes, it does.

9    Q.   How much was that?

10   A.   Just shy of $24,000.

11   Q.   And below that does it show the bank cash advances?

12   A.   Yes, it does.

13   Q.   What were her bank cash advances for the month?

14   A.   $34,000.

15   Q.   And you mentioned Northern Quest.  Do you see indications

16   of that there?

17   A.   Yes, I do.

18   Q.   What kind of cash advances was she taking at the casino?

19   A.   She took a $3,800 advance as well as a $2,140.

20   Q.   And so if you add all that up, approximately what was she

21   spending or running through her credit card in this given

22   month?

23   A.   About $57,000.

24   Q.   And similar to the prior credit card statement we looked

25   at, did she also incur considerable fees and expenses?

1    A.  Yes.

2              MR. MALONEY:  Excuse me one second, Your Honor.

3    Q.  (BY MR. MALONEY)  I'd like to direct your attention to

4    what's been marked as Government's Exhibit Number 12.  Do you

5    recognize that?

6    A.  Yes, I do.

7    Q.  What is it, please?

8    A.  It's basically a spreadsheet that we put together

9    compiling the total of the checks.  The far right corner has a

10   number in it, and that is the red number that is associated

11   with each of the checks in the prior exhibit.

12   Q.  So let me just blow that up so we can see it.  So there's

13   a column at the beginning of the table that says number and

14   has a number, sort of like 10363.  What is that?

15   A.  That would be the number on the check.

16   Q.  All right.  And the payee, what does that represent?

17   A.  That is who the check was paid out to.

18   Q.  And clearly there's an amount.  That is the memo?

19   A.  That would be the handwritten memo that would have been in

20   the memo area on each of the checks.

21   Q.  So to the extent that that memo went to one of her

22   personal credit cards or Pioneer Title, as we've looked at

23   earlier in your testimony, that would be reflected in this

24   column?

25   A.  Yes.

Gunnerson - Direct by Mr. Maloney                    44

1   Q.  All right.  And then there's a column called Bates number

2   that's probably self-explanatory.  There's a column called

3   sort order.  What's that?

4   A.  That's the number that I just identified as the red number

5   that's above each of the checks in the other exhibit.

6   Q.  So our check reference number, if you will?

7   A.  Correct.

8   Q.  In all of these 343 checks that we've been talking about

9   and that are represented in the plea agreement as constituting

10  the loss amount, are they reflected in this spreadsheet?

11  A.  Yes.

12  Q.  And if we paged down through the spreadsheet --

13          MR. MALONEY:  Actually, I should move for it's

14  admission.  Your Honor, I move for the admission of

15  Government's Exhibit 12, please.

16          THE COURT:  Counsel?

17          MS. RUBIN:  Your Honor, the only question I have

18  is -- with regard to this spreadsheet is whether or not this

19  was produced in discovery, as I think that this may be the

20  first time that we've seen this.  And so if it was produced,

21  I'm just wondering maybe when it may have been provided to our

22  office.  Or this was maybe a trial exhibit?

23          MR. MALONEY:  My understanding is that this went out

24  from Traci to you to demonstrate the computation of the 341

25  checks, and we may well have put it in discovery.

1          MS. RUBIN:  I don't recall seeing this.  I'm not

2     going to object to obviously the agent being able to use it

3     for purposes of testifying, but I'm not entirely -- I'm not in

4     agreement that we agree with everything that's on the

5     spreadsheet.  But certainly no objection for the agent to be

6     able to use it for purposes of testifying today.

7          MR. MALONEY:  Thank you.

8          THE COURT:  Counsel, is this anything more than a

9     summary of the checks?

10         MR. MALONEY:  No, Your Honor.

11         THE COURT:  I'll admit it as a summary.

12      (Government's Exhibit 12 received.)

13         MR. MALONEY:  It's the summary of the total, I guess

14    I should say.

15         THE COURT:  Yes.  It's admitted.

16    Q.  (BY MR. MALONEY)  All right.  So explain generally, if you

17    will, the process you went through for each of these 343

18    checks.

19    A.  It's pretty much what we've kind of talked about.  I

20    obtained the bank records, pulled out the checks that Mr. Sims

21    had originally identified as being fraudulent.  From there I

22    went to try to identify additional checks, and part of that

23    was looking for checks that potentially had handwritten memos

24    in the field and the payee looked different than some of the

25    other payees on the checks and started to see if we could

1    trace the memo fields to accounts owned by Trina Welch, which

2    in most cases we were able to.

3           And we then started to go back into QuickBooks to

4    identify how these checks were entered into the accounting

5    records of Kasco and any modifications to hide how these

6    checks were on the books.

7    Q.  Did you review these checks with Mr. Sims of Kasco of

8    Idaho?

9    A.  Yes, I did.

10   Q.  Did he confirm for you that they were all money taken

11   fraudulently from his company?

12   A.  Yes.

13   Q.  Did you add up the total of these checks?

14   A.  Yes, I did.

15   Q.  What do they add to?

16   A.  $3.6 million.

17   Q.  Okay.  Please read the exact number into the record, if

18   you would, please.

19   A.  $3,674,338.86.

20   Q.  Thank you.  Now, aside from your work on this case, did

21   Kasco of Idaho have insurance?

22   A.  Yes, they did.

23   Q.  Did the insurance company hire an independent auditor to

24   review what had happened to Kasco and to come to its own

25   determination of whether they would have to pay out on the

1   policy?

2   A.  Yes, they did.

3   Q.  Were you able to obtain a report from that independent

4   auditor?

5   A.  Yes, I was.

6   Q.  Was that auditor a CPA?

7   A.  Yes, it was.

8   Q.  Now, this report, did it in any way inform or influence

9   your computations?  I shouldn't say in any way because that's

10  pretty -- those computations that you made, did you make those

11  prior to receiving this report?

12  A.  Yes, I had.

13  Q.  And as far as you know, when this report was written, did

14  the report writer have your computations?

15  A.  No, he did not.

16  Q.  So to your knowledge, this report acted -- this CPA acted

17  independently of you?

18  A.  Yes.

19  Q.  What was the policy limit on Kasco's insurance policy?

20  A.  $1 million.

21  Q.  Did the insurance company pay out at the policy limit?

22  A.  Yes, they did.

23  Q.  Have you had the opportunity to review this report?

24  A.  Yes, I have.

25  Q.  Did this accountant go through a similar process that you

1  did?

2  A.  Yes, he did.

3  Q.  And did he reach a similar conclusion?

4  A.  Yes, he did.

5         MR. MALONEY:  Your Honor, I move for the admission of

6  Government's Exhibit 13, which is this letter.  I -- just for

7  counsel's information, I do not have all the attachments with

8  it, although we could certainly submit those if counsel

9  wanted.

10        MS. RUBIN:  No objection.

11        THE COURT:  Exhibit 13's admitted.

12     (Government's Exhibit 13 received.)

13 Q.  (BY MR. MALONEY)  Describe generally, please --

14        MR. MALONEY:  Thank you, Your Honor.

15 Q.  (BY MR. MALONEY)  Describe generally for the Court, from

16 your review of this independent audit, what did the CPA do and

17 what did he conclude?

18 A.  He followed a fairly similar process.  I'm not sure how he

19 identified or obtained all the checks, but he took the checks

20 that he was provided, took a sample of those checks, and ran

21 them through QuickBooks and ran them through -- looked at the

22 audit report, the audit trail report that we talked about,

23 looked at the reconciliation to find out how they were

24 identified in the accounting system of Kasco, and came to the

25 conclusion that there was approximately 3.1 million that had

1    been fraudulently taken.

2    Q.  Is that conclusion on the final page of this report?

3    A.  Yes, it is.

4    Q.  Read the last sentence -- it stands alone as a

5    paragraph -- the one that says, "Based on my review."

6    A.  "Based on my review and analysis, Ms. Welch

7    misappropriated at least 3.1 million and used various cash

8    disbursement schemes to perpetrate and conceal her activity

9    from January 2014 through June 2019."

10   Q.  Thank you.  Based upon your involvement in this case, are

11   you aware that there is also a civil case between Kasco of

12   Idaho and Ms. Welch?

13   A.  Yes, I am.

14   Q.  And in that civil case are you aware that Ms. Welch filed

15   an affidavit?

16   A.  Yes, I am.

17   Q.  Generally speaking, what's that affidavit about?

18   A.  It's referring or replying to an affidavit that Keith

19   Sims, the owner of Kasco, had filed in the civil hearing.

20        MS. RUBIN:  Your Honor, I'm going to object as to

21   relevance.

22        THE COURT:  Why would it not be relevant?

23        MS. RUBIN:  Well, I think with regard to the purpose

24   of the document at this point in time, I think that it's not

25   relevant as to the nature of the loss with respect to this

1   hearing, as it, I think, goes to -- really it pertains to the

2   matter in the civil court with respect to -- I believe it's

3   the properties and so forth.

4           THE COURT:  So are you telling me that it would

5   probably have more to do with forfeiture and restitution than

6   with the loss amount?

7           MS. RUBIN:  I think it has more to do, yes, with the

8   forfeiture aspect of this case versus the loss amount.

9           THE COURT:  Your response, Counsel?

10          MR. MALONEY:  Your Honor, initially the relevance

11  standard should be fairly low because we're not in front of a

12  jury, so there's little risk of prejudicing the Court with

13  irrelevant information.  Secondarily, what we have here,

14  depending on where we end up going, is essentially a

15  credibility contest between what the Government and Kasco of

16  Idaho have computed that Ms. Welch stole and what Ms. Welch

17  may in some fashion argue that she didn't steal.  So it's a

18  credibility contest.

19          And this, to a great extent, along with a number of

20  other pieces of evidence, goes to her credibility, because she

21  said in this affidavit that she never endorsed or deposited

22  any checks without permission from Keith Sims to do so.  And

23  that is 100 percent contrary to what she told this Court in

24  her plea agreement.

25          THE COURT:  Counsel, anything further?

1          MS. RUBIN:  No, Your Honor.  I would just -- I mean,

2     I think the bottom line is that this was in 2019.  This was

3     certainly before the criminal matter had begun.  This was

4     before she had counsel of record with regard to her criminal

5     matter.  And again, I think that this goes to the forfeiture

6     aspect of this case and I don't think it goes to loss.  I

7     think credibility can certainly be determined by this Court

8     once and if Ms. Welch has had an opportunity to testify.

9          THE COURT:  All right.  I'm going to admit

10    Exhibit 14.  I'll give it the weight that I deem it entitled

11    to.  Truth is truth.  If she said something different here

12    than she says in this hearing, that's certainly credibility

13    issues.  So I'll let it come in.

14        (Government's Exhibit 14 received.)

15          MR. MALONEY:  Thank you, Your Honor.

16    Q.  (BY MR. MALONEY)  Looking at page 2 -- let me back up a

17    step, actually.

18          Just to lay a record about what this is, did

19    Ms. Welch file this document after being duly sworn upon oath?

20    A.  Yes.

21    Q.  And if you go all the way to the end of the document, does

22    her affidavit appear to have a signature on it?

23    A.  Yes, it does.

24    Q.  Do you recognize that signature?

25    A.  Yes.

1   Q.   What's the date of the signature?

2   A.   November 12, 2019.

3   Q.   Whose signature is it?

4   A.   Trina Welch.

5   Q.   And what does Ms. Welch say under penalty of perjury about

6   whether or not she was authorized to sign checks from Kasco of

7   Idaho?

8   A.   Basically that she never endorsed or deposited any checks

9   in any other account without having obtained permission from

10  Keith Sims to do so.

11  Q.   If you compare that to the statements we looked at in her

12  signed plea agreement at the beginning of this hearing, how do

13  they compare?

14  A.   They are contradictory.

15  Q.   Thank you.  All right.  You have in front of you what's

16  been marked as Government's Exhibit Number 15.  Do you

17  recognize that?

18  A.   Yes, I do.

19  Q.   What is it?

20  A.   It is a transcript of a recorded interview between Trina

21  Welch and Detective Glenda Hook of the Rathdrum Police

22  Department.

23  Q.   Please give the Court a little background.  How is it that

24  Detective Hook of the Rathdrum Police Department ends up

25  interviewing Trina Welch back in October of 2019?

1   A.  It was transcribed in October.  The interview was on

2   July 3.

3   Q.  Of what year?

4   A.  2019.

5   Q.  Thank you.

6   A.  Shortly after Keith Sims had identified what he believed

7   to be fraudulent activity on Trina Welch's part, he contacted

8   the Rathdrum Police Department.  Shortly after Rathdrum Police

9   Department received the complaint, they contacted me.  I was

10  out of town.  We got back into town and met with Keith, where

11  Keith outlined the story to me.  It was decided that the date

12  that Keith was planning to let Trina Welch go, that Glenda

13  Hook would be there to interview her after Keith had spoken to

14  her in a personal meeting prior to her interview.

15  Q.  Have you reviewed the audio of that interview?

16  A.  Yes, I have.

17  Q.  Have you reviewed the transcript of the interview?

18  A.  Yes, I have.

19  Q.  Is the transcript accurate to the audio?

20  A.  Yes, it is.

21  Q.  Does the transcript provide some details and admissions of

22  Ms. Welch's fraud scheme and items on which she spent fraud

23  proceeds?

24  A.  Yes, it does.

25          MR. MALONEY:  Your Honor, I'd move for the admission

1    of Government's Exhibit 15, please.

2              MS. RUBIN:  No objection.

3              THE COURT:  Is this a certified transcript?

4              MR. MALONEY:  Certified by a court reporter?  No.  It

5    was prepared by, I believe, an FBI analyst of some sort.

6              THE COURT:  But I did just hear this witness testify

7    that he compared the two and it's accurate.

8              MR. MALONEY:  Exactly, Your Honor.

9              THE COURT:  I'll admit it.

10        (Government's Exhibit 15 received.)

11             MR. MALONEY:  Thank you, Your Honor.

12   Q.  (BY MR. MALONEY)  All right.  Special Agent Gunnerson, the

13   Court will have a chance to read this now that it's been

14   admitted, so I don't want to go through it in gory detail.

15   But can you describe generally some of the admissions made by

16   Ms. Welch, and in particular let's start with what she said in

17   terms of being -- in terms of having betrayed Keith or

18   betrayed his trust.  Do you recall some admissions of that

19   nature?

20   A.  Yes, I do.

21   Q.  What types of things did she say?

22   A.  She said, "I feel so bad.  I betrayed him."  She talked

23   about how great a guy he was.  She talked about how sick she

24   felt because of what she has done.

25   Q.  And did Detective Hook question Ms. Welch in a way to try

1   to determine whether Ms. Welch had kept track of what she

2   stole?

3   A.  Yes.

4   Q.  And what was the result of those questions and Ms. Welch's

5   answers?

6   A.  That she didn't have any idea how much money it was.

7           MR. MALONEY:  Okay.  Thank you.

8           Your Honor, I believe that's all I have at this time.

9   I'd like to circle back and make sure I moved to admit all my

10  exhibits.  I think Exhibit 3 was --

11          THE COURT:  The only two exhibits I didn't hear I

12  don't think you offered, and that was Exhibit 4 and

13  Exhibit 10.

14          MR. MALONEY:  That's why I asked.  Thank you, Your

15  Honor.  I would move to admit Exhibits 4 and 10 --

16          THE COURT:  I don't know that there was an Exhibit 4,

17  so check that first.

18          MR. MALONEY:  Exhibit 4, Your Honor, is a list of

19  checks.

20          THE COURT:  Counsel, any objection to Exhibit 4?

21          MS. RUBIN:  No, Your Honor.

22          THE COURT:  Exhibit 4 is admitted.

23      (Government's Exhibit 4 received.)

24          MR. MALONEY:  Thank you.  And Exhibit 10 was the

25  Pioneer Title payment history.  I would move to admit that,

1    please.

2              MS. RUBIN:  No objection.

3              THE COURT:  4 and 10 are both admitted.

4         (Government's Exhibit 10 received.)

5              MR. MALONEY:  Thank you, Your Honor.

6              THE COURT:  That means just, for your knowledge,

7    Exhibits 1 through 15 have all been admitted now.

8              MR. MALONEY:  I appreciate it, Your Honor.  Thank

9    you.

10             THE COURT:  Cross-examination.

11             MS. RUBIN:  Your Honor, may we have just ten minutes

12   to get our thoughts in order with respect to

13   cross-examination?

14             THE COURT:  All right.  We'll take a short recess.

15             MS. RUBIN:  Thank you.

16             THE COURT:  We'll be in recess until about eight

17   minutes to.

18        (At 10:39 a.m., a recess was taken until 10:55 a.m.)

19             THE COURT:  Please be seated.

20             Counsel, you may cross-examine.

21             MS. RUBIN:  Thank you.

22                        CROSS-EXAMINATION

23   BY MS. RUBIN:

24   Q.  Agent Gunnerson, my understanding is that QuickBooks was

25   used to assist with the accounting in Kasco of Idaho; is that

1   correct?

2   A.   That is one of the systems, yes.

3   Q.   That's one of the systems.  And when the Government

4   provided QuickBooks to defense counsel, the system actually is

5   QuickBooks from 2016 essentially to 2019?

6   A.   That's the data that -- it was a backup that they had

7   pulled from their system.

8   Q.   But there was no accounting in QuickBooks from 2016 back

9   to 2012?

10  A.   Oh, that is -- I can't remember what the cutoff was, but

11  prior to that they were using Sage.

12  Q.   Okay.  So essentially there was no accounting system that

13  was at least provided in discovery with respect to 2016 and

14  back?

15  A.   I don't know what the time period is, but I know the Sage

16  stuff -- I don't know what that time period was.

17  Q.   Okay.  And that -- and that QuickBooks that was provided

18  pertains to Kasco of Idaho?

19  A.   Correct.

20  Q.   But there's two companies that we're discussing; right?

21  A.   Yes.

22  Q.   Because there's Kasco Communications?

23  A.   Yes.

24  Q.   And you did not review any QuickBooks accounting system

25  with Kasco Communications?

1    A.  Correct.

2    Q.  And nothing has been provided with respect to QuickBooks

3    or how that accounting system essentially was handled with

4    respect to Kasco Communications?

5    A.  Correct.

6    Q.  Okay.  So when you talk about checking all 341 or 343

7    checks, whatever it is, essentially you're saying that you

8    look at the check; right?

9    A.  Yes.

10   Q.  And then you track it back essentially to a Bank of

11   America statement or the credit card statement?

12   A.  Correct.

13   Q.  Okay.  And if you're able, I guess, to reconcile it in

14   QuickBooks, you do that too?

15   A.  Yes.

16   Q.  Okay.  But if the system doesn't exist prior to 2016, you

17   can't reconcile that with QuickBooks?

18   A.  Correct.

19   Q.  All right.  Now, I believe that you testified that when

20   you interviewed Mr. Sims and the other employees, that you

21   essentially -- maybe what the general consensus was or maybe

22   what Mr. Sims, I think, said to you was, well, with respect to

23   revenue, business was doing well, but the financial

24   perspective was Mr. Sims could not figure out why he could not

25   keep money in the bank?

1   A.  Correct.

2   Q.  Now, you're aware that Kasco Communications actually had a

3   partnership?

4   A.  Yes.

5   Q.  And that partnership was with another gentleman?

6   A.  Yes.

7   Q.  And Rick Methvin; right?

8   A.  It's something like that.  I can't remember the name.

9   Q.  Okay.  And a 50-50 split; right?

10  A.  I don't -- I believe I was told it's a 51-49.

11  Q.  But you also know that there was litigation going on with

12  that company?

13  A.  I know there was a disagreement.  I do not know what the

14  litigation is.

15  Q.  Well, there was a business dispute with respect to the

16  allegation that Mr. Sims was operating business in Washington

17  which was in violation of the contract of that business?

18  A.  That, I do not know.

19  Q.  And you don't know that because you never talked to the

20  partner?

21  A.  Correct.

22  Q.  You never interviewed the partner?

23  A.  Correct.

24  Q.  But certainly if there is litigation going on and there is

25  a business dispute and there's an issue with respect to how

1  business may be handled, that may actually make more sense as

2  to why Mr. Sims could not figure out why there was no money in

3  the bank?

4  A.  At the time he couldn't figure out there was no money in

5  the bank, that had been dissolved.

6  Q.  But if you have litigation you have to pay for that;

7  correct?

8  A.  Yes.

9  Q.  You hire lawyers; right?

10 A.  I assume.

11 Q.  And if it gets into the court, it certainly costs a lot

12 more, doesn't it?

13 A.  That, I don't know.

14 Q.  And if someone is accusing you of essentially being in

15 violation of the contract of your business and doing business

16 illegally, that could cost money; fair enough?

17 A.  Fair.

18 Q.  You're also aware that Mr. Sims was in a pretty egregious

19 divorce situation?

20 A.  Not at the time I began the investigation.

21 Q.  He was involved in a divorce situation; fair enough?

22 A.  During the investigation, yes.

23 Q.  Okay.  And if you have to hire lawyers, that can cost

24 money?

25 A.  Yes.

1   Q.   Okay.  So that may also explain why there's not as much

2   money in the bank even though your business is doing well;

3   fair enough?

4   A.   If he didn't run it through the account, it wouldn't

5   affect the business account.

6   Q.   But certainly there are things going on in people's

7   personal lives that they need to utilize money for; fair

8   enough?

9   A.   Yes.

10  Q.   Now, you have talked about this audit from 2019 that

11  essentially was -- with respect to the insurance company, they

12  did their own audit; right?

13  A.   Yes.

14  Q.   And basically I believe your testimony was something to

15  the effect of your investigation and their audit and their

16  final report were somewhat consistent with each other?

17  A.   Yes.

18  Q.   But as you testified, you don't know how the auditors for

19  the insurance company obtained the checks that they utilized

20  to determine the loss?

21  A.   Correct.

22  Q.   And if it's similar to how you obtained the checks, it was

23  provided by Mr. Sims?

24  A.   I think checks from Sims, but also received them from the

25  bank.

1    Q.   Okay.  But Mr. Sims was able to pick and choose which

2    checks he provided to you?

3    A.   Yes.

4    Q.   The same way Mr. Sims was probably able to pick and choose

5    the checks that were provided to the insurance provider?

6    A.   I do not know.  I was not part of that.

7    Q.   Okay.  The affidavit that the Government has admitted as

8    far as trial -- I'm sorry -- Exhibit Number 14, you would

9    agree with me that that affidavit, I believe, was signed

10   November 12th of 2019?

11   A.   Yes.

12   Q.   That was prior to criminal charges being charged?

13   A.   Yes.

14   Q.   That was prior to Ms. Welch having an opportunity to

15   listen to the interview that had been conducted at the -- at

16   the -- I believe it was Kasco of Idaho?

17   A.   Yes.

18   Q.   That was before she had an opportunity to see any sort of

19   witness statements that had been obtained by the FBI?

20   A.   Yes.

21   Q.   And presumably because, of course, this document does have

22   Witherspoon Kelly, which is a law firm in Spokane; right?

23   A.   I don't know where they are.

24   Q.   But presumably if it has a lawyer's name, they probably

25   prepared it?

1   A.  Yes.

2   Q.  All right.  Now, the -- I want to go back.  The auditors

3   in 2019 with regard to the insurance investigation, ultimately

4   Mr. Sims received a million-dollar payout?

5   A.  The payout went to his wife.

6   Q.  It went to his wife, but they received a million-dollar

7   payout?

8   A.  Yes.

9   Q.  With regard to the information that we're discussing today

10  that relates to the criminal charges?

11  A.  Yes.

12  Q.  That million-dollar payout was not a part of the

13  discovery, was it?

14  A.  That, I do not know.  The information was provided to the

15  U.S. Attorney's Office.  I don't know if you got it or not.

16  Q.  Well, you wouldn't have any reason to disagree with me if

17  I told you we didn't receive it until after a change of plea,

18  would you?

19          MR. MALONEY:  Objection, Your Honor; calls for

20  speculation.

21          THE COURT:  It does.  I'm honestly not sure how much

22  the rules of evidence apply here, but I get the point.  The

23  statement and argument's been made.  Let's let it stand at

24  that --

25          MS. RUBIN:  Okay.

1          THE COURT:  -- because he can't answer that question.

2          MS. RUBIN:  That's fine.

3   Q.  (BY MS. RUBIN)  But certainly this is something that if

4   this occurred in 2019 and a change of plea occurs in 2022, you

5   would agree with me that there's two years where certainly a

6   million-dollar payout would have been discussed as a part of

7   discovery?

8          MR. MALONEY:  Your Honor, it's improper to ask the

9   witness about discovery.  He's not a lawyer.

10         THE COURT:  Nor do I think he's had anything to do

11  with that stage of these proceedings, so I'll sustain that

12  objection.

13  Q.  (BY MS. RUBIN)  You were provided information about the

14  million-dollar settlement?

15  A.  Yes.

16  Q.  And when you get that information, presumably you turn

17  that over to the U.S. Attorney's Office?

18  A.  Yes.

19         MS. RUBIN:  Just one moment, Your Honor.

20         No further questions, Your Honor.  Thank you.

21         THE COURT:  Before you sit down, let me make sure I'm

22  understanding here.  Are you suggesting that that

23  million-dollar payment needs to be subtracted from the

24  3.7 million?

25         MS. RUBIN:  Well, I think the loss will be the

1   3 point -- or, well, if the Government -- you know, if the

2   Government -- their argument is it's the 3.6.  No, I don't

3   think it would be subtracted from the loss.  I think it would

4   go to a different victim per se.  I think it would go to the

5   insurance company versus Mr. Sims.  I think that the argument

6   I'm making is that that information was not turned over to, I

7   believe, the Government until well late in the game, which one

8   questions why that was not discussed by Mr. Sims to the

9   Government.

10          THE COURT:  Okay.  Any redirect?

11          MR. MALONEY:  Just briefly, Your Honor.  Thank you.

12                      REDIRECT EXAMINATION

13  BY MR. MALONEY:

14  Q.   Agent Gunnerson, I'd like to clarify the timeline

15  regarding Detective Hook's interview and the affidavit counsel

16  asked you about.  Could you just set those in a time frame?

17  When did the interview occur in comparison to the affidavit?

18  A.   The interview by Detective Hook was in July of 2019, and I

19  believe the affidavit was signed in November of 2019.

20  Q.   So at a minimum, at the time Ms. Welch signed the

21  affidavit, she was aware that at least Detective Hook and the

22  Rathdrum Police Department had her under investigation for

23  embezzlement?

24  A.   Yes.

25  Q.   And then there were a couple of questions about a partner

1    with Kasco Communications.  Is there any indication from the

2    financial records that you reviewed that one of the Kasco

3    entities having a partner would change the fact that this

4    $3.7 million flowed through Ms. Welch's Bank of America credit

5    card and her other financial instruments?

6    A.  Would you restate that, please.

7    Q.  Yeah.  This idea of there being a partner, does that

8    change anything that you reviewed in the financials of

9    Ms. Welch?

10   A.  No.

11            MR. MALONEY:  Thank you, Your Honor.  No further

12   questions.  I guess, Your Honor, I should ask the Court,

13   counsel argued a little bit about this discovery matter.  I'm

14   going to assume the Court doesn't want me to argue that right

15   now unless you tell me you do.

16            THE COURT:  I do not.

17            MR. MALONEY:  Thank you, Your Honor.

18            THE COURT:  In my mind, it has nothing to do with

19   today's hearing other than credibility of the witness.

20            MR. MALONEY:  Thank you, Your Honor.

21            THE COURT:  Sir, you may step down.

22            Is the Government calling any other witness?

23            MR. MALONEY:  No, Your Honor.  For today's purposes,

24   the Government rests.

25            THE COURT:  All right.  Thank you.

1          Counsel, I'm assuming that you're going to reserve

2     any opening statement, if you give one, until you have a

3     witness to testify.

4          MS. RUBIN:  That is correct.  Thank you.

5          THE COURT:  All right.  I will say this for the

6     record.  At this point in time, the Government has met its

7     burden of proof on the 3.7, whatever it is, million.  I

8     recognize defendant has not yet presented her case, and she

9     has the right to do that.  In other words, she can attack that

10    3.7, but the 3.7 is the starting point.  We've got that

11    established.

12         I will also note for the record that I think that the

13    defendant's credibility is certainly questionable given the

14    clear contradictions between her affidavit and the stipulated

15    facts in the plea agreement.  So she needs to be very careful

16    about how she proceeds from here.  But I'm not removing any of

17    her constitutional rights to testify if she chooses to do

18    that.

19         We'll give counsel an opportunity to speak to the

20    U.S. Attorney's Office who's in charge of the case and decide

21    how to proceed from here.  I think, as I mentioned earlier --

22    I don't know that I put it on the record -- I have some time

23    the week of sentencing.  My proposal would be if we need to

24    have more testimony, we do it on the day of sentencing, the

25    day originally scheduled for sentencing, which would be the

1    13th, and then turn around and do sentencing two or three days

2    after that.  If you can get things resolved before

3    September 13, we'll figure out a way to get a hearing before

4    that date, but we'll make it one way or the other.  I don't

5    want to lose the September date.

6           Anything else for today?

7           MR. MALONEY:  One thing if I may, Your Honor.

8           THE COURT:  Yes.

9           MR. MALONEY:  Thank you.  Your Honor, we talked at

10   the beginning about the Victims' Rights Act and Mr. Sims's

11   interest in making a statement.  Given the Court's comments, I

12   talked to him during the break, and he offered to me that we

13   could either submit his statement in writing or I could read

14   it to the Court.  Given what the Court said earlier and the

15   current rulings, I suspect perhaps the Court would prefer I

16   just submit it in writing through probation like a normal

17   victim impact statement.

18          THE COURT:  Well, that's what I was expecting.  But

19   I'm -- I don't want Mr. Sims to think I'm removing his rights

20   to give a statement.  If he would rather give it verbally, he

21   can do that.

22          MR. MALONEY:  Do you mind if I ask him real quickly?

23          THE COURT:  Yes, please.  I didn't answer that right.

24   No, I don't mind.

25          MR. MALONEY:  Thank you, sir.

1          Mr. Sims has asked that I read it today.  Would that

2     be okay with the Court?

3          THE COURT:  Yes.

4          MR. MALONEY:  Thank you, Your Honor.  And for

5     background, Your Honor, Mr. Sims drafted a fairly lengthy

6     witness statement and -- or victim statement, and we asked him

7     to reduce it.  So he may submit something more later, but this

8     is for the purposes of today.

9          THE COURT:  Understood.

10          MR. MALONEY:  And I'll submit this to probation.

11    It's on Kasco of Idaho, LLC, letterhead:

12          The following is a brief statement to the Court of

13    the damaging effects of Ms. Welch's crime.  I have submitted a

14    full impact statement additional -- I think he will.  Her

15    actions didn't just impact myself or the company.  Sadly, I'm

16    not the only victim here.  Kasco's employees, her fellow

17    employees, are just as much a victim of her deceit and fraud

18    as I am.

19          Due to Ms. Welch's activities, the company was unable

20    to pay vendors numerous times.  To field off phone calls from

21    these vendors for overdue payments under Ms. Welch's direction

22    as CFO, she would have the AP employee print check runs and

23    hold the checks.  When the vendors called the employee about

24    payment status, she instructed them to provide the check

25    number, amount, and that it had been mailed.  This would buy

1    time and stop the vendors from holding the materials needed or

2    close the accounts even though there was no, quote, check in

3    the mail, unquote.

4         I remember calling two specific vendors to ask for an

5    extension of our terms because there was no money to make the

6    payments.  It was humiliating.  These late payments dropped

7    our PAYDEX score significantly, which made opening any new

8    vendor accounts nearly impossible.  Many times Kasco was

9    unable to pay the company credit card used to purchase

10   materials not on accounts and pay the employees' expenses when

11   working out of town.  This is how they pay for food, lodging,

12   fuel and incidentals.

13        We got by with partial payments and incurred interest

14   fees.  The company incurred fines and penalties due to being

15   unable to report and pay state sales taxes, federal

16   withholding filings and deposits, as well as state filings and

17   deposits.  These accounts and filings were directly

18   Ms. Welch's responsibilities.

19        Ms. Welch had full visibility of the financial

20   distress she was causing and continued to defraud.  She led me

21   to apply for a line of credit to help solve these severe

22   financial issues.  She stated it would help cover the costs

23   and we would just pay it back every month.  It was approved

24   but with a very high interest rate and fees due to the

25   financial state of the company.  I backed out.  It just didn't

1    feel right, thank goodness, or the debt could have been much

2    worse.

3          The impact of what Ms. Welch did to her fellow

4    employees of Kasco is unconscionable.  There were a lot of

5    mornings I would come in before anybody would get here.  I

6    would walk through my fleet of around 20 work trucks and I

7    would look at which ones had the worst tires, which ones were

8    the most important, and try to determine what I could budget

9    that month or that quarter so I could buy $3,000 worth of

10   tires.  When we could not afford new tires, I would try to get

11   by with retreads.

12         I want to clarify that some of these employees

13   weren't just driving work trucks but dump trucks, hauling

14   large excavators on trailers, and other heavy equipment.  The

15   danger she put many of our employees in without any thought to

16   them or their families I will never be able to understand.

17         Another example of this is a meeting I had with

18   Ms. Welch, the AP employee, and my insurance agent.  We had to

19   bit and piece together where we could save a few thousand

20   dollars on a marine policy, and we removed some trailers from

21   full coverage due to the financial distress.  One of my

22   drivers thankfully averted a head-on collision with an

23   uninsured drunk driver who crashed into the trailer he was

24   hauling instead.  It was one of the trailers I had removed

25   from full coverage.  I was not able to replace that trailer

1    until 2020.

2           There were times when I was unable to pay payroll.

3    There was simply not enough money in the checking account to

4    cover it.  Ms. Welch's solution was to do paper checks instead

5    of direct deposits to buy time for payments to come in from

6    customers or from myself to deposit personal funds to cover.

7    Once, because I did not have enough money to cover payroll and

8    no payments were coming in, Ms. Welch lent Kasco $20,000 to

9    cover it.  She literally lent me the money that she was

10   stealing to pay the employees.

11          I was unable to give the bonuses they counted on as

12   part of their salary, and raises were out of the question.  I

13   couldn't afford it.  I lost many great employees due to not

14   being able to meet the compensation they needed, had earned,

15   and deserved.

16          Once we discovered her thieving ways, we kept her

17   employed for one more week.  I personally watched her enter a

18   fraudulent check and code it to a past invoice.  I put a stop

19   payment on it immediately.  Minutes later she entered my

20   office and started venting about the greed of my employees and

21   the audacity of this.  I fell back in my chair said, "Oh, no,

22   I'm late," and bolted from the office.

23          I appreciate you allowing me to try to explain how

24   devastating her actions have been and the significance it had

25   to Kasco, myself, and the employees.  When she was confronted

1  on July 3, 2019, during that meeting her only question was,

2  quote, "Does anyone know?" end quote.  I have a recording of

3  that termination conversation.

4          In closing, in addition to the 3.6-plus million she

5  stole, we incurred so many other fees, fines, and additional

6  costs the real number would exceed 4 million.  Ms. Welch has

7  shown zero guilt or remorse for her actions.  She has spent

8  the three-plus years spreading lies of her actions.  At one

9  time she was my most valued and trusted employee who I thought

10 was also a friend.  And she utilized this in her scheme to

11 defraud.

12         Thank you for your time.  Sincerely, Keith Sims,

13 Kasco.

14         Thank you, Your Honor.

15         THE COURT:  Thank you.

16         Counsel, I don't think that was the type of statement

17 that would call for cross-examination, so I'm not going to

18 allow any at this time.  It is certainly going to be relevant

19 at the time of sentencing.

20         Anything else for today?

21         MR. MALONEY:  No, Your Honor.  Thank you.

22         THE COURT:  From the defense?

23         MS. RUBIN:  No, Your Honor.  Thank you.

24         THE COURT:  All right.  I'm going to put the burden

25 on you, defense, to let me know how you want to proceed.

1      MS. RUBIN:  We'll talk to Ms. Whelan as soon as she's

2 back in the office.

3      THE COURT:  Court will be in recess.

4    (Proceedings concluded at 11:17 a.m., August 3, 2022.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                           C E R T I F I C A T E

2

3          I, ANNE BOWLINE, a Registered Merit Reporter and

4    Certified Realtime Reporter, do hereby certify that I reported

5    by machine shorthand the proceedings contained herein on the

6    aforementioned subject on the date herein set forth, and that

7    the foregoing 74 pages constitute a full, true and correct

8    transcript.

9          Dated this 30th day of August, 2022.

10

11

12

13                      _____/s/ Anne Bowline_____

14                         ANNE BOWLINE
                        Registered Merit Reporter
15                      Certified Realtime Reporter

16

17

18

19

20

21

22

23

24

25