JOSHUA D. HURWIT, IDAHO STATE BAR NO. 9527
UNITED STATES ATTORNEY
TRACI J. WHELAN, IDAHO STATE BAR NO. 4416
ASSISTANT UNITED STATES ATTORNEY
DISTRICT OF IDAHO
6450 N. MINERAL DRIVE SUITE 210
COEUR D'ALENE, ID 83815
TELEPHONE: (208) 667-6568
FACSIMILE:  (208) 667-0814

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>vs.<br><br>TRINA MARIE WELCH,<br><br>    Defendant. | Case No. CR20-052-N-DCN<br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

The Government recommends that the Court sentence the Defendant to a term of imprisonment of 63 months.

## BACKGROUND

Defendant Welch worked as the bookkeeper for Kasco of Idaho, LLC and Kasco Communications, LLC (jointly referred to as Kasco).  She used that position to engage in wire fraud to further her scheme to steal and embezzle at least $3,673,934.00.  Her criminal activity came to light in June of 2019, and it was later learned she had engaged in this pattern of activity for years.  On the day she was fired, Defendant Welch was interviewed by Rathdrum Police

**GOVERNMENT'S SENTENCING MEMORANDUM - 1**

Officer Glenda Hook, and she admitted to taking money. A transcript of this interview was introduced at the August 3, 2022, loss hearing and admitted as United States' Exhibit 15.

Pursuant to a written plea agreement, Defendant Welch pled guilty to Count Six of the fifteen count Indictment which charged her with Wire Fraud in violation of 18 U.S.C. § 1343. (ECF 45.) In the written plea agreement Defendant admitted to all elements of wire fraud and admitted she wrote or caused to be written at least 341 fraudulent checks from Kasco's bank in furtherance of her scheme to defraud from approximately 2013 through July 3, 2019. (ECF 45, p. 3.) Through the plea agreement, Ms. Welch understood the United States contends she defrauded her employer and obtained fraudulent proceeds of at least $3,674,338.86 through the scheme. (ECF 45, p. 4.) The United States and Ms. Welch agreed that the loss amount was at least more than $1,500,000. (ECF 45, p. 11.) It was also understood that Ms. Welch wanted to retain the right to challenge the amount of loss and restitution at an evidentiary hearing prior to the sentencing hearing. (ECF 45, p. 11.)

The Court set the loss sentencing hearing for August 3, 2022. At that hearing, the United States offered, and the Court admitted, 15 exhibits. Special Agent Bryant Gunnerson testified regarding the scheme and loss calculations and the Court found the United States met its burden of proof to establish the loss amount of $3,673,934.00. The Defendant has indicated she still wishes to challenge the loss amount of $3,673,934.00. The United States has no additional information. The sentencing is set for September 16, 2022. The United States anticipates calling several employees of Kasco to discuss how the crime impacted them and Mr. Sims will make a victim impact statement.

**GOVERNMENT'S SENTENCING MEMORANDUM - 2**

## LEGAL ANALYSIS

In *United States v. Carty*, 520 F.3d 984, 991-92 (9th Cir. 2008) the Ninth Circuit set forth a basic framework that district courts should follow to comply with *United States v. Booker*, 543 U.S. 220 (2005) and progeny. Its guidance is summarized as follows:

(1)  Courts are to begin all sentencing proceedings by correctly determining the applicable sentencing guidelines range, precisely as they would have before *Booker*.

(2)  Courts should then consider the 18 U.S.C § 3553(a) factors to decide if they support the sentence suggested by the parties. Courts may not presume that the guidelines range is reasonable. Nor should the guidelines factors be given more or less weight than any other. The guidelines are simply to be treated as one factor among the § 3553(a) factors that are to be taken into account in arriving at an appropriate sentence.

(3)  If a court decides that a sentence outside the guidelines is warranted, then it must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance.

(4)  Courts must explain the selected sentence sufficiently to permit meaningful appellate review.

*Carty*, 520 F.3d at 991-92.

## SENTENCING CALCULATION

### I.  Statutory Maximum and Minimum Sentence

The statutory maximum sentence for Wire Fraud as charged in Count Six of the Indictment is twenty years.

### II.  United States Sentencing Guidelines Calculation

"As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The United States agrees that the calculations of U.S. Probation are correct as outlined in paragraph 55 of the Presentence Report. (ECF 71.) The total offense level is 24, criminal

**GOVERNMENT'S SENTENCING MEMORANDUM - 3**

history category of I, which results in an advisory guideline range of 51 to 63 months imprisonment.

## IMPOSITION OF SENTENCE

I. **Imposition of a Sentence under 18 U.S.C. § 3553**

    A. **18 U.S.C. § 3553(a) Factors**

        1. <u>The nature and circumstances of the offense.</u>

The nature and circumstances of this offense were well outlined in the plea agreement (ECF 45), the presentence report (ECF 71), and the evidentiary hearing held on August 3, 2022. The summary of the offense is Defendant Welch stole millions of dollars from her employer, an individual who trusted her. She used that money to finance a lifestyle wherein she indulged herself and her family in ways unimaginable to most people. She spent thousands at the spa, gambling, flying her family to vacation destinations, buying vehicles, and financing her children's housing. As outlined in United States' Exhibit 9 from the evidentiary hearing, Welch's spending skills were astounding. In 2016, she spent over $800,000 above the amount that she and her husband earned, and that was spending with Bank of America. In 2017 she spent $937,846 over the earned income; again, this was overspending with only one banking institution. As shown in admitted Exhibit 2, Defendant Welch had many different accounts which she utilized during her wire fraud scheme.

The impact of her selfish actions affected Keith Sims and Welch's fellow employees at Kasco. Employees who didn't get their usual bonuses, or employees who drove trucks with tires the company could not afford to replace. It also rocked the small community in the Silver Valley, as the Defendant disputed that she had engaged in illegal activity until her guilty plea several years later.

**GOVERNMENT'S SENTENCING MEMORANDUM - 4**

2.     The history and characteristics of the Defendant.

Defendant Welch is a 49-year-old woman who has been twice married. She graduated from high school and attended some college courses. She was raised in a loving and stable environment and has no noted substance abuse or mental health issues for which she receives treatment. She has six children, five of whom are living. All her children are adults.

Unfortunately, this is not Defendant's first federal conviction. She was convicted of Bank Fraud in the U.S. District Court of Montana in 1996. Notably, that offense also involved a scheme to defraud others and spend money that she did not earn. As noted in paragraph 34 of the Presentence Report, she spent almost a year's worth of gross earnings in three-months. Money that she did not earn, but rather received only by engaging in criminal behavior.

To say that Defendant Welch was a poor money manager would fail to acknowledge the complexity, effort and planning her criminal acts required. Defendant's conduct in these criminal cases required constant attention to avoid detection. They also required her to act the part of being a truthful and authentic person to the merchants with whom she interacted during her bank fraud scheme in 1996. In the instant offense Defendant Welch convincingly acted as a friend, trusted employee and co-worker, all while ensuring her scheme to take millions of dollars went undetected. This is not the character of a poor money manager; it is much more serious and truly criminal.

Detective Glenda Hook interviewed Defendant Welch on the day she was trespassed from Kasco property. That interview is contained in Exhibit 15, which was admitted during the evidentiary hearing. When asked why she did it the first time, Welch replied, "I think it just 'cause it was easy. We were building our house and it was just easy." (Exhibit 15, p. 3.) Although she initially said she used a lot of the money to help her son resolve some criminal

**GOVERNMENT'S SENTENCING MEMORANDUM - 5**

matters and attend rehab, she later agreed her Post Falls house was paid for with Kasco money. (*Id*. at 12.) The loans for their home in Osburn were also paid off with Kasco money. (*Id*. at 12.)

The credibility of Defendant Welch and her lack of respect for courts is evident by reviewing her own words. On November 12, 2019, Welch filed an affidavit wherein she swore under oath that she never confessed to Detective Hook and that the only thing she said about gambling was that she occasionally gambled with her husband and Keith Sims. (Exhibit 14, ¶ 5.) This was a blatantly false statement. She did confess as outlined above and as seen in this exchange: Detective Hook: "Trina, you're a thief." Trina: "I know. I hate that. It sucks." (Exhibit 15, p. 51.) Defendant Welch admitted to gambling five or six thousand dollars at a time. (Exhibit 15, p. 30.) She stated she gambled a few times a month. (Exhibit 15, p. 39.) This affidavit was filed in a State of Idaho court proceeding. *See* CV40-19-0372 First Judicial District of Idaho, Shoshone County. The making of such a false statement, under oath, is of great concern as to Defendant's character and respect for the law.

A 63-month sentence is supported when one reviews the history and characteristics of this Defendant.

> 3. <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment as well as afford adequate deterrence and protect the public.</u>

White collar crimes are generally committed by individuals who are methodical and engage in a cost-benefit analysis, it is particularly amenable to general deterrence. *See, e.g., United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence. Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore

**GOVERNMENT'S SENTENCING MEMORANDUM - 6**

can be affected and reduced with serious punishment."); *United States v. Bergman,* 416 F.Supp. 496, 500 (S.D.N.Y. 1976) ("[W]e continue to include among our working hypotheses a belief (with some concrete evidence in its support) that crimes like those in this case [nursing home fraud] – deliberate, purposeful, continuing, non-impulsive, and committed for profit – are among those most likely to be generally deterrable by sanctions most shunned by those exposed to temptation."). Indeed, the drafters of Section 3553(a) recognized the distinction between white collar criminals and other criminals when it comes to deterrence:

> The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as the cost of doing business.

S.Rep. No. 98–225, at 76 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3259. On one side of the calculus, white collar criminals weigh the benefits of creating and maintaining a fraudulent enterprise and all the perks – financial, professional, societal status – that come with it. Against these benefits, they weigh the costs. Namely, they weigh the likelihood of getting caught, the likelihood of being charged, the likelihood of being convicted, and the degree of punishment they might face. A sentence lower than the advisory guidelines, will affect that decision making process for this Defendant and others similarly considering this risk benefit analysis.

The perceived certainty of a long prison term often is decisive in the calculus and can deter future violators. *See* James J. Fishman, *Enforcement of Securities Laws in the United Kingdom*, 9 Int'l Tax & Bus. Law 131, 170 (1991) ("Though it may be small satisfaction to defrauded investors, incarcerating perpetrators of financial misdeeds serves as important deterrence to future violators. The certainty of enforcement and prison for white collar criminals

**GOVERNMENT'S SENTENCING MEMORANDUM - 7**

is an effective deterrence."). Conversely, insignificant sentences can have the opposite effect. *See id.* at 171 ("And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes."); *United States v. Cutler*, 520 F.3d 136, 163 (2d Cir. 2008) ("To the extent that the district court's views that this 'type' of offense did not warrant a long sentence and that the relative length of the sentence was relatively unimportant in providing deterrence were meant to apply to [defendant's] convictions for tax evasion and tax fraud conspiracy, the court's views were squarely contrary to the policy judgments articulated by the Sentencing Commission.").

No doubt there are those who will point to Defendant's crime as nonviolent and assert she is no threat to the public. However, the facts of this case contradict that proposition. Defendant Welch needed only a computer and office supplies to commit her crimes. Even more troubling than how easily she was able to commit this offense is the charade she engaged in everyday with her employer and co-workers. She worked for years with the very people she knew her crimes were hurting. Defendant Welch acknowledged this when she spoke with Detective Hook, "And the guilt of like looking at him, like, when he was struggling in moments. Like, I'm like, that made me feel guilty." (Exhibit 15, p. 44.) "I just feel the biggest horribleness of betraying him." (Exhibit 15, p. 48.)

A 63-month within guideline sentence will assure the public is protected during her term of incarceration.

In cases like this, which receive a great deal of local attention, the deterrent effect, or lack thereof, is magnified. While no sentence can repair the damage which has been done, would-be criminals may look to this sentence to gauge whether they too should attempt a similar fraud in hopes of achieving the windfall and money Defendant Welch took. The United States

**GOVERNMENT'S SENTENCING MEMORANDUM - 8**

and the community depend on punishments to help prevent these crimes from occurring.  The Court must send a message that this conduct will not be tolerated and the costs of engaging in this behavior are not worth the potential profits.

> 4. <u>The need for the sentence imposed to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>

The Defendant is an educated woman who was raised in a healthy and safe environment.  She did not suffer the trauma and deficiencies in her formative years that many individuals whom this Court sentences have.  Defendant Welch was married, with children, she and her husband were employed and by all accounts did not suffer from severe mental illness or addictions.  The correctional treatment she receives in prison will be based upon what effort she decides to put into learning a new vocation.  Perhaps the greatest correctional treatment will be realized when she sits in the quiet moments and owns her actions.  By embracing treatment, she can understand the damage she caused and learn not to respond with justification or victim blaming.  If this can be achieved, she becomes less of a threat to the financial security of others.

> 5. <u>The need to avoid unwarranted sentence disparities.</u>

Unfortunately, this is not the first case of individuals taking from others to pad their own pocketbooks prosecuted in North Idaho.  In 2013, Sheryl Lynn Carroll, a clerk for the City of Coeur d'Alene, was sentenced to 40-months imprisonment.  *See* CR12-00269-N-EJL.  Ms. Carroll stole $365,000 from the City of Coeur d'Alene by using the wires to execute a scheme to defraud.  In 2015, Sally R. Hansen, the former City of Athol Finance Director was sentenced to 48-months imprisonment.  *See* CR 15-00002-N-BLW.  Ms. Hansen stole $434,112.00 from the City of Athol using the wires to execute a scheme to defraud.   In 2019, Laurcene Isenberg was sentenced to 60-months imprisonment.  *See* CR 18-CR-000320-001-N-EJL.  Ms. Isenberg committed wire fraud when she stole $579,495.75 from North Idaho Housing Coalition

**GOVERNMENT'S SENTENCING MEMORANDUM - 9**

(Coalition), a nonprofit organization which provided the opportunity for individuals of low and moderate income to purchase or rent affordable homes.

Defendant Welch committed wire fraud to steal approximately 6 times as much money as Ms. Isenberg and yet the sentence recommended by the United States is just three months more than Ms. Isenberg's sentence. Any sentence less than 63 months would create a sentencing disparity.

6. The need to provide restitution to any victims of the offense.

As this Court is well aware, loss amount is different than restitution amount. Restitution focuses on the harm to victims. 18 U.S.C. § 3663A(a)(2). "[T]he court shall order . . . that the defendant make restitution to the victim of the offense . . . ." 18 U.S.C. § 3663A(a)(1). "[T]he term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A(a)(2). "Accordingly, when the crime of conviction is mail fraud or other crime requiring proof of a scheme, a court is authorized to order restitution on related but uncharged conduct that is part of a fraud scheme, and is not limited to the harm caused by the particular counts of conviction." *United States v. Lo* 839 F.3d 777, 788 (9th Cir. 2016). (internal quotation marks omitted); *see also United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) ("restitution may be ordered for all persons directly harmed by the entire scheme"). "Restitution is . . . not confined to harm caused by the particular offenses of which [a defendant] was convicted." *Booth*, 309 F.3d at 576. "Under 18 U.S.C. § 3663A and Ninth Circuit precedent, the district court could properly order restitution for all victims harmed by [the defendant's] scheme, including those harmed by conduct beyond the count of conviction." *United States v. Johnson*,

**GOVERNMENT'S SENTENCING MEMORANDUM - 10**

No. 15-30350, 2017 WL 1416490, at *3 (9th Cir. Apr. 21, 2017). The victim losses associated with dismissed counts that are part of the scheme are also part of the required restitution. *United States v. Bright*, 353 F.3d 1114, 1120 (9th Cir. 2004).

Here, the Defendant pleaded guilty to wire fraud in violation of 18 U.S.C. § 1343, including a scheme to defraud. (ECF 45.) Therefore, losses to all victims of the Defendant's fraudulent scheme must be awarded as restitution for each victim, which includes (but is not limited to) at least 341 fraudulent checks from Kasco's bank in furtherance of her scheme to defraud from approximately 2013 through July 3, 2019.

The United States respectfully asks this Court to order Defendant to pay a total of $4,009,468.01 in restitution. One million should be paid to Alaska National Insurance and $3,009,468.01 should be paid to Kasco of Idaho, LLC. This restitution request is based upon the loss amount of $3,673,934.00 from the 341 checks combined with legal fees/expenses, which were incurred for investigation of loss and assisting the government. The total legal fees for assisting the United States is $4,303.76 and does not include any charges from the civil lawsuit filed by Kasco against Welch but solely for assisting the United States. Kasco was required to take out a loan in order to remain in business. The need for the loan was based upon the Defendant's actions of stealing millions of dollars. The fee for the loan was $19,194.20. The interest over the life of the loan is $311,631.19. It is foreseeable that stealing millions from a business will cause financial hardship necessitating the business to borrow money to continue operation.

"[T]he purpose of restitution is to put the victim back in the position he or she would have been but for the defendant's criminal conduct." *United States v. Gagarin*, 950 F.3d 596, 607 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2729, 210 L. Ed. 2d 887 (2021) (quoting *United*

**GOVERNMENT'S SENTENCING MEMORANDUM - 11**

*States v. Gossi*, 608 F.3d 574, 581 (9th Cir. 2010)). Therefore, Defendant Welch should be ordered to make her victims whole. To make the victims whole, she should be ordered to pay Kasco and Alaska National Insurance the total of $4,009,468.01 in restitution, as allocated above.

The government may enforce the restitution order against property of the Defendant notwithstanding any other federal law. 18 U.S.C. § 3613(a). The Court's payment schedule does not affect the enforcement under § 3613(a). *See United States v. Lumiere*, No. 16-CR-483 (JSR), 2021 WL 4710778, at *1 (S.D.N.Y. Oct. 7, 2021). Even so, the Court must order a payment schedule based on the Defendant's ability to pay. *See* 18 U.S.C. §§ 3572(d) and 3664(f)(2). The Defendant must submit an affidavit with U.S. Probation describing all of the Defendant's financial resources. *See* 18 U.S.C. § 3664(d)(3). According to the PSR, the Defendant did not do this. Thus, the Court should order the entire amount of restitution due and payable immediately. *United States v. Johnson*, No. 1:18-CR-00214-DCN, 2021 WL 1950017, at *8 (D. Idaho May 14, 2021), *aff'd*, No. 20-30051, 2022 WL 1315305 (9th Cir. May 3, 2022) ("Absent such a document, the Court has no reason to allow payment on an intermittent schedule.").

### B. Forfeiture

The government filed a Motion for Preliminary Order of Forfeiture (ECF 51) seeking two types of forfeiture: 1) forfeiture of the Defendant's interest in real properties into which the Defendant directed proceeds of her scheme; and 2) a forfeiture money judgment in the amount of the criminal proceeds obtained by the Defendant.

Regarding the real properties, the Defendant agreed to the forfeiture of the real properties in her Plea Agreement and the Court already entered a Preliminary Order of Forfeiture forfeiting

**GOVERNMENT'S SENTENCING MEMORANDUM - 12**

the Defendant's interest in those properties, which will be part of the sentence. (Fed. R. Cr. P. 32.2(b); ECF 45, pages 6-7; ECF 52.) Some of the real properties have potential third-party interests, such as Defendant's husband, children, or a bank mortgage. Typically, third-party interests are resolved after sentencing, in the ancillary proceeding, and should not impact termination of the Defendant's interest at sentencing. *See* Fed. R. Cr. P. 32.2(b) and (c). The United States has initiated communication with the potential third parties. Potential collections from the sale of the real property likely will not occur until after the third-party ancillary proceedings and eventual real estate sales.

Regarding the forfeiture money judgment, the Indictment provided the Defendant with notice of a potential forfeiture money judgment of "at least $3,600,000" and the Plea Agreement indicated the United States would seek "at least $3,674,338.86." (ECF 1, p. 7; ECF 45, p. 7.) The Court should consider the amount of the forfeiture money judgment at the hearing and enter an order of forfeiture "setting forth the amount of any money judgment" as part of the sentence. Fed. R. Cr. P. 32.2(b)(2)(A). A forfeiture money judgment is an in personam judgment against the Defendant and typically does not involve third-party interests. *See United States v. Nejad*, 933 F.3d 1162, 1165 (9th Cir. 2019) (holding that the United States Supreme Court decision in *Honeycutt* did not undermine forfeiture money judgments and explaining that: a court may order forfeiture in the form of a personal money judgment against the defendant; the government may satisfy the judgment with substitute property it locates in the future; and a contrary rule might allow a defendant to escape the mandatory forfeiture penalty Congress has imposed.) Additionally, the Court should order both forfeiture and restitution and may not discount one against the other. "The purpose of forfeiture is to punish the offender, while the purpose of restitution is to compensate the victim [. . .] Even though the government would receive both

**GOVERNMENT'S SENTENCING MEMORANDUM - 13**

forfeiture and restitution, there 'simply is no double recovery' since forfeiture and restitution are entirely different remedies that serve different goals." *United States v. Wong* (C.D. Cal., Dec. 9, 2014, 2014 WL 6976080, at *2; *citing United States v. Davis*, 706 F.3d 1081, 1084 (9th Cir. 2013). *See also United States v. Newman*, 659 F.3d 1235, 1241 (9th Cir. 2011) (Clarifying that although defendants must pay both restitution and criminal forfeiture, that result is not an impermissible "double recovery").

At sentencing, the forfeiture money judgment should reflect the full amount of fraudulent proceeds obtained by the Defendant. It seems likely that the forfeiture money judgment will be the same amount as the Sentencing Guideline loss, although that will depend on the Court's findings regarding the Guideline loss amount. The United States respectfully requests this Court impose a forfeiture money judgment of $3,674,338.86 representing the fraud proceeds obtained by the Defendant.

### C. **Application of the Guidelines in Imposing a Sentence under 18 U.S.C. § 3553(b)**

A within-guidelines sentence in this case will properly reflect the accumulated wisdom and expertise of the Sentencing Commission and serve the vital goal of uniformity and fairness in sentencing. The guidelines, formerly mandatory, now serve as one factor among several that courts must consider in determining an appropriate sentence. *Kimbrough v. United States*, 552 U.S. 85, 90 (2007). Nonetheless, "the Guidelines Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise." *Id.* at 108-09 (internal quotation marks omitted). Thus, "the Guidelines Commission's recommendation of a sentencing

**GOVERNMENT'S SENTENCING MEMORANDUM - 14**

range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The guidelines are the sole means available for assuring some measure of uniformity in sentencing, thereby fulfilling a key congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the guidelines, while carefully considering the § 3553(a) factors, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. Therefore, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

The guidelines deserve significant respect. The Government recognizes that the guidelines are entirely advisory, and that a district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. A district court, however, must consider the guidelines range, *see* § 3553(a)(4), and is usually well-advised to follow the Sentencing Commission's advice in order to assure fair, proportionate, and uniform sentencing of criminal offenders. Moreover, there are no other § 3553(a) factors in this case which mitigate against imposition of a sentence within that range; to the contrary, the § 3553(a) factors on balance support the imposition of the recommended guidelines sentence. Accordingly, the Government recommends a within-guideline sentence of 63 months.

## CONCLUSION

The Government submits that a sentence of 63 months is sufficient, but not greater than necessary, to accomplish the goals of sentencing, and that a lesser sentence is not supported by application of the 18 U.S.C. § 3553(a) factors. A three-year period of supervised release should follow the prison sentence and the Defendant should immediately pay the $100 special

**GOVERNMENT'S SENTENCING MEMORANDUM - 15**

assessment. The United States requests this Court enter a final order of forfeiture money judgment of $3,674,338.86 and total restitution of $4,009,468.01.

Respectfully submitted this 9th day of September, 2022.

        JOSHUA D. HURWIT
        UNITED STATES ATTORNEY
        By:


        *s/ Traci J. Whelan*
        TRACI J. WHELAN
        Assistant United States Attorney

**GOVERNMENT'S SENTENCING MEMORANDUM - 16**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on September 9, 2022, the foregoing **GOVERNMENT'S SENTENCING MEMORANDUM** was electronically filed with the Clerk of the Court using the CM/ECF system, and that a copy was served on the following parties or counsel by:

| | |
|---|---|
| Steve Roberts<br>Steve_Roberts@fd.org<br><br>Amy Rubin<br>Amy_Rubin@fd.org | ECF Filing |

*s/ Carin Crimp*
Legal Assistant

**GOVERNMENT'S SENTENCING MEMORANDUM - 17**