76

# ORIGINAL

<pre>
 1                UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF IDAHO
 2
    UNITED STATES OF AMERICA,     )  Case No. 2:20-CR-00052-DCN
 3                                )
                                  )  September 16, 2022
 4                    Plaintiff,  )  Coeur d'Alene, Idaho
    vs.                           )
 5                                )  Evidentiary Hearing - Day 2
                                  )  and
 6  TRINA MARIE WELCH,            )  Sentencing Hearing
                                  )
 7  _____Defendant.)  Pages 76 - 190
</pre>

         8            BEFORE THE HONORABLE DAVID C. NYE
              CHIEF UNITED STATES DISTRICT COURT JUDGE
         9

APPEARANCES:

<pre>
10
    For the Plaintiff:           MS. TRACI J. WHELAN
11                               Assistant United States Attorney
                                 6450 N. Mineral Drive
12                               Suite 210
                                 Coeur d'Alene, Idaho 83815
13
    For the Defendant:           MS. AMY H. RUBIN
14                               MR. JOHN STEPHEN ROBERTS, JR.
                                 Federal Defenders of Eastern
15                               Washington and Idaho
                                 North 10 Post Street
16                               Suite 700
                                 Spokane, Washington 99201
17
    Also Present:                Special Agent Bryant Gunnerson
18

19

20  Official Court Reporter:     Ronelle F. Corbey, RPR, CRR, CCR
                                 Washington CCR No. 2968
21                               United States District Courthouse
                                 P.O. Box 700
22                               Spokane, Washington 99210
                                 (509) 458-5283
23

24
    Proceedings reported by mechanical stenography; transcript
25  produced by computer-aided transcription.
</pre>

1      (Court convened on September 16, 2022, at 9:04 a.m.)

2           THE LAW CLERK:  All rise.

3      (Call to Order of the Court)

4           THE COURT:  Please be seated.

5           THE COURTROOM DEPUTY:  The Court will now hear the

6  loss hearing and sentencing on Trina Marie Welch, 2:20-CR-52.

7           THE COURT:  Good morning.

8           MS. WHELAN:  Good morning, your Honor.

9           MR. ROBERTS:  Good morning, your Honor.

10          THE COURT:  Counsel, if you'll identify yourselves for

11 the record, please.

12          MS. WHELAN:  Good morning, your Honor.  Traci Whelan

13 for the United States, and Special Agent Bryant Gunnerson is at

14 table with me.  He's the case agent.  Thank you.

15          THE COURT:  Thank you.

16          MR. ROBERTS:  Good morning, your Honor.  Steve Roberts

17 and Amy Rubin on behalf of Trina Welch; and she's present, your

18 Honor.

19          THE COURT:  Thank you.  Let me just begin by saying --

20 can you all hear me?  We have a lot of people in the gallery

21 here today.  People on both sides of this case; and, frankly,

22 that's great.

23      However, this is not a sporting event.  I expect that there

24 be silence in the gallery.  If there's too much noise or even

25 dramatic gestures, you will be asked to leave and will not be

*EVIDENTIARY HEARING - DAY 2 - SEPTEMBER 16, 2022*
*COURT REITERATES WHAT HAPPENED DURING THE AUGUST 3, 2022, HEARING*
*DEFENDANT'S CASE IN CHIEF*

1  allowed to return.

2      I say that not expecting it to happen, but I need to say it

3  anyway.

4      This is the one warning that you will get.  I will also

5  tell you phones must be turned off.  There can be no recording.

6  There can be no cameras.

7      Last time we were here on this case, the Government put on

8  their evidence regarding the amount of loss incurred because of

9  the defendant's crime.

10      After the Government closed its case in chief, I ruled that

11  it had met its burden of proof to show over 3.5 million in

12  losses.  That amount is important because any loss greater than

13  3.5 million adds at least 10 months to the guideline sentencing

14  range over what it would be if the total loss is between

15  1.5 million and 3.5 million.

16      I also said at that time defendant would have the

17  opportunity to present her case in chief today but that she

18  needed to be careful to not try to present evidence that

19  contradicts what she has already said under oath in the Plea

20  Agreement or in other written documentation.

21      So we're here today to start with the defendant's case in

22  chief.

23      Mr. Roberts, Ms. Rubin, you may call your first witness.

24          MR. ROBERTS:  Thank you, your Honor.  I think your

25  Honor has correctly outlined the summary of where we left off.

*EVIDENTIARY HEARING - DAY 2 - SEPTEMBER 16, 2022*
*PRESENTATION BY MR. ROBERTS*

1 It is -- remains the defense's position that the loss amount

2 that the Court sustained of $3.67 million is not the correct

3 loss amount.  We are still arguing for the plus-16-level

4 enhancement and not the plus-18-level enhancement.

5      Your Honor, in terms of witnesses and given the Court's

6 admonishment, Ms. Welch is not going to testify.  The defense

7 does not have any witnesses.

8      I have one exhibit that I'm going to ask for admission, and

9 then I have several demonstrative exhibits that I plan to show

10 the Court.  And, then, essentially, I'm going to give our

11 argument -- or if the Court wants to hear from the Government

12 first -- but our argument as to why the loss amount should be

13 less than 3.5.

14      That's how I intend to proceed, your Honor.

15           THE COURT:  Okay.

16           MR. ROBERTS:  The first exhibit that I am going to ask

17 the Court to admit is labeled Defense Exhibit 1.  I've given a

18 copy to the Government.  Once I get it, your Honor, on, I'll

19 hand up a copy to the Court and then project it.

20      (Pause in the proceedings)

21           MR. ROBERTS:  May I approach, your Honor?

22           THE COURT:  You may.

23      (Discussion off the record)

24           THE COURT:  Mr. Roberts, it appears these are W-2

25 statements over the years for your client?

1          MR. ROBERTS:  Correct, your Honor.  That is correct.

2     And so I think they should be admitted under seal.  They are

3     marked as Defense Exhibit 1; and it goes from 1-1 to 1-8, your

4     Honor.

5          THE COURT:  The Government's position?

6          MS. WHELAN:  No objection for the admission, your

7     Honor.

8          MR. ROBERTS:  Thank you, your Honor.  Your Honor --

9          THE COURT:  Let me admit it first.  Exhibit 1 is

10    admitted.

11       (Exhibit No. 1 admitted into evidence)

12         MR. ROBERTS:  Thank you, your Honor.

13    Your Honor, essentially, Exhibit 1 is important; and the

14    reason that I'm admitting it is because it shows that Ms. Welch

15    had, essentially, a series of two W-2s for the two Kasco

16    companies at issue here, which were Kasco of Idaho, which was

17    maintained solely by Keith Sims, and then the Kasco

18    Communications, which was a joint partnership between

19    Rick Methvin, who the Court received a letter from, and

20    Mr. Sims.  I think there was an initial 4951 partnership; and,

21    then, after Mr. Methvin paid off the initial due, so to speak,

22    he was a 50-50 partner.

23    But the point is Ms. Welch worked for both of the companies

24    as the CFO/bookkeeper:  Kasco of Idaho and Kasco Communications.

25    And what these W-2s show, your Honor, from 2012 up until

1   she was terminated in 2019 is she was getting paid a steady

2   salary at Kasco Communications starting out at $58,000 in 2013.

3   In 2014, there was $75,000.37 -- or 75,037.80.

4        And then what we see at Kasco of Idaho is her W-2 slightly

5   increasing, and then by 2017 to 2018 it's going down again.  And

6   they -- what you're going to find out later on is that, as

7   Ms. Welch continued to do work for both Kasco of Idaho and Kasco

8   Communications, she also took on bookkeeping responsibilities at

9   two of Mr. Sims' other businesses.  One was called "Best Shots."

10  That was a bar/restaurant in Kellogg.  And then another was a

11  motorcycle business called "Twin Tech."

12       But the point is she was doing a lot of work for not only

13  Kasco of Idaho but those other companies, and her salary did not

14  reflect that.

15       So part of what I'm trying to get across to the Court in

16  Exhibit 1 is that -- excuse me one second, your Honor -- as CFO

17  of both of those companies and later on the other two companies,

18  part of the -- what's not -- what's reflected in the

19  Government's 3.6 million --

20       (Interruption by voices on the public listening line)

21            THE COURT:  Somebody is on the Zoom.  You need to mute

22  your microphone, please.

23       (Pause in the proceedings)

24            THE COURT:  Sorry about that.

25            MR. ROBERTS:  That's all right, your Honor.  Part of

*EVIDENTIARY HEARING - DAY 2 - SEPTEMBER 16, 2022*
*PRESENTATION BY MR. ROBERTS*

1  the Government's loss amount does not include the off salary --

2  the off-books salary that Ms. Welch received.  And we believe

3  that is one of the areas where she actually earned that salary,

4  and the Government's loss amount should be reduced by that

5  amount.  And that amount was 75,000 for Kasco of Idaho, and she

6  was to receive another 75,000 working for Kasco Communications.

7      So that's one area that the defense is challenging the loss

8  amount.

9          THE COURT:  Can you tell me why there's only W-2s for

10  two companies for two years and not for all the rest?

11          MR. ROBERTS:  For the other two companies?  That's an

12  excellent question, your Honor.

13          THE COURT:  No, the -- for the two companies that you

14  submitted W-2s for.

15          MR. ROBERTS:  Right.  So there were no W-2s because --

16  for Kasco Communications, eventually, because what the Court's

17  also going to learn through our speakers and through Ms. Welch

18  is that Kasco Communications dissolved.  I believe it was in

19  2016.  There was a business dispute, litigation ensued between

20  Mr. Sims and Mr. Methvin; and we're going to get into the

21  reasons why but not for the purpose of this hearing but for the

22  sentencing hearing.  And then that company eventually -- they

23  went their -- parted ways, basically, your Honor.  It was

24  dissolved.

25          THE COURT:  And I understand that argument; but, for

1 example, if you look at Exhibit 1-3 --

2 　　　　　MR. ROBERTS:  Yes, your Honor.

3 　　　　　THE COURT:  -- there's only a W-2 for Kasco

4 Communications, LLC.  Why isn't there one for the other company?

5 　　　　　MR. ROBERTS:  That's correct, your Honor.  There

6 wasn't a W-2 for Kasco of Idaho because it is the defense's

7 position that it was Mr. Sims' agreement with Ms. Welch to pay

8 her off the books.

9 　　And also what we're going to argue to the Court later is

10 that was incentivized by an audit that would come in 2016 and

11 again in 2019 to, essentially, get as much money off the books

12 as they could.  And one of the ways that the defense is arguing

13 that Mr. Sims did that was to not pay Ms. Welch on the books so

14 to speak.

15 　　　　　THE COURT:  Well, that happened again in 2016, '17,

16 and '18?

17 　　　　　MR. ROBERTS:  Well, she had W-2s for Kasco of Idaho in

18 2016, 2017, and 2018.  What I'm telling the Court on the Kasco

19 Communications is --

20 　　　　　THE COURT:  Right --

21 　　　　　MR. ROBERTS:  -- by about the '16 time frame, that

22 company was dissolved.  So there was no W-2s for 2017 and 2018.

23 Does that make sense, your Honor?

24 　　　　　THE COURT:  That does.  Is there going to be somebody

25 testify to all of that?

1          MR. ROBERTS:  No, your Honor, there's not going to be

2   testimony to that effect; and I understand that that may give

3   the Court pause.  But let me lead with this, which is,

4   Ms. Welch's Plea Agreement allowed her to challenge this loss

5   amount.  The Court knows that.

6          Part of the problem is anytime that we have tried to attack

7   that loss amount by actually identifying specific checks that

8   were not part of the fraud, we're faced with the problem of

9   breaching the Plea Agreement or Ms. Welch being in a position

10  where she could lose acceptance of responsibility.  And we're

11  not going to let her do that.

12         And so I am navigating a tightrope here where I'm trying to

13  argue to the Court, we stand by our plea, and the amount that we

14  agreed to, at least in controversy or to be able to object to;

15  but what we're saying is this money wasn't fraudulent.  It was

16  earned off books.

17         So that's -- that's how the argument goes as to the

18  salaries.  And, again, I understand that this is kind of

19  difficult; and the Court is going to have some more information

20  as the speakers come forward to sort of color in the lines.  So

21  I understand that the Court would like to probably hear from,

22  you know -- or receive more testimony on this issue, but I feel

23  like we are, again, navigating a tightrope, so to speak, in

24  terms of how to present this evidence to the Court if that makes

25  sense, your Honor.

1    THE COURT:  Well, it makes sense; but didn't she agree

2   to this amount in the Plea Agreement?

3    MR. ROBERTS:  She agreed that the 341 checks were

4   fraudulent, your Honor; but she reserved the right to challenge

5   it.  So I guess that's the issue.  Right?  How are you supposed

6   to challenge that if the agreement was that all of the checks

7   were fraudulent?  She plead guilty to one count, Count 6; but

8   that doesn't mean that every single check -- every dollar of

9   every single check was fraudulent.  I think that's our position,

10  your Honor; and I don't think that runs afoul of what we were

11  permitted to do per the agreement.

12    THE COURT:  Okay.  You may continue.

13    MR. ROBERTS:  Thank you, your Honor.  Your Honor, the

14  next thing that I'd like to reference -- I'm going to put this

15  on the document camera for your Honor.  Can we turn on the

16  screen here?  There we go.

17    MS. WHELAN:  Judge, at this point, I'm going to object

18  to this being used in -- for purposes of bolstering an

19  evidentiary hearing.  These are character letters.  The United

20  States has no ability to cross examine these individuals; and as

21  the Court is well aware, even though I was not here when the

22  United States met its burden, it presented evidence and exhibits

23  that could be cross examined.

24    So this would be inappropriate for this part of the

25  hearing.

1            MR. ROBERTS:  May I respond, your Honor?

2            THE COURT:  You may.

3            MR. ROBERTS:  Your Honor, I think Agent Gunnerson's

4   testimony at the last hearing was that they did not interview

5   Rick Methvin at all during this investigation.  The Government

6   had an opportunity to reach out to Mr. Methvin.  I haven't

7   received any subsequent 302s.  So the fact that they had the

8   opportunity, did not reach out to him should not prevent us from

9   at least showing this exhibit, which I filed under seal with the

10  Court as Exhibit C.  You can see the --

11           THE COURT:  Has the Government seen this before today?

12           MR. ROBERTS:  The Government saw this letter --

13           MS. WHELAN:  Yesterday.

14           MR. ROBERTS:  -- yesterday, your Honor, in terms of --

15  as part of our character letters that we filed.

16           MS. WHELAN:  Additionally, your Honor, if I may?

17           THE COURT:  You may.

18           MS. WHELAN:  If the defense wanted Mr. Methvin to

19  testify and to present, they could have subpoenaed him.  This is

20  hamstringing the Government because we cannot cross examine a

21  piece of paper that was purported to be a character letter that

22  was attached to a sentencing recommendation.

23       We've asked repeatedly what evidence might be presented at

24  today's evidentiary hearing.  I was given Exhibit 1 today.  I

25  was given the character letters yesterday.  I cannot cross

1 examine him nor should this be the basis for the Court to make a

2 decision as weighty as this.

3          THE COURT:  I am troubled by that.  These were

4 submitted to the Court for purposes of sentencing.  I was never

5 informed they were for purposes of the evidentiary hearing, and

6 I have never heard from or met Mr. Methvin.  All I know is that

7 he and Mr. Sims had some kind of a falling out.  I don't know

8 why I would believe anything he says when I don't -- I don't

9 even get the chance to see him on the witness stand.

10          MR. ROBERTS:  Well, your Honor, I'm not trying to

11 admit this -- this exhibit.  It's merely for demonstrative

12 purposes.  I know the Court read the letter.

13          Can I get to the point then?  The point of this exhibit is

14 that, when Agent Gunnerson testified on -- for the Government

15 during their loss portion, he indicated that he did not

16 interview Mr. Methvin and that the 80 checks that Mr. Sims

17 submitted as part of the loss amount for Kasco Communications

18 that total around $253,000, right, were submitted as part of the

19 loss amount and yet there was no QuickBooks or Sage accounting

20 system provided for those checks.

21          So my argument is that the Government did not meet their

22 burden and that this does bolster that argument, but it comes

23 directly from Agent Gunnerson's cross examination that no

24 accounting system or no software was provided for the Kasco

25 Communications checks.  And that's particularly telling that,

1  when Mr. Sims and Mr. Methvin parted their separate ways, which

2  we'll learn about later, that Mr. Sims did not raise the issue

3  with Mr. Methvin.  And there was no issue in terms of

4  Ms. Welch's accounting, your Honor.

5          MS. WHELAN:  Your Honor, respectfully, the Government

6  would move to strike that argument.  This is not a demonstrative

7  exhibit for purposes as which counsel is purporting.  This is

8  hearing by sandbag.

9      And, respectfully, Judge, in the Plea Agreement, what it

10  was was that the defendant agreed and knew the Government's

11  position.  The Government appeared and accounted for each of

12  those checks and showed through -- because I read through the

13  testimony even though I wasn't here -- how each was accounted

14  for and put on an individual who has the appropriate training

15  for this.

16      This is simply argument in trying to reduce it, and it is

17  not -- it could be argued that now they're saying 80 of those

18  checks were not actually fraudulent and that it's in breach of

19  the Plea Agreement.

20      And, additionally, the Government can't cross examine this.

21  Defense could have subpoenaed him if it was important.

22      And so I'd move to strike that argument.

23          MR. ROBERTS:  May I respond, your Honor?

24          THE COURT:  You may.

25          MR. ROBERTS:  Your Honor, the response is that the

*EVIDENTIARY HEARING – DAY 2 – SEPTEMBER 16, 2022*
*PRESENTATION BY MR. ROBERTS*

1   Government bears the burden to prove loss.  And in this case,

2   the argument is that they have not borne the burden to that

3   entire 3.6 million.  I don't know how else I'm supposed to be

4   able to exercise the right to challenge that loss amount other

5   than to make arguments that I'm making, which is they didn't

6   bear their burden; and that certainly is not a breach of the

7   plea agreement.

8          THE COURT:  You could have him here to testify today.

9   That certainly would have helped better than this letter does.

10         MR. ROBERTS:  Correct, your Honor.  And, then, if that

11   had occurred, then, of course, if we had called into question

12   the accuracy of the 80 checks, which were -- came straight from

13   Mr. Sims and not Mr. Methvin, then we would have been in breach

14   of the Plea Agreement.

15      So I go back to that initial conundrum.  So --

16         THE COURT:  The Plea Agreement that your client

17   entered into.

18         MR. ROBERTS:  Absolutely, your Honor.  Absolutely,

19   your Honor.  So I'm going to move on then and just say this --

20         THE COURT:  Okay.  Let me say this:  This exhibit's

21   already in the record.  I will give it the weight that it's

22   entitled to for purposes of this evidentiary hearing and that

23   weight, frankly, is minimal, if anything.

24         MR. ROBERTS:  Thank you, your Honor.

25      Your Honor, I'm just going to, then, conclude that there

*EVIDENTIARY HEARING - DAY 2 - SEPTEMBER 16, 2022*
*PLAINTIFF PRESENTS NO REBUTTAL*
*CLOSING ARGUMENTS*

1  are amounts of money that we don't believe should be included in

2  the loss amount.  Our objections have been lodged in terms of

3  the loss amount.  We are asking the Court to sustain the

4  objection and find that the specific offense characteristic

5  should be increased by only 16 levels and not 18 levels.  If

6  that were sustained, the guideline range would decrease to 41 to

7  51 months.  That's taking into account the abuse of trust and,

8  of course, the three levels of acceptance, which we believe that

9  Ms. Welch should receive and we do not believe that this runs

10  afoul of any of the Plea Agreement issues.

11      Thank you, your Honor.

12          THE COURT:  For the record, I don't believe you've run

13  afoul of any of the Plea Agreement either.

14          MR. ROBERTS:  Thank you, your Honor.

15          THE COURT:  Ms. Rubin -- Ms. Rubin, I'm sorry.

16      Ms. Whelan, do you want to call any rebuttal witnesses?

17          MS. WHELAN:  I don't believe there's anything to

18  rebut, your Honor.  No thank you.

19          THE COURT:  All right.  Do you want to make any type

20  of closing arguments either side?

21          MS. WHELAN:  Your Honor, if it's okay with the Court,

22  in the interest of time, I would just reserve rebuttal.  I don't

23  think there's been anything that would require me to argue

24  anything different than what the Court's already found.

25          THE COURT:  All right.  And, Mr. Roberts, anything you

*EVIDENTIARY HEARING - DAY 2 - SEPTEMBER 16, 2022*
*CLOSING ARGUMENTS*

1  want to argue in addition to what you've already said?

2          MR. ROBERTS:  One second, your Honor.

3      (Discussion off the record)

4          MR. ROBERTS:  Your Honor, I'd just -- Ms. Rubin

5  reminded me of one thing that I forgot to point out, which was

6  in Mr. Sims's own statement, I think in the 302s, and his

7  subsequent statements, there also was a lack of QuickBooks

8  software.  So the point goes to he got to put in all of the

9  checks knowing that there was no, at least, portions, gaps of

10  accounting software for these things to be reviewed.  And I just

11  want to remind the Court of that.

12      So, no, I don't have anything further.  And I think we

13  are -- the defense is prepared to launch right into sentencing,

14  your Honor.

15          THE COURT:  All right.

16          MS. WHELAN:  Judge, I do have one response to that.

17          THE COURT:  Go ahead.

18          MS. WHELAN:  Respectfully, your Honor, the United

19  States is troubled by this presentation as if Mr. Sims is

20  somehow presenting evidence and there's some nefarious part upon

21  Mr. Sims' part.  This is a case brought behind -- before -- by,

22  excuse me, the United States.  The evidence was presented

23  through the FBI agent who presented his qualifications before

24  this Court and the training that he has.  The Court has found

25  that.

1    We would ask the Court to maintain that loss amount as

2    found in the PSR.  There were no objections to the PSR.  It is

3    the correct finding in this case.

4    Thank you.

5         THE COURT:  Thank you.  It is my finding, based upon

6    the evidence presented in this two-day hearing and my

7    discretion, that there has been over $3.5 million in loss in

8    this case.

9    Specifically, I find that the amount of loss is $3,674,000.

10   Defendant has challenged the loss amount claiming that there are

11   moneys that should not be included, but they've presented no

12   evidence that I can consider.

13   Thus, my prior ruling stands as far as the loss is

14   concerned.

15   I recognize that amount of loss is not the same thing as

16   restitution.  Restitution will be determined as part of

17   sentencing.

18   What the amount of loss does mean is that the figure used

19   to determine the offense level will be a plus 18 rather than a

20   plus 16 when it comes to amount of loss.

21   We're going to take a ten-minute recess, and then we'll

22   proceed with sentencing.  Court will be in recess.

23   (Court recessed at 9:28 a.m.)

24   (Court reconvened at 9:44 a.m.)

25        THE COURT:  Please be seated.  We are back on the

*SENTENCING HEARING - SEPTEMBER 16, 2022*

1  record.  We've completed the evidentiary portion; proceeding now

2  into sentencing.

3       In this case, the defendant entered a plea of guilty to

4  Count 6 of the Indictment.  The Court accepted her plea and

5  ordered a Presentence Investigation Report.  That report has

6  been provided to Court and counsel, and I have reviewed it.

7  Today is the date set for sentencing in this matter.

8       To begin with, the Plea Agreement contained an agreement to

9  dismiss Counts 1 through 5 and 7 through 15 pursuant to

10 Rule 11(c)(1)(A).  Does the Government intend to make that

11 motion?

12          MS. WHELAN:  We so move, your Honor.

13          THE COURT:  The Court finds that the defendant's plea

14 of guilty to Count 6 adequately reflects the seriousness of the

15 defendant's crime.  The Court, therefore, grants the

16 Government's motion and dismisses Counts 1 through 5 and 7

17 through 15.  Only Count 6 remains, and I accept the Plea

18 Agreement.

19      I have received several documents submitted by the counsel

20 in advance of today's hearing.  Specifically, a Sentencing

21 Memorandum, an Amended Memorandum filed by the Government,

22 Victim Impact Statements, and character letters on behalf of the

23 defendant.

24      Are there any other documents or letters to be submitted

25 today?

94

*SENTENCING HEARING – SEPTEMBER 16, 2022*
*VICTIM IMPACT STATEMENTS*

1          MS. WHELAN:  No, your Honor.

2          MS. RUBIN:  No, your Honor.

3          THE COURT:  Ms. Whelan, do you have anyone who's going

4  to give statements or testify at sentencing?

5          MS. WHELAN:  Your Honor, Mr. Sims wishes to make a

6  Victim Impact Statement.

7          THE COURT:  All right.  And, then, for the defense, I

8  understand there are several people who are going to give

9  statements?

10         MS. RUBIN:  That is correct.

11         THE COURT:  Why don't -- well, before we get to that,

12  has the defendant had the opportunity to read the Presentence

13  Investigation Report?

14         MS. RUBIN:  Yes, she has.

15         THE COURT:  And did you, Counsel, have the opportunity

16  to discuss that report and review it with your client?

17         MS. RUBIN:  Yes, we did.

18         THE COURT:  All right.  There were no objections filed

19  to the Presentence Report.  So I'm going to accept the report as

20  my own findings in this matter.

21      So at this time, let's go forward with the statements.

22  We'll start with Mr. Sims on behalf of the Government.

23         MS. WHELAN:  Thank you, your Honor.  Mr. Sims, would

24  you come forward.

25         THE COURT:  Sir, if you'll state your name and your

1  occupation for me.

2           KEITH ALLEN SIMS:  Keith Allen Sims.  I'm a

3  self-employed contractor and the sole owner of Kasco of Idaho.

4           THE COURT:  All right.  Go ahead.

5           MS. WHELAN:  Okay.  So I want you to speak into the

6  microphone, okay, so we can hear and get that ready.  Okay.

7           KEITH ALLEN SIMS:  On June 26th when we discovered

8  Ms. Welch's theft, I was in my 40s.  Tomorrow will be my 53rd

9  birthday.  There's been a significant impact on my health, my

10 mind, and my family in nearly three-and-a-half years waiting for

11 today.

12      Also on June 26th, 2019, when we discovered her theft, we

13 had less than $80,000 in our account.  We could not survive any

14 more theft and/or make payroll and our expenses.

15      I had put all of the money from my personal account I

16 could; and at that very time, Mrs. Welch was still trying to

17 convince me to take out a line of credit to allow Kasco to

18 continue in business.

19      To put it in perspective, your Honor, during the

20 four-and-a-half years that Ms. Welch embezzled, misappropriated,

21 stole nearly $3.7 million, it averages out to $68,035 a month.

22 That would be the average.

23      I realize you've read my Victim's Impact Statement.  Thank

24 you for that.  I was thinking about this day, and I realize it's

25 important for you to hear something else.  This is a recording

1  of the day that I confronted Ms. Welch with her theft.  You will

2  notice that not once does she apologize.  She only tries to

3  convince me to work through it without law enforcement.

4       MS. WHELAN:  Your Honor, for the Court's knowledge we

5  did let defense know we were playing this and have provided a

6  copy of this for the record, for the Court because we know it's

7  going to be impossible to type it.

8       THE COURT:  With your mask on, I thought that was the

9  recording already going.  Sorry.

10       MS. WHELAN:  Sorry.  Go ahead.

11       KEITH ALLEN SIMS:  Your Honor, I met Trina at the

12  door.  We had already -- I had to work with Trina for about a

13  week prior to this meeting, and I convinced her to come in.  She

14  was -- had a -- it was a holiday weekend, and she had a long

15  weekend planned.  I had convinced her to come in.  We had

16  cleaned out her office, and so there's a little bit of back and

17  forth as we move to the conference room.

18     (A recording was played)

19       THE COURT:  Counsel, I'll need a copy of that

20  recording for the record.

21       MS. WHELAN:  Your Honor, the Court has a copy.  We

22  provided it this morning.  Thank you.

23       THE COURT:  Thank you.

24       KEITH ALLEN SIMS:  So, your Honor, to this day, she

25  has never apologized or shown any remorse.  I've had a lot of

1   time to review the United States' Sentencing Memorandum, and I

2   know they recommended 51 months.  As a victim in this case, the

3   person who almost lost everything I had worked for and as the

4   spokesman for the other people who were injured, like, my

5   employees and their families, I am asking for a much higher

6   sentence than 51 months.  Of course, that is the Court's

7   determination.  But the seriousness of this crime demands it,

8   and I feel that it may deter other similar crimes.

9       I am a bit dumbfounded by the emotions of others knowing

10  she did this but yet she should be shown a lesser sentence.

11      Trina stole money, which we've determined here.  She also

12  stole dignity, confidence, my ability to trust.  But I can

13  assure you I've never lost my sense of humor through this nor my

14  faith in God.

15      Thank you.

16          THE COURT:  Thank you.

17          MS. WHELAN:  Your Honor, other than the other Victim

18  Impact Statements, which there were two from employees, that's

19  all we have.  No other witnesses to present.

20          THE COURT:  And I have read both of those.

21          MS. WHELAN:  Thank you.

22          THE COURT:  From the defense side, your people, if

23  they want to give their statements now.

24          MS. RUBIN:  Yes, thank you, your Honor.

25          THE COURT:  Tell me who you are and your relationship

1  to the defendant.

2      STACY WELCH:  Your Honor, my name is Stacy Welch.

3  Trina Welch is my sister.  We have a brother, Richard Beyl,

4  who's here in court today, as well.

5      As far as siblings go, I'm blessed.  While our father

6  passed away at a very young age and our mother has been absent

7  most of our adult lives, Trina, my sister, has kept us together

8  as a family unit.

9      Trina became a mother at a young age and immediately

10 excelled at that role.  Nick, Derrick, Brock, Zack, and Elli

11 have been blessed with a mother who loves every second of her

12 role.  This includes the mundane daily responsibilities, such

13 as, making school lunches, folding basket after basket of

14 laundry, bandaging scraped knees, and cleaning up after five

15 kids in one house.

16     Trina has been with each of her children for the most

17 exciting times in their lives, whether that was winning big

18 games, high school and Marine graduations, and the birth of her

19 four beautiful grandchildren.

20     Trina's daily involvement with her children and

21 grandchildren is simply amazing.  No matter where they are or

22 what they are doing, they are in communication with her.  She's

23 a reliable constant in their daily lives.

24     In addition to being an outstanding mother to her children,

25 Trina has stepped in as a -- as a parental figure for me

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*ADVOCATE STATEMENTS FOR THE DEFENDANT*

1  personally.  I will never forget her being there for me when I

2  gave birth to my first child, and she's never missed an

3  important moment since for either of my two children.

4      I often rely on my sister as much more than that.  She

5  fills the role of a mother and confidant for me.  And although

6  her hands were plenty full, she never wavered in being there for

7  me and my family.

8      In July of 2019, my sister's world was flipped upsidedown.

9  I recall having a conversation with her in which she could

10  barely speak between the sobs.  Her character was in question,

11  and I could not believe it.  Trina has shared with me her

12  accountability in the events which occurred with Kasco of Idaho.

13      As a result of the accusations, Trina and her family have

14  also been affected in many ways.  Trina has been the subject of

15  what can only be described as bullying through social media by

16  several individuals who had previously been her friend.  This

17  bullying starting -- started immediately in July of 2019 and

18  continues to occur now.

19      In fact, as late as last week, a social-media post

20  containing an invitation to "Welcome to a Prison Party" was

21  published.  That along with the hundreds of other posts have

22  reached their intended targets:  Trina, her husband, and her

23  children.

24      To those who are involved and who can hear me today, you

25  should be disgusted with yourselves.

SENTENCING HEARING - SEPTEMBER 16, 2022
ADVOCATE STATEMENTS FOR THE DEFENDANT

1      Outside of the ongoing online harassment, Trina's entire

2  life changed starting in July of 2019.  She cannot go to places

3  we all visit daily.  She cannot simply get groceries or get the

4  mail without feeling the fear of being harassed.  Only after

5  many conversations and learning ways to calm her nerves was she

6  able to attend her daughter's school activities, including

7  sporting events.

8      I believe Trina, my sister, has learned from her mistakes;

9  and this experience has humbled her while bringing with it

10  wisdom to avoid such violations from occurring ever again.

11      Prior to the events with Kasco of Idaho, Trina has not

12  committed a crime, regardless of what people have said on social

13  media, which affects society or makes her a danger to the

14  community.  While I do understand she has acknowledged her guilt

15  and accepted her accountability, I do hope that you will

16  consider her overall character and importance to the well being

17  of our family, her children, and her grandchildren in your

18  sentencing.

19      Trina has a son and daughter in college who are not here

20  today.  They are not here as Trina specifically told them school

21  and their exams were important, and she'd see them after

22  sentencing.

23      Trina has a son and grandchildren who live out of state and

24  could not be present in court today.  Please allow her the

25  opportunity to see her children and grandchildren one last time

1  before checking -- prior to checking herself in.

2      Trina has taken accountability and has every intention of

3  turning herself in and answering to the judgment ordered by this

4  Court.  As her sister and as a family, I can commit to this

5  Court and your Honor that she will self check in where and when

6  required.

7      Despite the current charges, I know Trina Welch, my sister,

8  to be an honorable individual, a valuable member of her

9  community, and a good human being.

10      Thank you, your Honor, for your time and consideration.

11          THE COURT:  Thank you.

12      (Pause in the proceedings)

13          THE COURT:  Again, tell me who you are.

14          GIZELLE KOTSHEVAR:  Your Honor, my name is

15  Gizelle Kotshevar.  Most people know my by Gigi, and I'm also a

16  former employee of Kasco of Idaho and Kasco Communications.

17          THE COURT:  Go ahead.

18          GIZELLE KOTSHEVAR:  I believe I have additional

19  information that I know to be pertinent to Trina's case.  While

20  I worked in Rathdrum for Kasco, Keith decided he wanted to

21  install a safe.  The safe was installed in the corner of Trina's

22  office.  I found it odd.  Kasco was not a cash business; and if

23  he felt the need to install a safe, why he wouldn't have put it

24  in his own office.

25      A few months later, Keith installed a camera system.

1  Another oddity was the fact that the camera in Trina's office

2  did not point at the safe or the doorway at all.  It was

3  installed above her desk pointing straight down at her.

4      He often would send her messages from out in the field

5  commenting about her nice cleavage and her clothing.

6      Like I said in my letter to the courts, Keith treated Trina

7  like a trophy.  If he was in the office, he was usually in

8  Trina's office with her behind closed doors.

9      I never understood why there were so many secrets.  To me,

10  it was a very dark and strange place to work.

11      So much about Kasco was off to me; for example, when Keith

12  fired Skye Sams unexpectedly and gave me her complete workload

13  on top of what I was already doing full time, not to mention I

14  was not knowledgeable in her position whatsoever.  Her role was

15  very important in the daily function of the company.

16      Working with contracts of the telecommunication companies

17  seemed to me to be Kasco's bread and butter.  Each company had

18  different protocols of how to submit and receive information.

19  If it wasn't correct, it would be rejected.

20      I wasn't trained in this.  Therefore, I felt very set up

21  for failure.

22      Skye's other roles, from what I can remember, were employee

23  insurance, DOT compliance of Department of Transportation, IFTA,

24  IRP, tax association, licensing equipment, each state has their

25  own qualifications and codes, and the licensing of Keith's and

1  his family's personal vehicles; such as, campers, cars, trucks,

2  snowmobiles, motorcycles, and trailers.

3      I went home nightly very upset and crying a lot.  I told my

4  husband on many occasions that Keith was setting me up for

5  failure.  My husband, Don, assured me that Keith believed in me

6  because, "If you fail," he said, "he fails."

7      Keith not only set me up to fail in my position with Kasco,

8  he played head games and gaslighted me as he would block me out

9  of my computer.  If he didn't do it himself, he had our computer

10 technician do it.

11     Keith would then call me out as a form of discipline for

12 not doing my work.  He did the exact same thing to Cathie Bailey

13 before she quit her job at Kasco.

14     I was grossly belittled and sexually harassed by Keith Sims

15 while working at Kasco.

16         THE COURT:  I'm going to interrupt you.

17         GIZELLE KOTSHEVAR:  Okay.

18         THE COURT:  Blaming the victim for being sleazy and

19 shifty -- I understand you're venting, but that doesn't give the

20 defendant a license to steal.  And that's why we're here is her

21 and her sentencing.  Focusing on him does not help her.  Okay?

22         GIZELLE KOTSHEVAR:  Okay.

23         THE COURT:  So focus on her.

24         GIZELLE KOTSHEVAR:  Okay.

25     Because Trina and I have been friends for 25 years, I was

1  with her on hundreds of occasions when Keith would contact her,

2  while she was still an employee for Kasco, while she was off

3  work on vacation, holidays, evenings, and weekends.  There was

4  never a time that was off limits in his mind for him to contact

5  her.  I find it ridiculous for anyone to believe she was only

6  making $20,000 a year managing 4 to 5 of his companies'

7  financials.

8          MS. WHELAN:  Your Honor, I'm going to object.  This is

9  not going to the character or to support Ms. Welch.  It is,

10  again, attacking Mr. Sims.

11          THE COURT:  It's still attacking the victim and --

12          GIZELLE KOTSHEVAR:  Okay.

13          THE COURT:  -- that doesn't accomplish anything.  I

14  need to know what kind of woman she is.

15          GIZELLE KOTSHEVAR:  Okay.  Okay.

16      Trina has kept a very low profile during these last

17  34 months.  She rarely leaves her home.

18      My husband, Don, and I also arranged -- sorry, your Honor.

19  I'm just trying to redo this --

20          THE COURT:  I understand.

21          GIZELLE KOTSHEVAR:  -- a little bit.

22          THE COURT:  I'm making you ad lib, and I

23  understand that.

24          GIZELLE KOTSHEVAR:  That's okay.  That's okay.

25          THE COURT:  But it -- but the focus needs to be on

1  her.

2       GIZELLE KOTSHEVAR:  Trina removed herself from social

3  media immediately from this happened on July 3rd of 2019 and is

4  only in contact with a small amount of people.

5       She attended her daughter's sporting events her senior year

6  as best she could, but it did require her to take an

7  anti-anxiety medication.

8       I helped her make an appointment with a new doctor because

9  I saw the mental -- that mentally she wasn't good.  When she

10  wasn't in bed trying to ignore the world around her, she was

11  crying all the time; and I felt it important for her to connect

12  with a medical professional.  She has anxiety and suffers

13  anxiety attacks often to this day.

14       She no longer works.  She won't go to the grocery store,

15  the post office, a gas station, or the school.  She would bring

16  her daughter's lunch to school and drop it off in her car for

17  her to avoid seeing people.

18       She is trying to be strong for her children and get through

19  this the best she can.  I have lived through this with her for

20  the last three years.  She works on this case every single day

21  in an attempt to help lessen the load for her team of attorneys.

22       Trina is very sorry for the grief and heartache her actions

23  have caused.  She is horribly embarrassed that she allowed

24  herself to be influenced by many.  What she wants most of the

25  outcome of this hearing today is the truth, her truth and

1 participation in her dealings with Keith Sims, and Keith Sims'

2 truth.

3     Trina has come to terms with the possible facts of her

4 punishment and is ready to put this chapter of her life behind

5 her.

6     Thank you, your Honor.

7         THE COURT:  Thank you.

8         MS. RUBIN:  Your Honor, may I just have one moment?

9     (Discussion off the record)

10         MS. RUBIN:  Your Honor, I think, before we bring up

11 the next two folks and probably before we proceed with regard to

12 the other parts of this sentencing hearing, would it be possible

13 to just have a quick conversation at the bench with -- with the

14 Court to include, obviously, Ms. Whelan?

15         THE COURT:  You want it on the record?

16         MS. RUBIN:  I think -- I don't know that it needs to

17 be on the record.

18         THE COURT:  All right.

19     (Discussion off the record at the bench)

20         THE COURT:  We're going to take a ten-minute recess,

21 and then we'll continue on.  Court will be in recess.

22     (Court recessed at 10:21 a.m.)

23     (Court reconvened at 10:52 a.m.)

24         THE COURT:  Please be seated.  Ms. Rubin, you may

25 proceed.

1       MS. RUBIN:  Your Honor, I believe we have only one

2  more person to speak on behalf of Ms. Welch today.

3       THE COURT:  Who is that?

4       MS. RUBIN:  Her name is Brooks Annette --

5     (Discussion off the record)

6       MS. RUBIN:  Oh, sorry.  Brook Chilson.  Chilson?

7     (Discussion off the record)

8       THE COURT:  All right.

9       MS. RUBIN:  Chilson.  Sorry.

10      THE COURT:  Let me state for the record that I was

11 handed, during the break, a letter from Lorinda Blalack, I

12 believe is the ex-wife.  I have read that letter.

13      I will say that there are several statements in there as to

14 the cause for the breakup of the marriage that contradict what

15 Mr. Sims said.  I appreciate that.  I understand that there's

16 two sides to everything.

17      But, again, that has nothing to do with the defendant being

18 sentenced today; but I have read the letter in its entirety.

19      So go ahead.

20      MS. RUBIN:  Thank you, your Honor.

21      THE COURT:  Tell me your name.

22      BROOK CHILSON:  Brook Chilson.

23      THE COURT:  And your relationship to the defendant.

24      BROOK CHILSON:  I've been friends with her for a

25 little over 16 years.

1    THE COURT:  All right.  Go ahead.

2    BROOK CHILSON:  Okay.  I'm an owner/operator of my own

3 accounting and tax service for about 25 years just to give you a

4 little background.

5    Trina and I have become exceptionally close over the past

6 eight years.  During the time, I've learned so much from her.

7    (Interruption by the reporter)

8    BROOK CHILSON:  Sorry.

9    (Interruption by the reporter)

10   BROOK CHILSON:  About her -- and about her.  She's an

11 amazing mother, wife, and friend.  Her main priority has always

12 been her children and her husband.  When she first moved to the

13 Silver Valley, she started the flag football league for the

14 Silver Valley children.  She wanted to make sure not only her

15 children but other children had the opportunity to participate.

16   She also would help with fundraising for basketball and

17 football teams for many years.  She made a point --

18   THE COURT:  If I can interrupt, are you just reading

19 the same letter you submitted to me?

20   BROOK CHILSON:  No.  Just the first part.

21   THE COURT:  Okay.

22   BROOK CHILSON:  Okay.

23   THE COURT:  Thank you.

24   BROOK CHILSON:  Um-hum.  She organized spaghetti feeds

25 at her home multiple times a year to celebrate.

SENTENCING HEARING - SEPTEMBER 16, 2022
ADVOCATE STATEMENTS FOR THE DEFENDANT

1      (Discussion off the record)

2           BROOK CHILSON:  One of Trina's favorite things to do

3    was to have an annual Christmas tea for the women in the Silver

4    Valley.  She would invite many women from many different walks

5    of life.  She felt it was so important for women in the

6    community --

7           (Interruption by the reporter)

8           BROOK CHILSON:  Okay.  Sorry.

9      One of Trina's favorite things to do was have the annual

10   Christmas tea for women in the Silver Valley.  She would invite

11   many women from many different walks of life.  She felt it was

12   so important for women in the community to show support for one

13   another; to make new friends, especially for newcomers to the

14   Silver Valley.  It is very important for her to see other women

15   enjoying themselves and being happy and successful with

16   everyone.

17      Trina has taught me a lot over the years.  She has a way

18   about her that helps you understand what someone else may be

19   feeling or going through.  Her passing judgment against people

20   is something that she does not usually do at all.  She has been

21   there for me and my children no matter what we have been

22   through.  She's there at the drop of a hat.  The amount of

23   compassion she has for other people is a rare quality.

24      I just wanted to clear up one thing that was put in the

25   news press and then -- it was accusing her of bank fraud

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*ADVOCATE STATEMENTS FOR THE DEFENDANT*

1  earlier, and I just wanted to clarify.  I do have the Judgment

2  in that case.  Is it okay if I just clarify it for the record?

3          THE COURT:  Go ahead.

4          BROOK CHILSON:  (Reading)  On January 25th, 2022, the

5  Shoshone news press released an article --

6          THE COURT:  Just slow down though.

7          BROOK CHILSON:  Sorry.

8          THE COURT:  And I -- and I apologize for having to

9  tell you that, but she has to --

10          BROOK CHILSON:  Right.

11          THE COURT:  -- take down everything we say.  And we

12  have a tendency to read faster --

13          BROOK CHILSON:  I know.  Sorry.

14          THE COURT:  -- than we speak.  So slow down.

15          BROOK CHILSON:  Okay.  (Reading)  Within the post, we

16  were able to comment and post other information.  There was an

17  additional old news article from 1996 where the headline read

18  "Accused Bank Embezzler Pleads Guilty."  There were many people

19  listed in this article that had plead or were charged with a

20  crime.  I would like to set the record straight on the matter.

21          On October 18th, 1996, Trina and her ex-husband at the time

22  were charged with bank fraud originally listed as "bankruptcy

23  fraud."  Charges against her husband were dropped because he was

24  a teacher and the charge could affect his employment.  Trina

25  took responsibility for the charge.  They both chose to use the

1  credit card that was listed on their bankruptcy, which is a

2  crime.

3      The reason for them to file bankruptcy was attributed to

4  many factors, but the most important factor was that Trina lost

5  her daughter the same day she had her.

6      That same day her husband left the hospital after her

7  daughter passed and was in an accident at the ICU.  Trina did

8  not work at a bank or steal from a bank.  She used her credit

9  card to pay bills, and she shouldn't have.  I do have the actual

10 Judgment from 1996.

11         THE COURT:  She used her credit card that did not have

12 funds attached to it.  Who -- who was the victim there?  The

13 bank.

14         BROOK CHILSON:  No, I'm not saying she was.  I'm

15 just -- people -- because it says that she was bank embezzling.

16 Somebody else in that article was, but I'm just clarifying it.

17         THE COURT:  I -- I understand that she did not work at

18 the bank.

19         BROOK CHILSON:  Well, she still did something wrong a

20 hundred percent.

21         THE COURT:  Okay.

22         BROOK CHILSON:  I just wanted to clarify it.

23     (Pause in the proceedings)

24         BROOK CHILSON:  Trina and I have talked multiple times

25 daily for the -- since this has happened, of course.  She takes

*SENTENCING HEARING – SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. WHELAN*

1  accountability.  She knows she did wrong.  She wishes she could

2  turn back time and do things right.  She feels awful about

3  everything and what it's done to her family.

4      Thank you.

5          THE COURT:  Thank you.

6          MS. RUBIN:  We have no other witnesses, your Honor.

7          THE COURT:  All right.  Ms. Whelan, if -- would you

8  like to make your recommendations at this time?

9          MS. WHELAN:  I would, Judge.  Sometimes you can have

10 too many papers so I might have to walk -- sometimes you can

11 have too many papers so I may have to walk back and forth, and

12 I'll try to be careful because I know I have a mask on.

13     Judge, first, as a housekeeping matter because I don't want

14 to miss anything, Mr. Maloney and Mr. Humphries, as you know,

15 are also involved in this case.  They have to do with the

16 restitution and the forfeiture, and they sent me an email so I

17 didn't forget.

18     So I'm going to -- we are asking the Court to recognize the

19 Preliminary Order of Forfeiture, which was already entered on

20 the real property, which is found at ECF 52 and make a finding

21 on the forfeiture money judgment and order it.

22     That is in my sentencing brief and then there was a motion

23 yesterday, and I don't want to forget that.  And I don't believe

24 there's any objection to that forfeiture if the Court is --

25 would grant that.

1          MS. RUBIN:  No objection.

2          THE COURT:  Did you say, "No objection"?

3          MS. RUBIN:  No objection.

4          THE COURT:  Then, as part of my Order today, I will

5    make that a final Forfeiture Order.

6          MS. WHELAN:  Your Honor, I next just want to talk

7    about restitution briefly.  We did outline that in our

8    memorandum.  And pursuant to 18 USC 3664(j)(1), we ask that

9    Kasco -- if the Court orders restitution in this matter, that

10   Kasco's restitution be paid before the insurance company

11   restitution is paid if the Court will incorporate that in its

12   Order.

13         THE COURT:  All right.  I will.

14         MS. WHELAN:  And I apologize.  I'm taking this out of

15   order, but I -- I know they're important parts that normally I

16   would not get to.  So --

17       And then, your Honor, also, notwithstanding a payment plan

18   or schedule that the Court may order, the United States will

19   seek to collect the entire restitution amount pursuant

20   18 USC 3613 so that the Court is aware there.

21         THE COURT:  That will be part of my Judgment.

22         MS. WHELAN:  Okay.  Thank you.  I can put this part

23   down.

24       Your Honor, I can honestly say that I have had homicide

25   cases with less drama in the courtroom than what we have seen

1   today.  And I think all of the lawyers are well aware that what

2   we are here for today is sentencing of Ms. Welch, and that is

3   controlled by the factors found in 18 USC 3553(a).

4        The United States did file a Sentencing Memorandum last

5   week as we're -- as a week beforehand as we were required to --

6   well, if we wanted to file, filed a week beforehand -- and the

7   Court has gone through that.  I don't intend to go through that

8   and reiterate it, but I think there are some important parts

9   that I want to discuss in that.

10       First, the Court will notice that we filed an Amended

11  Sentencing Memorandum that was ECF 80; and that is because I

12  made an error.  In the first sentencing recommendation, I wrote

13  the wrong recommendation.  And the Government's recommendation

14  is 51 months, which is the low end of the guidelines.  And I

15  believe the Court has accepted the Presentence Report or will

16  accept it as its own finding.

17           THE COURT:  All right.  And that is your -- that's the

18  one you're standing on is the 51 months.

19           MS. WHELAN:  Yes, your Honor.

20           THE COURT:  Okay.

21           MS. WHELAN:  And I want to make sure everyone is clear

22  about; that the Government made an error and we've corrected it

23  and that is our recommendation is 51 months.

24           THE COURT:  Understood.

25           MS. WHELAN:  Thank you, Judge.

1    Now, when we go through -- sorry.  Let me just get through

2  the rest of the recommendation.

3    The rest of the recommendation is 51 months in custody,

4  which we would respectfully ask be imposed today and she be

5  remanded;

6    That supervised release of three years follow with

7  conditions as outlined by the Pretrial Report -- Services

8  recommendation;

9    That restitution be ordered in the amount of $4,009,063.15.

10 That is broken down both in the Presentence Report and in our

11 memorandum as to why it is higher than the actual loss amount

12 and those are appropriate restitution pursuant to statute and

13 the $100.  Mr. -- special assessment.

14    Mr. Jack Mosby, who is the attorney for Mr. Welch (sic) in

15 the civil suit, did provide us with those numbers for what was

16 done to assist the Government.  That is by no means the entire

17 bill that Mr. Sims has had, and we want to be clear that we went

18 through his records meticulously to make sure they only

19 reflected calls with us.

20    So that is what we're asking this Court to order at the end

21 of today.

22    THE COURT:  Let me ask you:  What about interest on

23 the restitution?  Are you agreeing to waive that?  Are you

24 arguing against waiving it?

25    MS. WHELAN:  Your Honor, we are arguing for exactly

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. WHELAN*

1  what is in there, which is the interest in the restitution that

2  Kasco has to pay.

3      And that's a decision for the Court to make, but that is

4  our stance.

5           THE COURT:  Okay.  I didn't -- I didn't follow that.

6  Kasco has to pay who?

7           MS. WHELAN:  For the loan that they took in order to

8  stay afloat.

9           THE COURT:  Oh, I get that.

10          MS. WHELAN:  Okay.

11          THE COURT:  What I'm talking about is are you taking

12  the position that the defendant has to pay interest on the

13  restitution amount as she's paying it back over time?

14          MS. WHELAN:  I think that's a decision for the Court

15  to make.  It is a large payment that she has to make.  And I

16  think everybody, quite honestly, would be happy if we can just

17  get the money that is there.

18          THE COURT:  I -- normally I have a little problem with

19  not awarding interest because then I'm just giving her an

20  interest-free loan.  But the amount involved here makes a very

21  scary -- I don't know if she'd ever be able to pay it back with

22  or without the interest.  So --

23          MS. WHELAN:  I think --

24          THE COURT:  -- you're right.  It is my discretion, and

25  I'll make that call when it comes time.  But I'm concerned about

1  ordering her to pay even more on top of the large amount she's

2  going have to pay.  So --

3         MS. WHELAN:  Right.  And I think then it becomes

4  almost -- I mean, when it's such a large amount, she created

5  that amount; but it becomes incredibly disheartening because all

6  she'd be paying is the interest.  So I think that's a decision

7  the Court has to make.

8         THE COURT:  Exactly.  There's no end in sight.

9         MS. WHELAN:  All right.  Okay.  So I've taken care of

10  the preliminary matters; and, Judge, I want to get to the -- to

11  the guts of our argument.

12      Today is not about if Trina Welch is a good or bad person.

13  Today is not about whether she was a good mother, a good wife.

14  It's not about whether Keith Sims was the best employer or the

15  worst employer.

16      It is about a wire fraud scheme that was carried on for

17  many years that resulted in the loss of almost $3.7 million, and

18  that is money that the FBI has traced into the pockets of

19  Trina Welch.

20      That's why we're here.  At the end of this sentencing,

21  there should not be a person who leaves here, although we cannot

22  control what others do with judgment or thoughts, who, just

23  because she is sentenced to prison, holds that she has no value

24  or is a bad person.  Good people make bad decisions.

25      And, Judge, one of the things I brought up with me are some

1  of the -- the character letters that were written in there that

2  were submitted.  And I'm sure the Court found the same thing as

3  I did, which is they repeatedly say, "Trina takes care of

4  everyone else's needs.  She makes sure all the needs are met.

5  She took care of my siblings and I.  She even helped with soccer

6  teams -- or, excuse me, with sports teams and she was always

7  there looking out for others."

8      Specifically, I looked at the letter by Nickolas Arthun.

9  "She ensures everyone is comfortable and taken care of and this

10  comes quick and natural to her."

11      The letter from Bridget Welch.  "She has always loved and

12  cared for her children at every point in her life and will do

13  anything for them.  She tried very hard to give all she could to

14  her five children."

15      And respectfully, Judge, in part, that's the heart of this

16  case.  It is a theft that was done for whatever reason and lined

17  the pockets of the Welch family.  And what is, indeed,

18  unfortunate is that she paid for things for individuals and now

19  they are in the position where they may lose those because she

20  used, quote/unquote, "dirty money."

21      Now, how do we know?  The Court has found that we

22  established the loss amount, but how do we know that it ended up

23  in Trina's pockets -- or Ms. Welch's pockets?

24      Can we have the camera dock, please?

25      This was admitted at the evidentiary hearing.  It was

1  Government's Exhibit 9, and this is just the Bank of America

2  spending.  And as the Court will recall, there were many other

3  accounts.  You may recall the chart that Mr. Maloney introduced.

4  And in 2017 alone, there was over 1,000 -- or, excuse me,

5  $1 million spent in Bank of America expenditures.

6      Some of this went to enhance properties, to buy furniture,

7  to pay property taxes.  And the FBI has traced a lot of that.

8      But this is the income.  This is what happens when you try

9  to take care of everyone and you can't.  You don't make that

10 much money.

11     And to further that, Judge, I just went through some of the

12 Bank of America statements and not all of them; but this is a

13 Bank of America statement.  And what I want the Court to know,

14 because I know there has been some speculation by people, of,

15 well, how could Mr. Welch not have known?  Right?  How could he

16 possibly not have known when they were living and having so much

17 more than what they got?  And we met with him.  And it wasn't

18 until he looked at some of these statements and saw -- and these

19 are statements that were only in the defendant's name -- that he

20 saw the expenses.  And in one month, she paid almost their

21 entire income in payments.

22     And when we flip through this -- and everybody's going to

23 be glad because my voice is not gonna hold long -- but you look

24 here (indicating) Upper Keys Rentals, rentals in Florida,

25 $7,600.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. WHELAN*

1    Nordstrom's $1,400.

2    There's another expense here.  Excuse me, I want to move to

3  the next one.  That's where so much of this money went.  Family

4  trips.

5    Another month.  This is in May of 2017, that year when you

6  saw the really high expenditures.  Again, in one month, the

7  payments and other credits that she paid, she only owed 38 --

8  "only."  Many people don't make that much money, but she owed

9  $38,726.  She paid over $101,000.  I don't know of anybody else

10 who overpays their credit card by $70,000; and she had new

11 charges.

12    And we look here at Bed, Bath, and Beyond for $1,100;

13 Explore America, $2,400; $2,995 for the property in Montana for

14 building.

15    And we can go on and on through this, Judge.  But the

16 purpose of this is not to show the loss amount, but it's to show

17 where the money ended up.  It didn't end up in Mr. Sims' pocket.

18 It ended up in Mrs. Welch's pocket, in the defendant's pocket.

19    You know, she will have a moment to make her allocution.

20 And when she does so, she may have her version of what happened;

21 and she's entitled to that.

22    But as we respectfully showed in our Sentencing Memorandum,

23 Judge, this is an individual whose credibility is suspect and

24 respect for the Court is suspect.

25    In the Affidavit, which was admitted in the prior hearing,

1  Exhibit 14, she says, (Reading) I was terminated by Keith Sims;

2  and despite what he says, I never confessed or stated any of the

3  alleged statements.  And despite what he contends, I never

4  confessed or stated to any individual he references as

5  Detective Hook any of the alleged statements referenced therein.

6  And I only stated that we occasionally gambled and that I did

7  not steal funds from the plaintiff and then use the funds to

8  purchase real property or make payments.

9      But, Judge, when we go through that statement, I'd just

10  like to highlight a few things.

11      She says one of them, talking about using the money, was

12  the Post Falls house.  (Reading)  I did, when I bought -- when

13  my son was going to school there and that's probably when it

14  started 2016.  No, '14.  And then I did, like -- excuse me.

15     (Pause in the proceedings)

16         MS. WHELAN:  (Reading continued) -- an owner-financing

17  thing.  And then the balloon payment came up, and I actually

18  think that's when it first started.  And I used that to pay the

19  balloon payment off.

20      And then you talk about a fifth wheel, and we have a record

21  of that in the records in the discovery.  (Reading)  He paid for

22  it -- she paid for it, yes.  With Keith's money.  Correct?

23      She wanted everything to be fine for her children, but that

24  doesn't legitimize theft.

25      When talking about how she did this, (Reading) I didn't --

1  I wouldn't even think about it.  I was in the moment and you're

2  so deep and I didn't even think.  I'm so sick.  I didn't realize

3  what the number was.

4      In talking about properties, right?  They're talking about

5  the Montana property.  (Reading)  You paid for the supplies to

6  build it with.

7      And I just showed the credit card part of it.  One of the

8  receipts.

9      (Reading)  Yes, with Kasco money.  Yes.

10     (Reading)  He loaned you 40 grand, and then you paid him

11 back with it -- with his money.  I feel so bad.

12     He loaned her money, and she paid him back with his own

13 stolen money.

14     (Reading)  So the Post Falls house.  Yes.  That basically

15 was paid with Kasco money.  Right?  Yes, and I need to sell that

16 and give it back to him.  And it got paid off, the house up in

17 Osburn.  I had loans on it, and the loans got paid off through

18 that.

19     And, Judge, the reason I show this is not to embarrass

20 Ms. Welch; but there are questions.  And there are questions

21 about her credibility because she filed an Affidavit with

22 another court swearing under oath, under the penalty of perjury,

23 that she didn't say these things and yet they are here.  And I

24 have many more tabs, but you don't need me to go through all of

25 them.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. WHELAN*

1    Sometimes when we are a good person and we make a horrible

2   mistake, we have to create a narrative that allows us to live

3   with it.  And sometimes that narrative involves blaming the

4   victim as a reason to justify what happened.

5    In this case, there is no justification.  When we look at

6   the 3553(a) factors and we look at the Presentence Report, we

7   are aware that Ms. Welch has had a prior fraud.  And it was

8   writing checks, as I understand it from the probation report,

9   not credit cards.  There were insufficient-funds checks where

10  she did something similar and spent almost over a year's income

11  in the matter of three months.

12    Judge, what is deeply troubling about this case is this was

13  not just one act.  This was many acts.  What's even more

14  troubling is they are calculated acts because every day for

15  years she went into an office where she worked, working for

16  people who loaned her money, sent her kids to athletic camps,

17  who even made sure that she wasn't interviewed by the detective

18  when she needed to pick her daughter up from basketball camp,

19  and lied every day to calculate that and carry out this wire

20  fraud.

21    When we look at all the 3553(a) factors as outlined in the

22  Government's argument, when we look at similar cases, when we

23  look at the need for deterrence, when we look at the reason that

24  white-color criminals generally weigh the risks and benefits, a

25  51-month sentence is not in any way unreasonable.  It is not

124

1  greater than is necessary to achieve the goals of 3553(a).

2      Judge, there is a reason -- now, I anticipate, since I

3  won't likely have a chance to stand back up -- well, I know that

4  Ms. Welch is going to ask for self surrender.  And we're going

5  to have a discussion about how that is due in this case.

6      But there is an end point, as Judge Lodge used to say,

7  where you are held accountable; and it is judgment day.  She has

8  had months to prepare for today.  It was not a surprise that it

9  was coming.

10      Just one moment, Judge.

11      (Pause in the proceedings)

12          MS. WHELAN:  When we look at 18 USC 3143 with regards

13  to a defendant, she was allowed to remain out until sentencing.

14  But she will be sentenced, and it is the judgment -- or it is

15  the request of the Government that a sentence of imprisonment be

16  imposed.

17      Given what you've heard today and the lack of

18  acknowledgment of the true breadth of this offense, there is

19  likelihood that she would flee.  And there's a deterrent value

20  and a need for justice in having her report today.  And we would

21  respectfully ask the Court to remand her to the custody of the

22  Marshals.

23      Your Honor, I've tried to shorten my presentation

24  understanding today has been a long day.  The Court has had this

25  material in front of it, but I don't want to not answer any

1 | question the Court may have.

2 |      THE COURT:  I've already asked the questions I have

3 | for you.  Thank you.

4 |      MS. WHELAN:  Thank you, your Honor.

5 |      THE COURT:  Does defense counsel wish to make their

6 | recommendation?

7 |      MS. RUBIN:  Yes, your Honor.  Thank you.

8 |     I believe I heard the Court say this earlier today,

9 | actually on the record, that there are two sides to a story.

10 | And I think the old saying is true that there are always two

11 | sides to every story.

12 |     But I think the old saying goes to a little further, which

13 | is there are always two sides to every story; and perhaps most

14 | of the time no one is completely innocent.

15 |     The Court has heard a lot of information today; and,

16 | obviously, the courtroom is packed with people that are here on

17 | behalf of both Ms. Welch -- Mrs. Welch and on Mr. Sims.

18 |     Now, some of these folks it may make total sense why they

19 | are sitting -- which side they are sitting on today; but there

20 | are some people that truly have nothing to gain by being here.

21 | And they've actually -- they feel that they have taken great

22 | risk in even being here to make a statement in open court.

23 |     Some of those folks feel like they may be risking their own

24 | safety while others feel they're risking familial relationships

25 | and friendships.

1       This case began with a threat.  The investigation, shortly

2   after it'd begun, there was a threat on Ms. Welch's door

3   basically threatening her that she would be going to prison, she

4   would be taken from her family, and that is the last

5   three-and-a-half years of her life.

6       This case has a long history, and many of the lives in this

7   courtroom are intertwined.  Everybody knows everybody.  Some of

8   these folks have been friends for a long time.  Some have worked

9   together.

10      But I think it is important for the Court to really look at

11  the statements by Lorinda, BROOK, and, of course,

12  Mr. Rick Methvin, who was a former 50 percent equal-share

13  business owner.

14      Certainly the statement that was provided by Lorinda --

15  their divorce is final.  She received property in settlement.

16  She has moved on with her life and truly closed the door to her

17  marriage and now divorce.

18      And both BROOK and Lorinda, in their statements, tell this

19  Court that there are wrongdoings on both sides; that both

20  Ms. Welch and Mr. Sims had culpability in this situation.

21      Now, Ms. Welch stands here before this Court today and is

22  ready to be sentenced.  There has been a lot that has been said

23  with respect to her not taking responsibility, not being able to

24  hold herself accountable.  But in fairness -- and I think we all

25  know -- that when you are faced with a federal criminal charge,

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. RUBIN*

1  you have advice by your counsel that discusses the fact that you

2  cannot make any statements.

3      So Ms. Welch will have an opportunity to stand before this

4  Court and make her statement shortly after I finish.

5      I don't want to repeat what others have said to this Court

6  with respect to Mrs. Welch's background; but to suggest that her

7  background not to be even taken into consideration by the Court,

8  certainly is not what 3553(a) tells us.  In fact, the Court is

9  directed to look at her history and her characteristics.

10      I do want to share some things about Trina.  I know that

11  the Court has had a lot of letters about who Trina is and the

12  type of mother that she is, but I think there are so many more

13  things for the Court's consideration.

14      Her family is truly her life.  She lives and breathes for

15  her children and her grandchildren and husband.  She is the

16  mother of six; but as this Court knows, she lost her daughter,

17  Breanna, on the first day of Breanna's life.

18      Trina was a young mother at the time and had just been

19  beginning to take classes at Montana College before giving birth

20  to her oldest son.  At the time, she was married to her first

21  husband; and they were trying to start their family.  And,

22  ultimately, Trina stayed home with her children.

23      They began their new life in Montana and ultimately moved

24  to Idaho.  And as Trina will tell you, things in their marriage

25  began unraveling; but they were really good co-parents.

1  However, co-parents in that sense meant that they got along;

2  but, ultimately, Trina became a single mom in many respects to

3  three young boys.

4      She moved to Idaho and later met the love of her life,

5  Norman Welch.  Together they had two children, and it became a

6  packed house:  Five young kids, starting a marriage, and living

7  in a town where opportunities were limited.

8      So how did this situation begin with Mr. Sims and

9  Mrs. Welch?  They didn't know each other.  Trina worked smaller

10 jobs.  She was waitressing and then went back to school to get a

11 nail license.  She dreamt of opening a nail salon, and she did.

12     Again, these were not sophisticated jobs nor did either job

13 require any extensive schooling.  She ultimately sold the

14 business to a friend and, again, was helping out at a

15 restaurant.

16     And then the offer of a lifetime was presented:  Working

17 for Kasco of Idaho.  Trina will tell you more about this during

18 her presentation to the Court; but, ultimately, she was hired

19 after having one conversation after having met the owner for

20 Kasco for the first time at a bar.

21     She didn't know Mr. Sims.  Maybe she had heard of him.  She

22 wasn't looking for work at the time.  He didn't know a thing

23 about her.  And within a few days, he got her number, called her

24 up, met her for breakfast, and offered her $75,000 to come work

25 for Kasco of Idaho.

1    And Trina will tell you she was over the moon.  $75,000 for

2  her family was significant; and Keith offered medical coverage,

3  the opportunity to go back to school, bonuses, and he would pay

4  her expenses getting to and from work and, ultimately, even

5  getting her a car.

6    Now, certainly, I don't think you have to be an

7  entrepreneur to know that it takes an inherent risk to bring

8  someone with no experience, no real accounting experience, no

9  background in handling accounting with a multi-million-dollar

10  corporation within two days of meeting them at a bar, never

11  having looked at a resume, called references, and, literally,

12  not knowing a thing about them.

13    Of course, the flip side of that coin may be, well, this is

14  small-town living, you're trying to help out your community, and

15  giving people opportunities.  But Trina wasn't looking for a

16  job, and she wasn't looking for an opportunity.

17    Based on a meeting, she was hired.  And at that first

18  meeting, they talked about a relatively significant salary,

19  cars, bonuses, and she said, "Yes."

20    Now, I believe, in Lorinda's letter, there is some

21  indication about, at least, a pattern of behavior that she saw

22  when it came to hiring people for the business.  I don't think

23  that this was necessarily naïvety on the part of the

24  businessowner of being a good guy and wanting to maybe give

25  someone an opportunity.  There, I believe Trina would tell you,

1 there was a pattern of hiring; that there were people that

2 Mr. Sims looked for that would be unable to say, "Yes" -- or

3 were not able to say, "No."  They would get caught up with

4 bigger salaries, gifts, bonuses, helping out with their homes,

5 sponsoring their kids' activities.  A narrative that,

6 ultimately, one person was able to control.

7 　　　Now, some of these hires, as indicated by Lorinda's letter,

8 ended in some of these women being fired.  I don't think we need

9 to go into why.  I think it's pretty clear from the record or at

10 least with the Court -- the letter that the judge has -- or the

11 letter that you have.

12 　　　So when Trina started, within the first few weeks of

13 working for Mr. Sims, he told her that he didn't want to put her

14 entire salary on the books.  He didn't want to put her entire

15 salary on the books because, well, as he explained it, you want

16 to put more money in your pocket than giving it to the IRS.

17 　　　Now, obviously, this is not a normal conversation for

18 people to have; and it's your first few weeks of working at a

19 job.  And when you've been offered the job that you simply

20 cannot turn down, you say, "Yes."  It's hard to tell your new

21 boss "No" because then, shortly thereafter, he gives you the

22 title of being CFO of not just one company but multiple

23 companies.  And with each title -- and with each title being the

24 CFO, he promises you a salary, which allows you to bring in more

25 money than you've ever had; and you agree.

1    And when he tells you to bring in cash and put your

2  expenses on the card, you say "Yes."

3    But what is hard to explain and what Mr. Sims had full

4  control over this entire time were the W-2s.  So year after

5  year -- and I believe the Court has in front of it what we

6  presented earlier -- is a situation that reflects W-2s that,

7  starting in, I believe, 2015, there are two W-2s.  And then,

8  shortly thereafter, it goes to one because, of course, the

9  dissolvement of the company Kasco Communications.

10    But what doesn't make a lot of sense is 2016, 2017, 2018.

11  The salary continues to go down.

12    Trina accepts responsibility for what they did.  She is

13  prepared to deal with the consequences today.  But for the first

14  time, she now has an opportunity to tell her side of the story,

15  to share her side with the Court.  And what she will tell this

16  Court is supported by what you have read from other people.  She

17  was not in this alone but will remain the only one standing

18  before this Court.

19    Now, when things started to go south is there was a state

20  audit.  There was a state audit that both Keith and Trina were

21  feeling a bit panicked about.  They were trying to find ways in

22  which they could write off a number of things; and, ultimately,

23  they were successful.  They were successful in writing off the

24  things for the audit; and, ultimately, the audit kind of came

25  and went.

1    But then what happened is -- I believe it was in 2018 or

2  2019 there was a federal audit where I believe it was a

3  federal -- a former employee that had complained about some

4  other mishaps that were going on.  Both Keith and Trina knew

5  good and well that looking into the accounts, the records, the

6  money, the bookkeeping was not going to add up and both were

7  scared.  The W-2s certainly didn't make a lot of sense.  They'd

8  each avoided paying taxes on a lot of earned income.  I believe

9  in 2013 or 2014 alone Mr. Sims had $1.4 million of earned

10  income.  And so with this federal audit, the doors were closing

11  in.

12    Now, when this came -- investigation came to light,

13  Mr. Sims was permitted to select the checks that were provided

14  to the FBI; and he provided checks that would, of course, point

15  to Trina and Trina alone.

16    Now, interesting that checks from Kasco Communications were

17  also selected, a business where Mr. Sims had a 50-percent

18  partner, a partner that literally handled the day-to-day

19  operations of that business while Mr. Sims was only an equity

20  partner.

21    Mr. Methvin managed everything about that company:  The

22  business, the financials, the employees, and yet was never even

23  interviewed.  A business where there was huge litigation between

24  the two equal partners because of allegations of wrongdoing and

25  yet no one went to interview Rick Methvin or talk to him about

1   the civil suit.

2        And Mr. Sims had three interviews with the FBI:  July 2nd,

3   2019; December 16th, 2019; February 12th, 2020.  Not one mention

4   to the FBI in any of these statements about the million-dollar

5   payout that he had received from an insurance company.  And this

6   information was, frankly, not shared with our office until

7   September of 2021 when we asked the Government about whether

8   this was accurate or not.  It seems that this would have been an

9   important part of the case for both parties to know or be aware

10  of because it certainly makes a difference in where restitution

11  is owed unless, perhaps, maybe you don't want to disclose a

12  million-dollar settlement that was ultimately turned over to

13  your ex-wife as a part of their settlement as if there may be an

14  opportunity to double dip.

15       So, again, this narrative continues to be controlled by one

16  person and that narrative has the information provided by one

17  person.

18       Now, Mr. Sims talks in his victim letter that there was a

19  lot of tough times for the business; that there were times where

20  I believe he had to piece together money just to cover

21  month-to-month expenses.  Yet around the same time he became, I

22  quote from the *Spokesman-Review*, "Gonzaga's biggest fan" when he

23  pledged a million dollars.  He spent, I believe, four months

24  traveling to every single game that Gonzaga played in, including

25  a trip to Japan for a game.  And I think the *Spokesman-Review*

1  talked about that he had seen thrillers and heartbreakers, a

2  former US President in high tops, and spent the shortest

3  11-plane-hour ride in history while talking fly fishing with

4  Mark Few, the GU coach.

5      There was also a trip to Africa where he took clients on a

6  big hunt, wining and dining clients, spending close to a

7  half-a-million dollars to a million dollars each year on his

8  company card.  And, again, none of this ever investigated or

9  checked to match the reports of not having money in his company

10  account or not being able to pay bonuses or even get tires

11  changed.

12      This was not someone living check to check.  And I believe

13  Lorinda shared in her letter what things were being purchased

14  and where money was going:  Houses for their children; lavish

15  cars for their kids; $75,000 boat recently; and the list goes

16  on.  I believe they spent a month in Italy together.

17      And as I said at the beginning, I think the old saying is

18  true that there are two sides to every story.  Trina is

19  responsible for taking money, moving money, being paid under the

20  table, and putting personal expenses on her card that were

21  ultimately paid by the company.  She absolutely did it.  She

22  accepts full responsibility and knows she will be punished.  She

23  entered a plea of guilty and recognizes the wrongdoing in this

24  case.

25      But there is so much more to unpack, and we believe this is

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. RUBIN*

1  a theft between two people.

2      So what we are asking the Court to do is also recognize

3  that there is a question as to what is the appropriate sentence.

4  Obviously, the Government has recommended 51 months, which is

5  the low end of the guideline range.  We don't believe that there

6  would be any reason for the Court to extend anything beyond

7  that.

8      The Government has cited in its memorandum some disparity

9  arguments where maybe there were defendants that were not

10  involved with as much money regarding restitution.

11      There is a difference in this case.  There was a

12  million-dollar settlement that has been paid to Mr. Sims.  Where

13  that money ultimately went has nothing to do with this Court.

14  That million dollars was at least paid out.  Therefore, he has

15  been paid some of the restitution whereas Ms. Welch will have to

16  pay that to the insurance company.

17      There are properties in this case that will go towards

18  restitution.  I believe, at least the last, I think, chart I

19  looked at totaled that the properties were worth, I believe --

20  and I don't mean to be off if I am -- but around 2.2 million.  I

21  could be off by a little bit.  I don't know.  But, ultimately,

22  half of that will be immediately paid towards restitution.

23      That is unusual in a case.  Typically, there are no

24  properties where restitution can almost immediately be paid; but

25  here we have that in this case.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. RUBIN*

1    Now, in fairness, the Welches have been working tirelessly

2  to get their house ready to sell in Osburn so that way this

3  process is as easy as it can be.  Once this matter -- and I

4  believe the civil matter is still pending -- the hope is that

5  the sale of the properties will occur quickly.

6    Again, that money should be paid relatively quickly, which

7  is unusual in a fraud case; and we ask the Court to take that

8  into consideration.

9    The Welches, prior to this, had offered time and time again

10 to sell their properties, to put that money in a holding; but,

11 unfortunately, it was not something that the Government I think

12 felt comfortable with at the time.

13    But I want to go back to Trina because a lot has been said

14 about the case and the facts of this case, and I want to

15 highlight a few more things.

16    What you have seen from the letters is that Trina loves her

17 family.  She is someone who lights up a room and is the type of

18 friend who would be there when you need them.

19    She is a good mom who has raised five amazing children.

20 Her kids are good kids and that comes from good parenting.  Her

21 daughter recently graduated either with a full scholarship or

22 a -- primarily almost a full scholarship to Boise State.  Her

23 daughter was the valedictorian of her class and I believe a

24 pretty big superstar on the basketball team.

25    There is no greater honor to Trina than being a mom and a

1  grandmother to her children and grandchildren.  So no matter

2  what has been said about this case, this is who Trina is at her

3  core.

4       This case has impacted not only Trina but her family.

5  Trina lives with this every day.  She is thankful she has had an

6  opportunity to watch her daughter graduate and thankful that she

7  was able to take her down and get her moved into college.

8       No matter what happens today, Trina will continue to work

9  on making this situation right.  There will be restitution to

10 pay, and Trina hopes to get a job while in custody when she is

11 released to begin that -- and when she is released to begin that

12 process.

13      Closing this chapter of her life will be good.  It is time

14 for everyone to put this in the past.  The past three years have

15 been hard for Trina and her family, and everyone is ready for a

16 new beginning.  And a new beginning means closing the door to

17 any and all communication with Mr. Sims.

18      I want to talk about one of our requests in terms of why

19 we're going to make the recommendation we're going to make.

20      There has been obstruction in this case.  There have been

21 things said, posted that could be perceived absolutely as

22 threats, harassment, constant communication towards anyone

23 whoever comes out in favor or in support of Mrs. Welch.

24      And, frankly, with all due respect to opposing counsel,

25 Ms. Whelan, I know that, if the tables were turned, she would be

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*SENTENCING RECOMMENDATION BY MS. RUBIN*

1  livid if I had a client who was doing the same.

2      She would be asking the Court to not consider giving my

3  client acceptance of responsibility and asking that a two-level

4  increase be -- be -- enhance the sentence for obstruction and

5  also probably ask that my client be taken into immediate custody

6  because of the threat that they could pose.

7      The variance or departure for obstruction and intimidation

8  and harassment goes both ways.  Mrs. Welch has been silenced for

9  three years.  She has been off social media.  She has literally

10  been in her home not going to a grocery store or a post office

11  or any sort of other bar/restaurant in her community for three

12  years.  And this has been constant, and it has had a huge impact

13  on her life.

14      Literally, on November -- in November -- on November 25th,

15  2019, is when the threats began.  The day either after Trina

16  signed the Plea Agreement or that evening, which was early

17  January, two weeks before a change of plea hearing, there was a

18  letter that was left on the doorstep of renters.  A copy of a

19  signed Plea Agreement that Mrs. Welch had signed was left on the

20  doorstep of her renters, basically, advising the renters they

21  better get out soon because the property was going to be seized

22  and forfeited.  This caused, of course, certainly hardship for

23  the renters and hardship to Mr. and Mrs. Welch.

24      I think, while there was some discussion in the back about

25  an invitation that went out to celebrate, they titled it a

1  prison party in honor of Mr. Sims' birthday.  I'm not sure if

2  that doesn't say everything about what Trina has been faced

3  with, I'm not sure what does.  Perhaps the invitation came from

4  someone other than Mr. Sims, but the RSVP was to a Ms. Anson,

5  who is Mr. Welch's significant order.  She is also a court

6  employee in Shoshone County where there is an active civil case.

7      I was prepared to end with the invitation; but, of course,

8  I don't want to end without acknowledging another threat that

9  went out last night.  It does not stop and has not stopped.  I

10  know that I've had at least two conversations with the

11  Government when we have seen posts going to Mrs. Welch's friends

12  asking that the posts stop, and they haven't.  And I'm not sure

13  they will.  And that is because I think that Mr. Sims wants to

14  win at all costs.  No one is going to tell him what to do and no

15  one is going to tell him "No."  And that is exactly how

16  Mrs. Welch got herself in this situation today.

17      I'm asking the Court today to change the narrative of the

18  story.  I'm asking the Court to punish Trina for what she did by

19  recognizing that there are two sides to this story, which also

20  include Mr. Sims' roll in this and his continued obstructive and

21  threatening communication with Mrs. Welch, her friends, and

22  family.  I don't think this is to be taken lightly, and I think

23  this needs to be taken into consideration.

24      We are asking this Court for a 36-month sentence.  The

25  36 months includes consideration for Mrs. Welch's compliance

1  while on pretrial release, the fact that we're asking this Court

2  to consider a two-level variance based on the obstructive

3  conduct from Mr. Sims; 24 months of that being in custody; and

4  12 months being on home confinement followed by three years of

5  supervised release.

6      Mr. Roberts is going to speak to the issue of restitution

7  as he has kind of figured out the numbers; a $100 special

8  assessment.

9      We would ask the Court to recommend FCI Dublin.  In

10  addition, there has been discussion in the PSR about gambling.

11  We would ask that Mr. Welch -- that the Court recommend the RDAP

12  program, and we would ask that she self surrender.  Why?

13  Because she has been out for three years.  She has shown up to

14  every single court appearance.  She has kept in contact with her

15  probation officer every Tuesday over the last three years.

16  There is still a civil hearing that her husband will be involved

17  in; and, certainly, she can assist her husband with that case as

18  well as assisting their attorney.

19      There -- I know that there are properties that they still

20  own; and, certainly, Mrs. Welch has been very involved with that

21  and in the renters.

22      Now, there's been some indication that, perhaps, self

23  surrender is not appropriate because she hasn't held a job.

24  Your Honor, her daughter just graduated and she was at home with

25  her daughter.  She is also a caretaker to her kids.

1    But, more importantly, I will say that she has spent the
2  last three years providing and assisting us on getting ready for
3  this case.  As this Court may recall, we were not the first
4  attorneys involved in this case.  But she has literally met with
5  us probably once or twice a month for the last few months.  She
6  is not a risk of flight or risk of danger.  There is no
7  indication or evidence that supports that.

8    We ask that she be permitted to stay and reside in her home
9  in Montana in light of the continued threats and obstructive
10 conduct.  She no longer feels safe in Osburn and feels that this
11 hearing could result in future conduct and threats.

12    We ask the Court to -- I don't remember if it's in there,
13 but to impose a condition that she is to have no contact with
14 Mr. Sims.  I would certainly ask that the same be advised of the
15 folks who sit on the other side of the courtroom that that type
16 of conduct will not be tolerated.

17    Mr. Sims doesn't control the narrative today, your Honor.
18 You do.  And we ask this Court to follow our recommendation.
19 The key to this case is looking at the W-2s.  There is no other
20 explanation as to how someone is the CFO of one company, two
21 companies, three companies, ultimately four companies and their
22 salary is going down every single year while their
23 responsibility goes up.

24    And if I may have Mr. Roberts deal with the restitution
25 right now, your Honor, that would be appreciated.

1          THE COURT:  All right.

2          MS. RUBIN:  And if I don't -- if Mr. Roberts

3   doesn't -- I think the Court did ask with respect to how did

4   Ms. Whelan feel about the interest?  If Mr. Roberts doesn't

5   respond to this, I would ask that he -- that she be -- the

6   interest be waived.  I think that Ms. Whelan addressed this and

7   the Court I think hit on this.  If the interest is not waived,

8   frankly, the principal will never be paid.  And I think with the

9   amount of loss that the Court is going to find or has found that

10  it certainly makes the most sense for her to be able to pay

11  towards the principal of that -- of that restitution that she

12  will owe.

13         So if it's okay, I'm going to have Mr. Roberts address the

14  Court.

15         THE COURT:  It is.

16         MS. RUBIN:  Thank you.

17         MR. ROBERTS:  Thank you, your Honor.  Your Honor, as

18  Ms. Rubin indicated, we are asking the Court to waive the

19  interest on the amount of restitution imposed.  I'm looking at

20  the most recent version of the Presentence Investigation Report

21  at Paragraph 86.

22         The Court has made a finding in regard to the restitution

23  amount to Kasco of Idaho.  I think that's appropriate given the

24  Court's findings.  So no objection to that.  The legal fees and

25  expenses that Ms. Whelan indicated for the $4,303.76, no

1 objection to that.

2      However, we do object to the imposition of the $19,000 and

3 the $311,000.  I know that restitution works differently from

4 the loss amount, and those amounts could not be included in the

5 loss amount because that's the way the law works.

6      However, the way that restitution works is there has to be

7 some type of proximate causation in regard to the amount sought

8 and for these two amounts and the basis, as I understand it, is

9 that Mr. Sims' business was troubled and he had to take out a

10 loan on that.

11      What I'm arguing to the Court is there's a proximate

12 causation issue according to the *Paroline v. United States* case

13 and, that is, there are other intervening causes in terms of

14 Mr. Sims' business and that would be his spending as the Court

15 heard about, his divorce, and, ultimately, the COVID-19

16 pandemic.  There's no way to separate those amounts in terms of

17 just him saying, "My business failed."

18      So we'd ask the Court not to impose those amounts and, in

19 fact, to subtract those amounts.  Thank you, your Honor.

20           THE COURT:  Thank you.

21           MS. WHELAN:  Your Honor, may I be heard just briefly?

22           THE COURT:  On the restitution?

23           MS. WHELAN:  On the restitution and the arguments.  It

24 will be brief.

25           THE COURT:  This needs to be very brief.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*REBUTTAL ARGUMENT BY MS. WHELAN*

1    MS. WHELAN:  It will be very briefly.  Your Honor, the

2  idea that a defendant should get a lower sentence because a

3  businessman had the wherewithal to get insurance so has been

4  reimbursed a million dollars, that is not something Ms. Welch

5  did.  That is something that Mr. Sims did, and she should not

6  benefit from that.

7    The idea that she can pay restitution because she has

8  properties to sell and somehow should get a lower sentence does

9  not hold water because they are properties which were bought

10  with Mr. Sims' own money.  It is his money in those properties

11  that was done.

12    The idea that Mr. Sims has controlled a narrative, the

13  narrative of this case is the evidence that the Court has been

14  put before it.  Evidence that has tracked every dollar that went

15  into Mrs. Welch's account.

16    It is amazing that the United States stands up here with a

17  woman who stole $3.7 million and has asked everyone to remember

18  that is not the judgment of whether she is a good or bad person

19  but the action.  But, apparently, the victim, the man who lost

20  this money, is not intended or extended the same grace and

21  instead somehow the statute says that you can steal money from

22  somebody if they are a jerk.

23    Your Honor, the sentence that the Government has

24  recommended is appropriate.  And as to the restitution,

25  3.7 million is the cause.  There is no evidence in this record

1  of any other costs.  The Court has a narrative, and it is the

2  evidence before it.

3     Thank you.

4        THE COURT:  Ms. Welch, do you want to make a statement

5  today?

6        MR. ROBERTS:  Your Honor, she is going to speak; and

7  I'd ask for permission for her to, perhaps, address the Court

8  from the table, if that's all right.

9        THE COURT:  From being seated at the table?

10       MR. ROBERTS:  Yes, your Honor.

11       THE COURT:  We can start that way.

12       MR. ROBERTS:  Thank you.

13    (Discussion off the record)

14       THE DEFENDANT:  I hope there is a path of

15  forgiveness -- I'm sorry.  Okay.

16    (Pause in the proceedings)

17       THE DEFENDANT:  Just a second.  I'm sorry.  I just

18  need to breathe for a second.

19       THE COURT:  That's all right.

20       THE DEFENDANT:  It's hard when you've been quiet for

21  three years, and I just -- I'm sorry.

22    I hope there's a path of forgiveness for my actions and my

23  dishonesty.  I took money that did not belong to me.  I took

24  advantage of my position as the CFO of Kasco of Idaho.  I do

25  honestly accept responsibility for my action and recognize that

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*DEFENDANT'S RIGHT OF ALLOCUTION*

1   I am here today and face the consequences.

2       For the last three years, I have not been able to speak

3   about what happened or my experiences working with Kasco and for

4   Keith Sims.  There is more to the situation, and I thank the

5   Court for giving me an opportunity to share what happened.

6       I am terrified about what will happen today, but I am truly

7   ready.  I am ready for closure and to close this part of my

8   life.  I am ready to truly move forward.  My life has been on

9   hold for the last three years, and I know that today marks a new

10  beginning for me and for my family.

11      When I first got a job at Kasco, I was thrilled.  I had no

12  experience working for a multi-million-dollar company, and I

13  certainly did not have the educational background or work

14  background.  I had taken some college classes but left shortly

15  after having my first son.  I had done some bookkeeping for my

16  salon I owned and helped some friends out that owned a

17  restaurant but never had any experience with the position I was

18  hired for at Kasco.  The job offer was exciting because I live

19  in a small town, and this was a huge opportunity for me to grow

20  as a person and to pursue a career.  Keith made me feel

21  confident, and he made me feel like he believed in me.

22      What I did not know then but what I realize now is that he

23  was grooming me to be another person in his life that he could

24  control and manipulate.

25      He showered my family and me with gifts.  He bought me a

1  new car so I would be safe driving to and from work.  He offered

2  to sponsor my kids in their volunteer activities, offered to pay

3  for activities.  He paid for my family to go on trips and to

4  join him on trips.  He invited us to Gonzaga basketball games to

5  sit courtside --

6          THE COURT:  You need to slow down just a little bit.

7          THE DEFENDANT:  Okay.  I'm sorry.

8          THE COURT:  Take a keep breath and just slow down.

9          THE DEFENDANT:  He gave us money when he knew that

10  he (sic) wanted to purchase some land.  He gave me huge bonuses

11  to thank me for having his back.  He made me feel like I was

12  important, and I had an important role in the company, always

13  telling me over and over I had -- that I had his back.  In

14  hindsight, I know this was his way into winning me over so I

15  would never say, "No" to the things that he would ask me to do.

16      Was I willing to accept a large part of my salary under the

17  table?  Yes.  Was I willing to put expenses on my credit card to

18  avoid the money going through the company?  Yes.  Was I willing

19  to move money around for both companies, Kasco of Idaho, Kasco

20  Communications, and other companies and had titled me as CFO?

21  Yes.  Was I willing to hide money and affairs with the many

22  different women from his wife?  Yes.  I said, "Yes" over and

23  over because I had Keith's back, and I was loyal to him.  I had

24  his back.  I was a part of a company that was going somewhere;

25  and I felt I was, too.

1      Keith knows exactly what he asked me to do and was always

2  watching.  When we moved to the building, he put cameras in my

3  office to watch me.  Throughout the day, he was constantly

4  interrupting my workday by commenting about how I looked, what I

5  was wearing, and other completely inappropriate comments.

6      But the real reason he had cameras in my office is because

7  of the safe that had large amounts of cash in it.  He kept a

8  safe in my office and kept large amounts of cash in it because

9  Keith always had cash and the company card.  It was a way of

10  hiding --

11      Shortly before I was fired and charged in this case, Kasco

12  was audited through L & I 2018.  Keith was livid and wanted me

13  to fix the situation.  He knew the auditors would be looking at

14  the salaries on the books, and it would be a problem.  He was

15  furious and was texting me over and how to figure how to make it

16  look right on the books.  I was scared because I realized that

17  not only would we be in trouble for hiding money, moving money,

18  and changing the accounting system.  I told him that I would

19  help him fix the audit but was -- but that was it.  I wanted to

20  be paid legitimately, no more side deals, no more

21  under-the-table wages.  I wanted to get paid just like everyone

22  else, and I did not want to use my personal account anymore.  I

23  could not handle the stress any more; and, just like Keith, I

24  was scared.

25      I worked with Keith long enough to know exactly what he is

1  capable of.  I have seen what he has done to his former business

2  partners, his ex-employees, former associates, family, and his

3  ex-wife.  And if you don't play by his rules, then there are

4  consequences to pay.

5      Keith is smart.  He is always one step ahead of you.  He

6  figured that he needed a way for someone to take the entire

7  fall, and he knew I was the perfect pawn.  I think if the audit

8  had never happened and we continued to go along with what we

9  were doing -- fix the audit, continue getting paid under the

10 table, and move money around -- he would have just used it

11 against me to keep me silent.  But once he knew there were

12 bigger ramifications, such as, tax evasion and fraud, an FBI

13 investigation, he needed an out; and I was it.

14     I had a role in the fraud, and I had a huge role in it.  I

15 took money that did not belong to me.  I take full

16 responsibility for my actions and what I did because I overpaid

17 myself.  I moved money into my account.  I wrote off personal

18 expenses.  I used money to shop and pay myself more money than I

19 would have been entitled to based on my positions with this

20 company.  The money did not belong to me.  I know that, and I

21 took it.  I am responsible for my actions.

22     I know that a lot has been said about me with respect to

23 these charges, but I would like the Court to know a little more

24 about me.  I am a wife.  I am a daughter, a sister, and mother.

25 I am a proud mother of six children who have struggled with what

1  has happened.  I have let my family down and brought shame to

2  them.  I have also left them with a financial burden they do not

3  deserve.  I have lost friends, coworkers, and people that I

4  cared about in my life because of my wrongdoing.  Today I know

5  closure is just as important for my family, my friends, and

6  community as it is for me.  My kids have suffered tremendously

7  through all of this.  They have been talked about, posts on

8  social media have been sent directly to them.  They have been

9  shamed and hurt.  I did this to them, and this is by far the

10  worst part of all of this.  I hurt my kids by my actions, and

11  this -- and that is something I will continue to try to make up

12  to them for the rest of my life.

13       I was born in Miles City, Montana.  My dad passed away when

14  I was pregnant with my first born, and I never even got to share

15  with him my news that he was going to be a grandfather.  My

16  first-born son, Nickolas, was born in 1990.  At the time, I was

17  married to my ex-husband and going to school at Rocky Mountain

18  College.  A couple of years later I gave birth to my second son,

19  Derrick.  The boys were young, my ex-husband at the time was

20  teaching and coaching, and we were building our family.  In

21  1994, I gave birth to my third child, a daughter, Breanna

22  Nicole, who died shortly after birth in my arms.  It was a

23  devastating loss for me, and I know I struggled with that

24  post-partum.  My boys were little, and there were days I could

25  not function.  It was a tough time for all of us.  My two oldest

1  and the help of family and close friends helped me to get myself

2  together.  We moved to Livingston area to be closer to family,

3  and my husband took a teaching job.  In 1995, I gave birth to my

4  fourth child, Brock.  After I gave birth, my ex-husband was

5  driving home from the hospital and fell asleep behind the wheel

6  and ran into a utility pole.  He was in the ICU and everything I

7  felt in losing my daughter came back.  It was traumatizing.  My

8  ex-husband was in the hospital for almost a week, and we had no

9  health insurance.  We totaled the only car we had and only had

10 liability insurance on the car so the insurance could not cover

11 the vehicle.  The depression came back, and it was debilitating.

12 My husband was out of work with his injuries.  He had no

13 insurance, and the debt was overwhelming.  We filed for

14 bankruptcy.  I thought we were able to keep spending after

15 filing that we was not -- that was not correct.  I was young --

16 only 23 years old -- and I took the blame and felony convictions

17 so that my husband at the time would not lose his teaching

18 license.

19     My ex-husband took a teaching job in Mullan, Idaho, which

20 is now -- which is how we ended up living in Idaho.  I took a

21 waitressing job at the Snake Pit, Enaville Resort.  With three

22 little kids, coping the death of our daughter, and trying to

23 have a fresh start, it was causing our marriage to fall apart.

24 We went to counseling and remained good co-parents to our

25 children, but we knew it was best for all of us to divorce.  We

1 divorced in 2000.  We have remained friends and good co-parents.

2 I am very thankful for this.

3     I met Norman while living in Idaho, and we began dating.

4 We were married about two years later and, just prior to getting

5 married, had our first son, Zackery.  We lost Norman's mom

6 shortly after we were married, and it was a devastating loss for

7 the family.

8     In 2004, I gave birth to our daughter, Elli Welch.  Elli

9 has completed me in so many ways after losing my daughter,

10 Breanna.  Our home and our family were complete.  We had four

11 boys who filled our house with lots of wrestling, climbing, and

12 non-stop movement; and we had a beautiful daughter who brought a

13 sense of calm to all the boys' craziness.

14     In 2006, we bought a house in Osburn, Idaho, and moved our

15 family there.  At the time, I was still waitressing and wanted a

16 change.  I wanted to open my own salon and went to school to get

17 my nail license and opened a salon in Osburn.

18     In 2010, I started flag football in our community so my

19 youngest son could play.  I raised the funds for the equipment

20 by asking the local mines, businesses for donations to get the

21 equipment for the kids.

22     In 2012, I sold my salon and worked for the Snake Pit

23 helping them with their payroll and also helping a friend with

24 her tax business.  I did not have much experience but had been a

25 business owner so knew a little about bookkeeping.  Both the

1  owners of the Snake Pit were sick with cancer and had a huge
2  part of my life so I wanted to help them out.  They were like
3  family to me.
4      In August of 2012, my husband and I were at the bar in
5  Osburn with a few friends after a basketball game.  Keith Sims
6  was also in the bar and came up to the bar and was talking with
7  us.  He was super friendly, and everyone knew Keith or knew of
8  Keith.  He chatted with me about what I was currently doing for
9  work, and I asked if I was hap -- and asked if I was happy at my
10  job.  I left not giving the conversation a second thought.  A
11  few days later I ran into a mutual friend who told me Keith had
12  asked for my number.  Keith called and asked if we could meet up
13  for breakfast.  We met.  He told me he was looking for someone
14  to work in his office.  During this meeting, he told me he would
15  start me out with a salary of $75,000; would pay all vehicle/gas
16  expenses, provide bonuses, all family medical insurance would be
17  covered.  He added that if I wanted to finish schooling, he
18  would cover any schooling expense.  This was too good to be
19  true.  I've never been offered such a great job and that kind of
20  money would make a significant difference for us plus this
21  medical insurance was huge for our large family.
22      I was so excited.  This was an amazing opportunity for our
23  family.  Quite honestly, I am not sure he even told he what I
24  would be doing; but this was an opportunity my family could not
25  afford to pass up.  I called him back the next day and took the

1  job.

2      I started with Kasco on 9/10/2012.  We were working out of

3  Keith's house.  I had a desk across from another employee, Skye.

4  I asked to observe the first few weeks because I literally had

5  no idea about what I was doing and what would -- and was very

6  intimidated about the job.  As the weeks went by, I met other

7  employees with the company and business associates.  I met

8  Mike Woodard, who basically dissolved his own company to come

9  work with Keith as a project manager bringing many of his

10  employees with him.

11      Mike's wife did the books for Mike's company and helped me

12  understand how to do books, billing, and taxes.

13      At the time I was hired, Keith took care of payroll and

14  taught me how he wanted payroll down.  Within that short period

15  of time, Keith told me he didn't want my entire salary in the

16  books as his wife, brother, and Skye are in the books and asked

17  if he could pay part of my salary on the side and adjust the

18  books to reflect the lower salary.

19      He told me how I could make more money because taxes would

20  go into my pocket rather than the IRS.

21      I was so excited about this job and this opportunity that I

22  did not want to tell my new boss "No" within the first few weeks

23  of working with the company.  Looking back, I should have walked

24  away.  I knew better; but I said, "Yes" because I wanted to make

25  a good impression on my new boss that had truly offered me the

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*DEFENDANT'S RIGHT OF ALLOCUTION*

1  job opportunity of a lifetime.

2      Keith was married to Lorinda when I began with this

3  company.  His marriage did not stop his inappropriate behavior

4  with most of the women that worked for him.  I remember

5  specifically that, during my first week, Keith came up to me and

6  asked if Skye Sams, the other female employee had shared with me

7  how they were kissing the night before.  I was shocked and tried

8  to laugh it off, but it was very uncomfortable.  I learned later

9  that Keith had purchased a house for her to live in and gave her

10  many cash bonuses.  I kept my nose down and wanted to stay far

11  away from that situation.  Skye was later let go, and Keith

12  asked me to make sure she received extra pay and keep her on

13  insurance for a period.  I did what I was told to do.

14      In 2013, Keith went into business with Rick Methvin.

15  Essentially, Keith loaned the business money until Rick paid the

16  debt and Keith was behind the scenes --

17      (Interruption by the reporter)

18          THE DEFENDANT:  Oh, I'm sorry.

19      (Interruption by the reporter)

20          THE DEFENDANT:  I'll start that paragraph.  In 2013,

21  Keith went into business with Rick Methvin.  Essentially, Keith

22  loaned the business money until Rick paid back the debt; and

23  Keith was a behind-the-scenes owner while Rick ran the business.

24  Ultimately, what went from a 51/49 business relationship became

25  a 50 -- became a 50/50 because the loan was paid off.  They were

1  equal partners.  Keith took owner distributions from the

2  company.  Rick paid me a salary of 75,000; and my salary with

3  Kasco of Idaho was 75,000.  So for 2013, I made a total salary

4  of 150,000.  However, my W-2 for Kasco of Idaho said I made

5  $14,000 and my W-2 for Kasco Communications shows $58,000.

6       I told Keith that the cash money he was paying me on the

7  side was becoming harder to deposit because of all the cash.  He

8  told me to bring in my bills and pay the bills from Kasco.  He

9  instructed me to code into COGS so it comes -- so it comes off

10 balance in business income or code to expense accounts, and this

11 was what I was used to in case we got audited.  I did as I was

12 told.

13      He also lead me to believe that my role as CFO was

14 important, and he did not want to have to explain to other

15 employees why my salary was higher.  He instructed me to take

16 some of my pay out of Kasco Communications and get him cash when

17 needed and code his owner distributions to SAK Construction,

18 which is Keith's initials backwards.  There is no SAK

19 Construction.  And in return for that, I was compensated.

20      From 2013, Keith's W-2 remained the same every year always

21 $69,508.  He constantly asked me to get cash for him and use my

22 credit cards to get the cash.

23      I knew all of this was wrong, but I was absolutely caught

24 up in the money Keith of giving me.  He makes you feel good

25 about yourself.  You always have his back, confident, and, no

1  matter what, he would take care of it if something happened.  It

2  was like he had a way of convincing you that there was nothing

3  wrong with what you were doing.

4      He -- we moved out of Keith's house in Cataldo where we

5  were working and Keith purchased a building for company in

6  Rathdrum.  He explained that all the mileage and wear and tear

7  on our cars would be paid by the business because my trip was an

8  extra two hours.

9      The company was getting bigger, and we were hiring more

10 employees.  The employees quickly learned the importance of

11 being loyal.  Keith had a July 4th party every year, and he

12 would pay the people that showed up for the day.  But if you did

13 not show up, you would not get paid.  Employees were afraid not

14 to show up.

15     Keith had me sign all paychecks and tax stuff.  Keith was

16 receiving tons of owner distributions that gave him a lifestyle

17 that he did not have before.  In 2013 and 2014, his owner

18 distributions were over $1.4 million.  The more money he had the

19 more he liked flashing it and making his money known.

20     He had a lot of money, he -- and he was spending a lot of

21 money.  He loved the Zags and asked how he could get tickets.

22 He started becoming a season-ticket holder pledging 1 million to

23 GU, Gonzaga, and becoming a VIP.  He paid $50,000 to have access

24 to the Herak Room and around $12,000 for a premier parking

25 space.

SENTENCING HEARING - SEPTEMBER 16, 2022
DEFENDANT'S RIGHT OF ALLOCUTION

1      Keith took a trip to Africa and told us in the office that
2  we were going to see charges on his credit card with Verizon
3  people's name on it and we are not to let anyone know about it
4  nor enter the names in the computer as they get fire -- as they
5  would get fired for Keith paying for them to go on these Africa
6  hunting trips.  Keith would wine and dine people that we had
7  contracts with to get jobs.  Everything was paid in cash or on
8  the company credit card.

9      When we moved into the Rathdrum building, Keith put a safe
10  in my office and then later a camera where he watched me and
11  could see the safe.  He put the safe in my office for the cash I
12  was bringing in to him as he didn't have a cash business.

13      I knew that the schemes he and I were involved with were
14  catching up to us.  I had a W-2 from only one company but was
15  the CFO for multiple companies, and the money I was earning was
16  not adding up.  Keith would tell me to keep my pay on the side
17  to avoid paying taxes and keep the write-off going in the
18  company for less taxes Kasco would owe to the IRS.  I continued
19  to say, "Yes."

20      I was also moving money into the accounts that did not
21  belong to me.  I was taking cash and moving cash into my
22  accounts.  I would take out cash for Keith and take out cash for
23  me.

24      My workload increased.  I had more responsibility.  I was
25  moving money around from one account to another and yet my W-2

1   income continued to decrease.  I knew this was a problem, but I

2   was told not to worry about it.  Keith constantly told people I

3   was the CFO, which made me feel that I was entitled to a bigger

4   salary.

5        Keith hired Cathie Bailey in 2014.  Things were falling

6   apart.  Rick and Cathie (sic) were having legal issues with

7   Kasco Communications.  Gigi, my friend and former employee who

8   was wrongfully terminated, filed a lawsuit for unemployment and

9   won against Keith as he claimed that she committed fraud.  It

10  seemed that Keith was always upset about something.

11       Keith and Rick were not seeing eye to eye, which made it

12  completely awkward working for both and having two bosses

13  telling you different things.  Rick wanted access to Verizon as

14  this was their agreement when they first went into business

15  together, and Keith refused to give it to him.

16       Keith went around saying horrible things about Rick to his

17  family and workers saying he was stealing and doing illegal

18  stuff with company and told our project manager not to give him

19  any information.  This made Rick really upset; and towards the

20  end of 2014, Kasco Communications was struggling to get

21  contracts.  This was exactly what Keith wanted:  A way to end

22  Kasco Communications.  He wanted my help and continued to give

23  me more and more gifts.  He promised me more money if we were

24  successful.

25       Keith knew Norman and I were building a house and knew we

1  could use the money.  He had me put fake transactions into the

2  system and pulled the cash.  He would have me lie to Rick about

3  things.  He would talk -- he'd avoid talking to Rick and made me

4  deal with it.  He never -- he was never available to talk to his

5  equal partner.

6       Keith had a fake Customer/Vendor, again, SAK, his initial

7  backwards, Construction that he would have us code stuff to hide

8  it in the accounting system.  He hated that I had Cathie doing a

9  lot of Kasco of Idaho stuff and would get mad at me and not

10 treat her very well.  Cathie was so helpful and did amazing

11 work.  I loved having her at Kasco of Idaho because I was

12 overwhelmed by work Keith was giving me.  It was hard for me to

13 handle Kasco Communications' work because I knew what was

14 happening with the company, and I knew what Keith was doing to

15 Rick.

16      Rick was such a good boss and treated me so well.  I feel

17 horrible about what Keith and I did to him.  Rick compensated me

18 well, and Keith used to throw a fit about that.  I truly

19 understand Rick's frustration.  I was a part of his business

20 failing, and I feel horrible about what happened to Rick.

21      At some point, Keith clearly did not want Cathie working

22 for him.  He hated how she vaped, he hated her Facebook post, he

23 thought she was a bad person because she did not believe in God.

24 This went on and on.  It was always something.  Cathie was a

25 good employee and sought Keith's approval, but he was not nice

1  to her.

2      At some point, Cathie asked me how we were coding Keith's

3  personal stuff and handling the write-offs.  She was trying to

4  figure out a way for the personal stuff to be coded so it would

5  not come out of overhead or job profit and losses and we could

6  see accurate numbers.  I told Keith she was doing a good job,

7  but he was constantly trying to find a mistake she would make.

8  He wanted to find a way to get rid of her.

9      At the end of 2014, Kasco Communications was not doing

10  well.  There was an entire lawsuit between Keith and Rick.

11  Keith was trying to accuse Rick of stealing from the company,

12  cheating him out of money, and blaming Rick for trailers being

13  stolen and then later claiming the stolen trailers with the

14  insurance company as I dealt with the police.  I know that part

15  of the litigation had to do with Keith securing contracts in

16  Washington outside of Kasco Communications, which were in direct

17  violation of the partnership we had with Rick.

18      Within a short period of time, Kasco Communications

19  completely dissolved; and Keith wanted to fire Cathie and did

20  not want to pay her the salary.  He started to increase her

21  hours, he did not want her working remote, and did not want her

22  logging into the computers.  Keith wanted to pay more of my

23  salary under the table.  I begged him not to fire Cathie.  And

24  we lied to Cathie telling her that we will both come in the

25  office half of the week, and we will both make $25 an hour.  He

1 told me he would just continue to pay my salary through the

2 credit card so Cathie did not get suspicious.

3       At some point after Kasco Communications dissolved, I asked

4 Keith for a 1099.  He would avoid the conversation and just

5 wanted me to get everything to Frank Clovis, the CPA.  I

6 remember a conversation with Frank where Frank told me to find

7 more things to write off.  Keith was very firm that we needed to

8 figure out a way to put the money in our pockets and not the

9 IRS.  Keith just wanted me to code things to look like they were

10 material expenses or other business expenses.  He did not want

11 to owe the IRS and wanted everything written off.

12       Keith and Rick's litigation continued to get worse, and I

13 was in the middle.  Keith made everyone go through me.  He

14 called all of Rick Methvin's employees to see who would meet

15 with him in Oregon and try to get any kind of dirt on Rick to

16 use against him.  He would have me pay them or he would give

17 them cash.  He hired Rick's best friend, James Ramsey, to watch

18 over the inventory of Kasco Communications to make sure Rick

19 didn't take anything until the company was dissolved and

20 separated appropriately.  He paid James Ramsey $10,000 plus gave

21 him a truck and gave him an additional $10,000 loan.

22       Kasco Communications officially dissolved in 2015.

23       In October of 2014, Keith hired Jay Nicholson and expected

24 for us to keep things running.  Keith was busy traveling and

25 following the Zags and would ignore us and get frustrated if we

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*DEFENDANT'S RIGHT OF ALLOCUTION*

1  needed him in the office or if we would say the company wasn't

2  doing well.  Jay had a lot of responsibility handed to him.  He

3  was hired as a project manager with no project management

4  experience.

5      Keith wasn't getting the bids like he did before.  In 2016,

6  Keith added two more businesses to my responsibility.  I worked

7  for Kasco of Idaho.  I worked for Best Shots.  I worked for Twin

8  Techs and received money for ending Kasco Communications

9  completely dealing with taxes, et cetera, and other stuff that

10  Keith had me do for him.  The combined salary for being the CFO

11  of all these companies was $225,000.  However, my W-2 was only

12  $47,315 for doing all of these businesses.  I had no other W-2s

13  from any other business other than Kasco of Idaho.

14      During this time, Lorinda filed for divorce.  Another woman

15  came forward about another affair with Lorinda, and Lorinda was

16  done.  I knew that he was messing around with his physical

17  therapist and thought that was the girl, but it was someone

18  completely different.  Keith had Rob Smith move the safe into

19  his office out of my office.  Keith wanted to count the money

20  before we moved the safe; and we counted about $500,000.  He

21  also had a safe kept at Best Shots bar.

22      Keith was furious that Lorinda would -- was filing for

23  divorce and that it was in the newspaper.  I witnessed Keith

24  have Cathie write a note pretending like she was a nurse that

25  witnessed Lorinda having an affair with a doctor.  He asked Jay

1  to help him wipe out all the money in his money market account

2  and use my account to put the money into.  He wanted to hide

3  everything he could from Lorinda.  There was about a half a

4  million dollars in the safe.

5      He gave me a gifted bonus payment to help him mess around

6  with the P and L of the company that would be submitted to her

7  attorney.  He wanted me to manipulate anything we had to show

8  her attorney.  I privately met with Lorinda behind Keith's back

9  and gave her some financials as proof and was extremely nervous

10  about this as I was afraid of what Keith would do to ever me if

11  he found out, but I felt so bad for Lorinda.  Keith told me if

12  he could hire a hit man right now, he would; and I believe he

13  would have done it.

14      Keith would pay back to watch -- Keith would pay people to

15  watch her and try to get something on her.  Cathie would come to

16  me regarding charges of Keith of how to write them off.  We

17  would sometime text -- sometimes text Keith, and he would tell

18  us to figure it out.  Zach, who worked in the office, would

19  sometimes come to me and ask to do the billing invoices as Keith

20  kept some of the job money.

21      Keith purchased Best Shots in 2000 -- like, the end of

22  2015.  He wanted a bar and bought one.  He purchased Best Shots

23  without telling Lorinda.  He was spending all the time at the

24  bar and leaving Jay with the heavy load of Kasco.

25      With the new bar, I did all the business setup, state and

1  business taxes, and helped with purchase of the liquor license

2  for Best Shots.  Keith poured a ton of money and workers from

3  Kasco of Idaho to build Best Shots.  Jay was taken away from his

4  project management role to be at Keith's beck and call for Best

5  Shots.  Keith told me that only a certain kind of girl can work

6  at Best Shots.  There was always drama with the woman he hired

7  at the bar.  Sometimes (sic) later -- sometime later, he hired

8  Mona Rupp as a waitress and then quickly promoted her to

9  manager.  He bought Mona a car, which was purchased from cash

10  Jay took from the safe.  Keith paid me to help set up this

11  business.

12     There were other companies I helped Keith set up.  One

13  specifically was a motorcycle company.  Helped him get a liquor

14  license for another place in Rathdrum.  He met a woman and

15  agreed to buy her liquor license so he could open a barber shop

16  in Rathdrum and run the liquor license through the business,

17  which ended up with the woman so angry as Keith -- at Keith

18  because she was someone else that had gotten bulldozed over by

19  Keith.  Their liquor license was lost, and the woman was out of

20  a lot of money.  Keith did not care.

21     Every year I was told my salary would increase, but it

22  would not be reflected on my W-2s.  And my W-2s continued to

23  decrease.  At this point, we were in so deep I didn't even think

24  we even realized it anymore what was legitimate and what wasn't.

25     In 2017, I again talked with Keith about my salary and

1  again asked him to just give me a 1099.  He put the conversation
2  off again.  He said that people in the office could not know the
3  amount he was paying me and could not know how money was being
4  moved around.  These conversations always came with gifts.  He
5  would pay for things in my life, new stuff in our home, sponsor
6  the kids, and give me cash to help.

7      Lorinda and Keith worked out their differences and got back
8  together.  However, the condition was that Keith had to sell the
9  bar.  She knew he was having an affair with Mona, the one --
10 that one was one of the lines Lorinda had drawn.  He may have
11 told her that he was not drinking and that the affairs had
12 stopped, but it was far from the truth.  Keith gave Jay stuff on
13 the side sometimes for selling stuff for him.  Keith spent
14 majority of his time at Best Shots and would have me meet him
15 there to discuss work stuff instead of meeting at Kasco.  I saw
16 large amounts of cash in the safe when I was there.  Keith would
17 move money from safe at Kasco and at Best Shots.

18     When Zach left, I talked Keith into putting Cathie back on
19 salary of $65,000 as she was taking on some of Zach's roles and
20 coming back into the office five days a week.  It was short
21 lived from 2 of 2017 to 5 of 2017 as he really couldn't stand
22 her and hated her coming in five days and paying her a salary.
23 He would blame it on the company not doing well.

24     Keith hired Kerrie Smith.  Cathie was angry because Keith
25 was messing with her salary and days and blamed it on the

1 company not doing very good but had the funds to bring on a new

2 employee.  I ended up training Cathie (sic) to help me do

3 accounting for Best Shots and put Kerrie on the Best Shots

4 payroll.  Keith had me switch Kerrie to Kasco of Idaho's payroll

5 because he was worried about how things would look.  He wanted

6 Kerrie to do some of Cathie's job but didn't want me to give her

7 passwords yet to QuickBooks.  This caused a lot of tension in

8 the office.

9      Kerrie was a hairdresser and is now in my old position with

10 Kasco, and Keith has her sign his name on important documents.

11 I believe he is using her like he used me.

12      In 2018, my combined salary of Kasco and Best Shorts was

13 180,000; but that was not reflected on my W-2.  Keith was trying

14 to sell Best Shots, and there was no one interested in buying.

15 Lorinda wanted the bar gone because of how much time he was

16 spending there and the affair he was having with the bar

17 manager.  He said if the place burned down, he would get more

18 money from it than selling it.  He had me investigate the

19 insurance a week before the fire happened.  On September 17th,

20 Keith's birthday, the fire at Best Shots happened.  We talked

21 privately in my office a few days after the fire about the fire,

22 and I told him the rumor is Lorinda burned it down because you

23 weren't getting rid of it.  And he laughed and said, "If you

24 want something to happen, it will happen."  I asked him, "What

25 did you do?"  He told me that an electrical spark came from a

1 basement with an LED light bulb.

2      Keith wanted us to give Mona three months of salary.  I had

3 Kerrie and Mona help me with the insurance and anything they

4 needed us to provide them as Keith wanted the insurance check.

5 Keith told me not to tell anyone or the employees that he had no

6 intention of putting the money back into the business to fix

7 what the fire did and to just tell the employees to go file

8 unemployment and we don't know when it will open back up.

9      In the meantime, Keith just wanted to sell the building as

10 it -- as is and collect the insurance money, the sale of the

11 liquor license, and the building.  Keith told me that he wanted

12 Mona to remain on payroll.  She was the only employee that did

13 not get unemployment.  Keith still gave me my salary from Best

14 Shots and bonus money for helping him deal with the fire at Best

15 Shots.  He had me go to the bank and had me open an account that

16 had only our names on the account.  He did not want Lorinda to

17 know and that -- that is where the $400,000 insurance payout and

18 the account was in me and his name.

19      Kasco owed a lot of money to the IRS, and Keith was

20 furious.  He blamed me saying I didn't write off enough in the

21 company; and it was my job to pay attention to the numbers

22 before they are turned in, which I was constantly going over the

23 financials with Keith.

24      Things at Kasco were tense, and Kasco was not getting the

25 same big bids.

1      Cathie Bailey ended up giving her notice and took a

2   different job.  This gave Kerrie a bigger role with the company.

3   She was bored and said she didn't have much to do.  Jay quit

4   Kasco of Idaho and told me if I ever needed to know anything

5   that everything was on the server.  He told me that he was

6   afraid of Keith.

7      We had an investigator with the Federal L & I show up for

8   payroll audits as an employee turned Keith in.  I was a wreck

9   because I know that my salary and W-2 did not match, and I could

10  be in serious trouble for tax evasion.  Keith insisted I deal

11  with the L & I audit.  I asked for the CPA to handle the

12  situation and he told me "No."

13     During this period, I again told Keith I no longer wanted

14  to get paid under the table nor do I want to use my account any

15  more to get him cash and to use as write-offs.  He asked me to

16  wait until the L & I was over and then we could get my salary

17  fixed.  I now know that he was just using me to get the L & I

18  audit done for him.

19     I know that Keith and I were both scared about the audit

20  and trying to figure out what we could do.  I told Keith that we

21  needed to figure out how to handle this together, but that was

22  not Keith's plan.  He knew right then and there the only person

23  that would take the fall, and that was me.

24     There are two sides to this story.  I'm not giving an

25  excuse for what I did in this case, but I want the Court to know

1  that there is more to this story than what you have heard.  I

2  truly, truly accept responsibility for my role in this.  Money

3  was moved that did not belong to me.  Money was taken that did

4  not belong to me.  I used company funds to pay my credit card.

5  I am accountable for what I have done; and for that, I am sorry

6  for what I have done.

7      Keith posts about me online, Facebook and other social

8  media; he sends threatening messages to anyone that supports me

9  or cares for me; there has been damage done to our homes in

10 Montana; there have been notes left for our renters that they

11 should leave the premises; and so much more.  This is what I

12 have lived for the last three years.  And we have said nothing,

13 and we have done nothing.

14     I know what Keith is capable of and have been afraid to

15 leave my house.  His conversations in public have me scared to

16 leave.  I have anxiety and panic attacks.  My family has

17 struggled with anxiety because of the threats Keith has made.

18     The last three years have been the hardest years of my

19 life.  I have struggled and struggled emotionally, physically,

20 and mentally.  My family has suffered and struggled because of

21 my decisions and my choices.  This has been an excruciating time

22 for me and my family.  I have not been in the local grocery

23 store, post office, or anywhere with fear that Keith or someone

24 he knows will see me and say something to me.  I missed half of

25 my daughter's events over the last few years for fear of seeing

someone or the anxiety that I have to show up in the gym as
people are looking and pointing at me.  I have brought enough
shame to my family, and I don't want to cause them any more pain
or hurt.  I have not posted or had social media for the last
three years but have certainly seen all the horrible things
posted about me and my family.  I have lived a life of seclusion
because of everything that has happened.

I look back on the time I spent working for Kasco and ask
myself over and over -- I knew within the first few weeks I
began working for the business that I was being asked to do
shady things.  I should have quit.  Why didn't I?

And the honest answer is that Keith made me feel confident,
and I felt important.  I had a title that people respected.  I
was not someone who had gone into a big school and had much
education, but someone from a small town offered the opportunity
to be a CFO.  And then the gifts, the bonuses, the support for
my children, the fancy dinners, the outings to the bar, the
Gonzaga basketball games, the loans for our homes, all the
support I felt Keith was giving to my family.  We felt like big
fish in a small pond.  I should have quit because when something
is too good to be true it really is.

I realize I'm going to prison.  I will do everything I can
to take advantage of the programs that are offered in custody.
I believe the RDAP program would benefit me.  I want to take
classes and spend my time productively.

SENTENCING HEARING - SEPTEMBER 16, 2022
COURT'S ORAL PRONOUNCEMENT OF SENTENCE

1    To my family, friends, and support system who has been with

2  me during this very long and difficult three years, I want to

3  thank you for supporting me and being a part of our lives during

4  a very difficult time.  Your unwavering support and love have

5  meant the world to my entire family.

6    My attorneys have been amazing; not just my attorneys but

7  also some of my only friends when I feel like I have no friends.

8  A counselor, not to talk to but somebody that I feel like I can

9  vent to.

10    My husband, who stepped up to the plate, held his head up

11  high, and walked into our community, walked into his work, and

12  showed our family what a rock is supposed to be.

13    Judge Nye, thank you for giving me the time to share with

14  you this morning.  I accept what you believe is an appropriate

15  sentence and will continue to grow and learn from this

16  experience.  I will make the time in custody productive and,

17  when I am released, begin to do -- begin -- begin to right the

18  wrongs I have done.

19    Thank you.

20    THE COURT:  Thank you.  Under the Presentence Report,

21  the defendant qualifies under Section 3E1.1(a) for a two-point

22  reduction in the offense level for acceptance of responsibility.

23    Is the Government making a motion under 3E1.1(b) for the

24  third point of reduction for timely acceptance?

25    MS. WHELAN:  We are, your Honor.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1    THE COURT:  I will grant the motion.  I will note that

2  the recommended Presentence Report calculation anticipated

3  defendant would be given the full three-point credit.

4    I'm also going to say, though, shifting blame from the

5  person who plead guilty to the victim can be tantamount to not

6  accepting responsibility; but I understand this is a complicated

7  and complex case.

8    I will give the benefit of the doubt to the defendant.  I

9  will allow her to have that three-point reduction.  Without it,

10  the guideline sentence would be somewhere in the range of 70 to

11  87 months.  So by giving it, it cuts the range down to 51 to

12  63 months.

13    The adjusted offense level is 24, which, with a Criminal

14  History Category of I does yield a guideline range of 51 to

15  63 months as one of the factors that I am to consider.

16    In addition to what has already been said in fashioning a

17  sentence here, the Court has taken into account the factors

18  enumerated in 18 USC §3553(a), including the following factors:

19    First, I looked at the nature, circumstances, and

20  seriousness of the offense.  The defendant is before the Court

21  today having plead guilty to wire fraud.

22    Beginning in 2012, defendant was employed as a bookkeeper

23  for Kasco of Idaho, LLC, and Kasco Communications, LLC.

24    Between 2013 and 2019, she admitted that she wrote or

25  caused to be written at least 341 fraudulent checks from Kasco's

1  bank in furtherance of her scheme to defraud.  She defrauded the

2  company and unlawfully obtained fraudulent proceeds of at least

3  $3,673,000 -- 674,338.86 through her conduct.

4      She used fraudulently obtained funds to purchase real

5  estate, including property in Post Falls, Osburn, and

6  Smelterville, Idaho, as well as two properties in St. Regis,

7  Montana.

8      She further spent money she embezzled from Kasco at spas,

9  travel for herself, her family, her friends, and other personal

10 endeavors.

11     In addition to the embezzled funds, the victim is seeking

12 legal fees and interest on a loan taken out to cover the

13 expenses of projects and company expenses he claims is related

14 to the stolen money.

15     Defendant was released from custody on standard conditions

16 of release, including Pretrial Service Supervision on

17 March 11th, 2020.  She has complied with all conditions of

18 release.

19     Second, I looked at the history and characteristics of the

20 defendant.  She is a 49-year-old female.  She was born in

21 Miles City, Montana, and was raised in a loving and stable

22 environment by both of her parents.

23     She's resided in Idaho since approximately 1998.

24     She has been married on two occasions.  Her first marriage

25 ended in divorce in 2000.  She has four children with her

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1 ex-husband ages 32, 30, 28, and one daughter who passed away

2 during infancy.

3      She married her current husband, Norman Welch, in 2002.

4 The couple have two children together ages 21 and 18.

5      The defendant has no physical health concerns for

6 consideration.  She does have some history of mental health

7 concerns dating back to 2019 when she was diagnosed with anxiety

8 and panic attacks.  She further suffers from post-traumatic

9 stress disorder from the loss of her infant daughter.  She has

10 no history of substance abuse.  She consumes alcohol socially

11 and in moderation.

12      She attended school in Montana and graduated in 1991.  She

13 went on to attain a cosmetology certificate as a nail technician

14 in 2010.

15      She was employed for Kasco of Idaho between 2012 and 2019

16 when she was terminated due to the instant federal offense.

17      She recalled performing various duties, including office

18 work, accounts payable and receivable, taxes, and accounting.

19      She has been unemployed since March of 2020.

20      While the defendant's Criminal History Category is a I,

21 which is the lowest available, she has sustained a prior federal

22 financial offense, specifically, bank fraud.  And I know there

23 was discussion today about whether or not it was truly bank

24 fraud.  But the statute is entitled "bank fraud" and that is

25 what she pleaded guilty to.

*SENTENCING HEARING – SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1    She completed a five-year term of supervised release for

2  that crime.  She paid a total of $15,000 in restitution and her

3  supervision was terminated successfully in April of 2002.

4    She has not sustained any additional convictions.

5    The third factor I looked at was the need for the sentence

6  imposed to reflect the seriousness of the offense, to promote

7  respect for the law, and to provide just punishment for the

8  offense, to afford adequate deterrence to criminal conduct, to

9  protect the public from further crimes of the defendant, and to

10  provide the defendant with needed educational or vocational

11  training, medical care, or other correctional treatment.

12    The fourth factor.  I looked at the sentence and sentencing

13  range recommended by the United States Sentencing Commission

14  Guidelines together with the sentencing goals and policies of

15  the Sentencing Commission.

16    The fifth factor.  I looked at the need to avoid

17  unwarranted sentence disparities among defendants with similar

18  records who have been found guilty of similar conduct.

19    And the sixth factor.  I have looked at the need to provide

20  restitution to any victims.

21    Based upon all of those factors, I have come up with what I

22  believe is an appropriate sentence in this case.  There are

23  still some things that I want to say, however.

24    I am going to say a few things before I impose sentencing.

25  I'm sure that, in doing so, I'm going to offend nearly everyone

1  who's in the courtroom.

2      But I feel it is important as a judge, as the person

3  ultimately responsible for sitting in judgment on a fellow human

4  being, to say what I think with clarity and with precision.

5      I will begin by saying I do not appreciate receiving

6  letters, character letters or otherwise, the afternoon before

7  sentencing.  Every one of you, lawyers included, have known this

8  was the day for sentencing for quite some time.  To hand me a

9  massive amount of letters one day before sentencing is unfair to

10  me, it's unfair to the defendant, and it's unfair to the

11  Government.

12      My calendar is extremely crowded.  I have over 250 criminal

13  cases at any given time and almost as many civil cases.  To hand

14  me this volume of letters shortly before sentencing and expect

15  me to read them all is both unfair and naïve.

16      However, I take my role in society very seriously.  I know

17  that in a few minutes I have to impose a sentence on a person

18  who stands before me having plead guilty to a very serious and

19  egregious crime.  I know I cannot do justice without first

20  having done my job.  So I stayed up until almost two o'clock in

21  the morning last night reading every one of the letters

22  submitted to me at the last minute.  I did it, but I don't

23  appreciate doing it.  There's simply no reason and no excuse for

24  letters coming in that late.

25      At this late moment, the Government has had no chance to

SENTENCING HEARING - SEPTEMBER 16, 2022
COURT'S ORAL PRONOUNCEMENT OF SENTENCE

1  verify the veracity of the contents of those letters; but I'm

2  not going to postpone sentencing to allow them to do so.  This

3  case needs to end.  It's dragged on long enough.  It's time to

4  put a stop to all of this so that people can begin to move on.

5       I will say that I found the content of some of those

6  letters given me yesterday to be very, very troubling.  If there

7  is even a grain of truth in those letters, then I have to say,

8  Mr. Sims, shame on you.  You have no right to act out as a

9  vigilante to try and destroy people in the community simply

10 because they still cling to hope that the defendant is a good

11 person.  If people are violating a stay order, then that should

12 be taken to your lawyer, to the Government, or to the judge that

13 issued that order.  You cannot write threats on social media or

14 text to those people.  If you're doing the kinds of things

15 claimed in those letters -- the harassing, the intimidation, the

16 threats -- it must stop and it must stop now or you may find

17 yourself charged with crimes of your own doing.

18      Now, having said that, my intention with sentencing is not,

19 as Mr. Welch suggested in his letter, to hold the defendant to

20 answer to the victim's alleged lies.  My intention with

21 sentencing is to hold the defendant to answer for her own lies,

22 deceit, and thievery and to do that based upon her own guilty

23 plea, her own admission, and her own conduct.

24      This was not a momentary lapse of judgment, a one-time

25 mistake.  It was six years of calculated, contriving, criminal

1  conduct by the defendant, and having the intention of helping

2  her family, although expected and anticipated of every parent,

3  it is not justification for injuring other families, other

4  employees through criminal conduct.  Wanting to do better for

5  your children is no excuse for the crime defendant has admitted

6  and plead guilty to in this case.

7      I do not understand how it can be said that the victim here

8  is at fault for grooming the defendant to commit crimes.  Shady

9  business practices, if they exist, does not give anyone the

10 right or the license to steal this much money from a business.

11 And when the defendant already has a prior conviction for fraud

12 and spent five years on federal supervised release for this very

13 type of crime, you have to wonder who groomed whom.

14     It's amazing to me how charitable and contributing to

15 society people can see a defendant who is using ill-gotten gain

16 stolen from hard-working people.

17     Even after that, defendant confesses to a fraud crime of

18 this magnitude, her circle of friends and families still claim

19 she is the victim, she is the heroine of the community.  I

20 understand supporting her fully and completely and standing by

21 her side, and I would expect nothing less from friends and

22 family.  But to try to pass the blame onto others when she's

23 already admitted guilt, I -- I don't phantom how you do that.

24     I do not understand how a woman, who brought millions of

25 stolen dollars into a family's household finances, can be

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1  considered as being honest to her children and her husband and

2  how they did not know something was seriously amiss in their own

3  family budget.  A lot of the letters I read put the blame on the

4  company or on Mr. Sims because no one in their right mind could

5  miss $4 million leaving the company with -- unaccounted for.  I

6  don't see how that's any different than a family, especially a

7  husband, who does not see $4 million come into the household in

8  six years unaccounted for.  It simply baffles my mind.

9       This was not a bad choice the defendant made once in her

10  life.  It was a crime each and every time she stole money from

11  her employer.  341 fraudulent checks she wrote.  She put the

12  money into her family's coffers 341 crimes in six years.

13       That's what she's being sentenced for here today.  And if

14  there's any sentence to be imposed on Mr. Sims, that may come in

15  front of me at a later time and a later place; but it is not

16  part of today's proceedings.

17       Now, having said all that, I want to make it clear.  I'm

18  venting.  What I've said does not change the sentence I'm

19  imposing today.  I'm still going to give a guideline sentence,

20  and I'm still imposing the low end of the guideline sentence --

21  of the guideline range.

22       So, Ms. Welch, if you'll please stand for sentencing.

23       The defendant, Trina Marie Welch, having entered a guilty

24  plea to Count 6 of the Indictment and the Court being satisfied

25  that you are guilty as charged, I hereby order and adjudge as

*SENTENCING HEARING – SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1  follows:

2      Pursuant to the Sentencing Reform Act of 1984, it is the

3  judgment of the Court that the defendant is hereby committed to

4  the custody of the Bureau of Prisons to be imprisoned for a term

5  of 51 months.

6      It is further ordered defendant shall pay to the United

7  States a special assessment of $100, which shall be due

8  immediately.

9      Based on the defendant's current financial situation, it is

10  recommended that any fine in this case be waived.

11      It is further ordered that the defendant shall make

12  restitution to the Clerk of the Court in the amount -- in the

13  amounts as follows:

14      To Kasco of Idaho, LLC, $2,000,673.90 -- I'm sorry.

15  $2,673,934.

16      To Alaska National Insurance, $1 million.

17      I'm having -- I'm struggling with the last restitution

18  amount.  I'm just not sure there was sufficient evidence to

19  support that that was all part of this loan.

20      Ms. Whelan, can you tell me how much of the 335,000 went to

21  legal fees?

22          MS. WHELAN:  I can, your Honor; and I would recall

23  that there were parts that defense did not object to.  One

24  moment.

25          THE COURT:  I don't think it was either of those --

1  either the interest or the loan amount.  I think they objected

2  to both of those.

3      MS. WHELAN:  The legal fees for assisting the United

4  States was $4,303.76.

5      THE COURT:  That amount I will certainly order be

6  paid.

7  The loan amount?  I can't sit here in good faith and fair

8  conscience say that that was all tied to this theft rather than

9  other things that happened at the company.  I'm not going to

10  award the loan or the interest on the loan.

11  All monetary penalties are due and payable immediately.

12  However, having considered the defendant's financial resources,

13  the Court orders payment under the following schedule unless

14  modified by the Court at a later time:

15  While in custody, the defendant shall submit nominal

16  payments of no less than $25 per quarter.  That's pursuant to

17  the Bureau of Prisons' Inmate Financial Responsibility Program.

18  Then, during the term of supervised release, defendant shall

19  submit nominal monthly payments of 10 percent of her gross

20  income but not less than $500 per month.

21  The foregoing does not preclude collection efforts under

22  18 USC §3613.

23  Upon release from imprisonment, defendant shall be placed

24  on supervised release for a term of three years.  Within

25  72 hours of release from the custody of the Bureau of Prisons,

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1  defendant shall report in person to the probation office in the

2  District to which the defendant is released.

3       During the time of your supervised release, you must comply

4  with all of the mandatory standard and special terms of

5  supervised release as stated in the Presentence Investigation

6  Report, as outlined in the Judgment that will come out in this

7  case, and as otherwise stated here in open court today.

8       Counsel, did you review the terms and conditions in the

9  Presentence Report with your client?

10          MR. ROBERTS:  Yes, we did, your Honor.

11          THE COURT:  Does she have any objection to them?

12          MR. ROBERTS:  No, your Honor.

13          THE COURT:  Ms. Welch, do you understand that, if you

14  violate the terms of supervised release, you can be brought

15  before the Court and a further sentence of incarceration can be

16  imposed?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  You have agreed to the forfeiture

19  allegation in the Indictment.  Accordingly, the property

20  identified in the Plea Agreement and the Preliminary Order of

21  Forfeiture is deemed forfeited and a final Order of Forfeiture

22  will now issue.

23       Typically, a defendant has the right to appeal their

24  conviction or their sentence.  However, defendant may waive that

25  right as part of a Plea Agreement.  You entered into a Plea

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1   Agreement that waives your rights except as specified within

2   that Plea Agreement.

3        Those waivers are generally enforceable; but if you believe

4   the waiver itself is not valid, you can present your theory to

5   the appellate court.  I will tell you that any Notice of Appeal

6   must be filed within 14 days after judgment is entered in this

7   case.  If you are unable to pay the cost of an appeal, you may

8   apply for leave to appeal without costs.  If you make that

9   request and if you qualify, the Clerk of the Court will arrange

10  legal representation for you and will prepare and file a Notice

11  of Appeal on your behalf.

12       There was a placement recommendation.  I will make that

13  recommendation that she be sent to Dublin.  That's in

14  California.  Right?

15            MS. RUBIN:  Yes, your Honor.

16            THE COURT:  Outside of San Francisco?

17            MS. RUBIN:  Yes.

18            THE COURT:  I'll set -- I'll recommend that she go to

19  Dublin.

20       I will also recommend that she do the RDAP program.  I know

21  she does not have an addition for alcohol or illegal drugs, but

22  I did see in the record that there is probably some type of

23  addiction for gambling.  And I think the RDAP will apply to

24  that.

25            MS. RUBIN:  Thank you.

*SENTENCING HEARING - SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1    THE COURT:  Now, as far as the voluntary surrender --

2  well, let me see if I have anything else I want to note.

3    Oh, let me say this:  I know Mr. Sims asked for more than

4  51 months.  I will say that the bottom line here is that I

5  believe 51 months is appropriate for this crime.  I have -- and

6  whether -- frankly, whether the offense level went up by 16 or

7  18 -- in other words, whether the level of loss was 1.5 million

8  or 3.5 million -- I believe 51 months is appropriate and is

9  within the guideline.  I have to balance punishment, deterrence,

10  and restitution; and sometimes those intersect and compete or

11  even conflict with each other.

12    MS. WHELAN:  Your Honor?

13    THE COURT:  Yes.

14    MS. WHELAN:  As part of the restitution order, will

15  the Court -- and I believe you said you would.  I just can't

16  remember -- include that the restitution should be paid to Kasco

17  first before the insurance company pursuant to the statute?

18    THE COURT:  I said that earlier.  I did not say it

19  during sentencing so I'll say it now.

20    MS. WHELAN:  Thank you, Judge.

21    THE COURT:  Restitution is to be paid to Kasco before

22  it goes to the insurance company.

23    MS. WHELAN:  Thank you, sir.

24    MS. RUBIN:  Your Honor, I may have missed this and I

25  apologize; but I don't know if you said anything about the

SENTENCING HEARING - SEPTEMBER 16, 2022
COURT'S ORAL PRONOUNCEMENT OF SENTENCE

1  interest yet with respect to restitution.  I -- I just --

2          THE COURT:  I'm glad you guys are catching me on this.

3  It is my intent and I am hereby ordering that restitution is

4  owed but interest will not be paid on that restitution.

5          MS. RUBIN:  Thank you.

6          THE COURT:  Otherwise, she will be in a hole that she

7  will never get out of.

8          MS. RUBIN:  Thank you.

9          THE COURT:  Now, I understand that Ms. Welch says this

10  was a theft between two people.  That may or may not be true.

11  But my role today is to sentence the one person in front of me

12  who has plead guilty, and that's what I'm doing.

13      I know there's been a lot of talk about conduct since

14  getting caught and how that has impacted the family and the

15  defendant.  My response is, no, it's the crime that's impacted

16  the family and the defendant.  Maybe it wasn't handled the best

17  of ways by the public or by certain people, but this all came

18  about because of the criminal conduct.

19      I don't see the other note I was going to read so I will

20  say this:  Section 3143 does allow to keep a defendant out until

21  sentencing.  In order to do that, it says that I have to find

22  defendant has met the clear and convincing burden required to

23  voluntarily surrender.

24      I will note that she has done a very good job while on

25  pretrial release.  However, given the amount of money here,

*SENTENCING HEARING – SEPTEMBER 16, 2022*
*COURT'S ORAL PRONOUNCEMENT OF SENTENCE*

1  given the sentence here, I do not find there is clear and

2  convincing evidence for voluntary surrender; and I hereby remand

3  the defendant to the custody of the Marshals at this time.

4          MR. ROBERTS:  Your Honor, I understand the Court's

5  ruling on that.  I wanted to ask, though, if it would be

6  possible to allow for an hour for her to say good-bye to her

7  family and then we would walk her down to the Marshals?

8          THE COURT:  I am -- that's out of my control.  I've

9  remanded her to the Marshals.  It's up to them what they do.

10      Anything further from the Government?

11          MS. WHELAN:  No, your Honor.  Thank you.

12          THE COURT:  I will say she has had many, many weeks

13  since the last hearing to say her good-byes.  She's had many

14  years since she was charged to say her good-byes.  Another hour

15  shouldn't make a difference, and I'm not going to -- I'm not

16  going to give it to her.  I'll leave it to the Marshals, and

17  they will use their discretion.

18      Court is in recess.

19      (Court adjourned at 1:00 p.m.)

20

21

22

23

24

25

**GENERAL INDEX**

| | PAGE |
|---|---|
| Evidentiary Hearing - Day 2 - September 16, 2022...... | 77 |
| Court Admonishes Those Present Re:  Proper Courtroom Decorum........................................... | 77 |
| Court Reiterates What Happened During the August 3, 2022, Hearing....................................... | 78 |
| Defendant's Case in Chief........................... | 78 |
| Presentation by Mr. Roberts......................... | 79 |
| Plaintiff Presents no Rebuttal...................... | 90 |
| Closing Arguments.................................. | 90 |
| Court's Findings................................... | 92 |
| Sentencing Hearing................................. | 93 |
| Victim Impact Statements........................... | 94 |
| Advocate Statements for the Defendant............... | 97 |
| Sentencing Recommendation by Ms. Whelan............. | 112 |
| Sentencing Recommendation by Ms. Rubin.............. | 125 |
| Restitution Recommendation by Mr. Roberts........... | 142 |
| Rebuttal Argument by Ms. Whelan..................... | 144 |
| Defendant's Right of Allocution.................... | 145 |
| Court's Oral Pronouncement of Sentence.............. | 172 |
| Reporter's Certificate............................. | 190 |

1
<b><u>WITNESS INDEX</u></b>

2   **<u>PLAINTIFF WITNESSES:</u>**                                             **<u>PAGE</u>**

3   None

4   **<u>DEFENDANT WITNESSES</u>**                                               **<u>PAGE</u>**

5   None

6

7

8

9

10

11

12

13

14

15
<b><u>EXHIBIT INDEX</u></b>

16   **<u>NO.</u>**    **<u>DESCRIPTION</u>**                               **<u>ADMITTED</u>**

17   1    W-2 forms for the Defendant            80

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        I, RONELLE F. CORBEY, do hereby certify:

4        That I am an Official Court Reporter for the United States

5   District Court for the Eastern District of Washington in

6   Spokane, Washington;

7        That the foregoing proceedings were taken on the date and

8   at the time and place as shown on the first page hereto; and

9        That the foregoing proceedings are a full, true and

10  accurate transcription of the requested proceedings, duly

11  transcribed by me or under my direction.

12       I do further certify that I am not a relative of, employee

13  of, or counsel for any of said parties, or otherwise interested

14  in the event of said proceedings.

15       DATED this 27th day of September, 2022.

16

17       _____

18       RONELLE F. CORBEY, RPR, CRR, CCR
         Washington CCR No. 2968
19       Official Court Reporter for the
         U.S. District Court for the
20       Eastern District of Washington in
         Spokane County, Washington

21

22

23

24

25